## **EXHIBIT F**

**First Day Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES LLC, *et al.*,[1] | Case No. 17-_____ (_____) |
| Debtors. | **(Joint Administration Requested)** |

## DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Lawrence R. Perkins, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.    I am CEO and Founder of SierraConstellation Partners, LLC ("SCP"), headquartered at 400 South Hope Street, Suite 1050, Los Angeles, California, 90071.

2.    Effective December 1, 2017, I was appointed the Chief Restructuring Officer of WGC Independent Manager LLC, a Delaware limited liability company ("WGC Independent Manager"), which is the sole manager of Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors").[2] The sole manager of WGC Independent Manager is Beilinson Advisory Group, LLC, a Delaware limited liability company (the "Independent Manager").

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14225 Ventura Boulevard #100, Sherman Oaks, California 91423.  Due to the large number of debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the proposed undersigned counsel for the Debtors.

[2]    WGC Independent Manager is also the sole independent manager of 27 other Debtors, which Debtors indirectly own the Core Assets (as defined below) that are pledged in connection with the DIP Facility (as defined below).

3.      Concurrently with my appointment, SCP was retained by Woodbridge Group of Companies, LLC to provide support personnel to myself, in my role as the Chief Restructuring Officer, and the Debtors and certain of their non-debtor affiliates and subsidiaries (collectively, the "Woodbridge Group Enterprise").[3]

4.      Prior to my appointment, commencing on or about October 23, 2017, SCP was retained by Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to assist Gibson Dunn in discharging its duties as counsel to certain entities within the Woodbridge Group Enterprise and to provide such entities with advisory services with respect to their business operations and potential restructuring.

5.      Prior to my involvement with the Woodbridge Group Enterprise, I served as a chief executive officer, chief restructuring officer, chief financial officer, board member, principal investor, turnaround advisor, and strategic consultant to numerous companies across various industries, including asset management, real estate development, technology, automotive, consumer products, financial services, healthcare, retail, and telecommunications. In particular, I have served as chief restructuring officer for Katy Industries, Inc., Fuller Brush Company, Liberty Asset Management, Bethel Healthcare Inc., and Corinthian Healthcare, Inc.

6.      On the date hereof (the "Petition Date"), pursuant to the authority of WGC Independent Manager, each of the Debtors filed a voluntary petition for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

---

[3]      The Woodbridge Group Enterprise includes certain entities that have not filed a chapter 11 petition as of the Petition Date (such entities, the "Non-Filing Entities"), as illustrated by the Organization Chart (as defined below).

7.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases") and to support the Debtors' applications and motions for "first day" relief (collectively, the "First Day Pleadings"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, consultation with the Independent Manager, and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I have obtained this information in the course of my short tenure working with the Debtors and Gibson Dunn, and our investigation of the Debtors' operations and circumstances is ongoing.  To the extent that any information provided herein is materially inaccurate, we will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.      Overview of the Chapter 11 Cases

8.      To familiarize the Court with the Debtors, the Chapter 11 Cases and the relief sought in the First Day Pleadings, this First Day Declaration provides a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows.  Part I provides an overview of the Chapter 11 Cases.  Part II describes the Debtors' business operations, corporate structure, key liabilities, and estate assets.  Part III describes the events leading up to the commencement of the Chapter 11 Cases.  Part IV summarizes the overall restructuring goals the Debtors hope to

achieve by commencing these Chapter 11 Cases. Part V sets forth my basis for testifying to the facts underlying and described in each of the First Day Pleadings.

9.      The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated. As set forth in Part V, concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

10.     The Debtors intend to file a chapter 11 plan that implements the Debtors' proposed restructuring and that transitions the Debtors' real estate investment business to institutional financing sources. To this end, the Debtors have entered into an agreement with Hankey Capital, LLC (the "DIP Lender") pursuant to which it will provide the Debtors with up to $100 million in debtor in possession financing (the "DIP Financing") that will be secured by first priority priming liens on 28 properties (the "Core Assets") each owned individually by 27 of the Debtors. The DIP Lender has agreed to consider allowing the DIP Financing to be converted into exit financing, assuming certain conditions are satisfied (including confirmation that loan-to-value ratios and market conditions are in line with those existing at the closing of the DIP Facility); alternatively, the Debtors may pursue other financing sources to secure exit financing. The Debtors believe that the DIP Financing, combined with the ability to convert it into (or otherwise obtain) exit financing, will provide the necessary flexibility to restructure their business operations, as well as to engage in an appropriate dialogue with their creditor constituencies.

01:22617332.3

11.     The Debtors' proposed restructuring plan is designed to maximize the value of their business and assets, while restructuring their substantial debt load, to provide the maximum recovery possible to the Debtors' creditors.  With a deleveraged balance sheet, independent management empowering an organizational restructuring, and a committed lender that supports the Debtors' turnaround efforts, the Debtors will be poised to successfully emerge as a profitable real estate investment enterprise.  The Debtors seek to propose confirmation of a plan of reorganization before the end of 2018.

## II.     The Debtors' Business, Corporate and Capital Structure, and Assets

### A.     The Woodbridge Group Enterprise

12.     The Woodbridge Group Enterprise is a comprehensive real estate finance and development company.  Its principal business is buying, improving, and selling high-end luxury homes.  The Woodbridge Group Enterprise also owns and operates full-service real estate brokerages, a private investment company, and real estate lending operations.

13.     The Woodbridge Group Enterprise and its management team have been in the business of providing a variety of financial products for over 35 years, and have been primarily focused on the luxury home business for the past five years.  Since its inception, the Woodbridge Group Enterprise team has completed over $1 billion in financial transactions.  These transactions involve real estate, note buying and selling, hard money lending, and alternative financial transactions involving thousands of investors.  In total, the Woodbridge Group Enterprise has executed hundreds of significant transactions.

### (i)     Corporate Structure

14.     The Woodbridge Group Enterprise conducts its operations through a network of affiliated companies that own the various assets comprising its businesses.  These companies are

all directly or indirectly owned by RS Protection Trust, an irrevocable trust settled under Nevada law, of which Robert Shapiro is the trustee, or Mr. Shapiro or members of his family. Members of Mr. Shapiro's family are the sole beneficiaries of RS Protection Trust. A copy of the organization chart for the Woodbridge Group Enterprise (the "Organization Chart") is attached as Exhibit A.[4]

15.     The principal operations of the Woodbridge Group Enterprise are contained in three silos. *First* is Woodbridge Group of Companies, LLC, the principal operating company of the homebuilding enterprise. This entity has traditionally held the primary distributing bank account for the Woodbridge Group Enterprise and has managed contractual relationships with the architects, contractors, and construction companies engaged in the development of the Woodbridge Group Enterprise's properties.

16.     *Second* is the retail fundraising operation. This is managed by WMF Management, LLC ("WMF Management"), which directly owns seven fund entities (the "Funds").[5] The Funds were historically controlled by RS Protection Trust. Prior to the Petition Date, to facilitate the DIP Financing and administration of the Chapter 11 Cases, Mr. Shapiro, acting as Trustee of RS Protection Trust, contributed RS Protection Trust's undivided membership interests in WMF Management to Woodbridge Group of Companies, LLC, such that WGC Independent Manager now controls WMF Management (and, by extension, the

---

[4]     Please note that the version of the Organization Chart included with the *Consolidated Corporate Ownership Statement* filed with the Petitions incorrectly indicated that the entities on Schedule C are managed by WGC Independent Management, LLC, which is not the case. The Organization Chart attached hereto has been corrected to address this and effectively replaces the version of the Organization Chart included with the Petitions.
[5]     Another fund, Woodbridge Mortgage Investment Fund 5, LLC, was formed in October 2017, but is a Non-Filing Entity at this time since we are not currently aware of any operations in connection with that entity.

Funds). The Funds have raised money from thousands of retail investors by selling investments referred to as units (the "Units") and notes (the "Notes").[6]

17.     Units are non-voting equity interests in the Funds that entitle holders ("Unitholders") to distributions of available proceeds from the Funds (if any) consisting of a preferred return, return of capital, and profit participation. The terms of the Units of each Fund are generally similar, except with respect to distribution priorities.[7] In general, distributions to Unitholders (with, depending on the Fund, certain intervening distributions to the member of the Fund) are made as follows: (i) first, as pro rata distributions to each Unitholder until the Unitholder has received distributions equal to a certain percentage of its capital contribution per annum (from six to ten percent, depending on the Fund), (ii) second, as a potential redemption of the Unit (either at the request of the Unitholder or at the discretion of the relevant Fund manager), (iii) third, from five years after the investment date, as pro rata distributions to each then non-redeemed Unitholder until the Unitholder has received distributions equal to a certain "incentive" percentage of its capital contribution per annum (either one or two percent, depending on the Fund), and (iv) fourth, in certain Funds, from five years after the investment date, as pro rata distributions to each Unitholder of fifty percent of the cumulative profits of the relevant Fund that are earmarked for all Unitholders of the particular Fund. None of the Units has any voting rights (except to the extent specifically required by the Delaware LLC Act). The

---

[6]     Two of the Funds, Woodbridge Commercial Bridge Loan Fund 1, LLC and Woodbridge Commercial Bridge Loan Fund 2, LLC (collectively, the "Bridge Loan Funds"), have raised money only through Units and have not issued any Notes.

[7]     The Units of each Fund are governed by individual subscription agreements for each Fund. Each of the Funds is different, and the operation of the distribution priority "waterfall" is highly specific to each of the individual subscription agreements for each of the Funds. However, to give the court a general overview of the Unitholders' rights, we have attempted to summarize them in the general case. The description of the Unitholders' rights herein is qualified in its entirety by reference to the applicable Fund documents, including the subscription agreements.

Funds have issued Units with an estimated aggregate outstanding face amount as of the Petition Date of approximately $226 million held by an estimated 1,583 Unitholders.[8]

18.     Notes are short-term notes issued by the Funds (generally maturing within 12-20 months of issuance), which are secured by a pledge of certain promissory notes and related loan and security agreements, deeds of trust, or mortgages (described in more detail in the DIP Motion (as defined below)) owned by the Funds.[9]  Holders of Notes (each, a "<u>Noteholder</u>") are entitled to a fixed rate of interest generally ranging between 4.5 and 13 percent, payable on a monthly basis, and repayment of principal upon maturity.[10]  The Funds have issued Notes with an estimated aggregate outstanding face amount as of the Petition Date of approximately $750 million to an estimated 8,998 Noteholders.[11]

19.     *Third*, the Woodbridge Group Enterprise includes a network of special purpose vehicle entities ("<u>SPVs</u>") that hold real properties.  Specifically, the Woodbridge Group Enterprise includes over 200 separate active limited liability company SPVs (referred to herein

---

[8]     These numbers are drawn from a November 24, 2017 internal report, and as of the Petition Date, a more current estimate was not available.  The Debtors anticipate receiving updated numbers shortly after the Petition Date.

[9]     It appears that few, if any, Noteholders have taken proper steps to perfect their interest in the Notes pursuant to either of sections 9-312(a) or 9-313(a) of the Uniform Commercial Code ("<u>UCC</u>"), which provide that a security interest in promissory notes (such as the collateral securing the Notes) must be perfected by taking possession of the underlying notes or by the filing of a UCC-1 financing statement describing the underlying notes, respectively.  The Debtors have confirmed that no Noteholder is in possession of any of the collateral securing the Notes.  Further, on information and belief and based on an investigation, no Noteholder has filed a UCC-1 financing statement with respect to any of the collateral securing the Notes in Delaware, the jurisdiction of the Funds.  It therefore appears that any security interests held by the Noteholders is avoidable, such that the Noteholders' claims will ultimately be treated as unsecured claims in these Chapter 11 Cases.  The Debtors intend to commence adversary proceedings seeking the avoidance of these security interests.

[10]    Our description of the Noteholders' loan documents and rights therein is based on descriptions provided by management and a review of a sample of the relevant loan documents for each type of Lender Note.  While we believe these statements to be true in all cases, our diligence review of the documentation is ongoing.

[11]    As with the estimates of outstanding Units, these numbers are drawn from a November 24, 2017 report, and as of the Petition Date, a more current estimate was not available.  The Debtors anticipate receiving updated numbers shortly after the Petition Date.

as "PropCos"), 140 of which are Debtors, nearly all of which hold an individual real property

asset.  Most of the PropCos are, in turn, wholly owned by related SPVs (referred to herein as

"MezzCos" or "HoldCos"), the sole assets of which are the equity of the PropCos; a total of 127

MezzCos are Debtors.  Amounts required for the acquisition and development of the properties

were advanced to the PropCos and MezzCos by the Funds or on behalf of the Funds by

Woodbridge Group of Companies, LLC.[12]  Each of the PropCos and MezzCos issued secured

notes to the Funds.  The notes issued by each PropCo are secured by pledges of the real property

held by that PropCo.  The notes issued by each MezzCo are secured by a pledge of the MezzCo's

ownership interest in its PropCo subsidiary.

20.     Prior to December 1, 2017, each MezzCo and PropCo was managed by Mr.

Shapiro and wholly-owned (either directly or indirectly) by RS Protection Trust.  To facilitate

the DIP Financing and administration of the Chapter 11 Cases, prior to the Petition Date, Mr.

Shapiro, acting as Trustee of RS Protection Trust, contributed RS Protection Trust's membership

interests in 27 MezzCo Debtors to Woodbridge Group of Companies, LLC, which intends to

pledge the assets of these subsidiaries (and of their subsidiary PropCos) to the lender providing

the DIP Financing.  The remaining MezzCos continue to be owned by RS Protection Trust,

although they are now controlled, together with all the other MezzCos and PropCos, by the

Independent Manager through WGC Independent Manager.  A list of the MezzCo Debtors (and

the corresponding PropCo Debtors that they own) is included as Schedules A-1 and A-2 of the

Organization Chart.

---

[12]      The Debtors owe secured indebtedness to three third-party lenders in connection with three of their
properties.  Specifically, three of the PropCos—Bishop White Investments, LLC, Craven Investments, LLC, and
Grand Midway Investments, LLC (the "Third-Party Funding PropCos")—are funded by third-party notes issued by
805 Nimes Place, LLC, Ashley Land, LLC, and Tintarella, LLC, respectively (collectively, the "Third-Party
Funders") rather than by Noteholders. The properties held by the Third-Party Funding PropCos are not part of the
DIP Collateral, and any liens held by the Third-Party Funders in connection with these financing arrangements are
not being primed or otherwise impacted by the DIP Motion (as defined below) or the relief sought therein.

21.     In addition, the Woodbridge Group Enterprise includes three Non-Filing Entities that operate residential real estate and mortgage brokerage businesses: Mercer Vine, Inc., Riverdale Funding, LLC ("Riverdale Funding"), and Woodbridge Realty of Colorado, LLC (collectively, the "Brokerage Companies").  Riverdale Funding, located in Tennessee, is also engaged in the business of lending to third-party clients and servicing such loans.   Certain brokers employed by the Brokerage Companies own minority interests in their respective brokerages.  The Debtors anticipate entering into a shared services and discounted commission arrangement with these brokerage companies so that the Debtors can continue to benefit from their close relationship with the Brokerage Companies.

22.     A number of additional affiliated entities identified on the Organization Chart are owned directly or indirectly by RS Protection Trust.  Debtor Carbondale Doocy, LLC is the 100% owner of Woodbridge Group of Companies, LLC and has no material operations.  Debtors Whiteacre Funding, LLC ("Whiteacre") and Silverleaf Funding, LLC ("Silverleaf") manage foreclosure proceedings with respect to real estate owned ("REO") properties of the Debtors.[13] Debtor Woodbridge Structured Funding LLC and its subsidiary, Cuco Settlement, LLC, are structured settlement providers that purchase annuities and other future payment streams on the secondary market.  Debtors Woodbridge Capital Investments, LLC and Woodbridge Investments, LLC are lessees under certain office leases used by employees of the Woodbridge Group Enterprise.

---

[13]     Specifically, Silverleaf administers REO properties located in the state of Illinois, and Whiteacre administers REO properties located in states other than Illinois.  In general, when foreclosure proceedings are commenced with respect to properties of the Woodbridge Group Enterprise, the related loans are assigned to either Whiteacre or Silverleaf, which then administer the properties in connection with the foreclosure proceedings.

23.     The Non-Filing Entities holding material property include at least 13 MezzCos and 14 PropCos.  Bellflower Funding, LLC holds a portion of REO properties formerly held by other entities within the Woodbridge Group Enterprise that have not been assigned to the control of WGC Independent Manager.  Another 139 of the Non-Filing Entities are inactive PropCos and MezzCos with no assets or insubstantial assets.  We are continuing to conduct diligence on the remaining Non-Filing Entities.[14]

**(ii)     Management**

a)     <u>Prior Management</u>

24.     Mr. Shapiro is the Trustee of RS Protection Trust, which is, directly or indirectly, the sole member of most of the entities in the Woodbridge Group Enterprise.  Mr. Shapiro has been active in the real estate business since 1978.  He has managed the purchase, renovation, and sale of hundreds of properties during that time.  Until December 1, 2017, he managed and controlled, directly or indirectly, each of the entities within the Woodbridge Group Enterprise, and was also the sole Manager of most entities within the Woodbridge Group Enterprise.

25.     Due to the concerns expressed by federal and state securities regulators regarding the Woodbridge Group Enterprise's fundraising activities, Mr. Shapiro has agreed to empower an independent management team to take control of the Woodbridge Group Enterprise's assets and operations during the pendency of the Chapter 11 Cases to give regulators and Woodbridge Group Enterprise investors comfort that the business is being operated for the benefit of its creditors and stakeholders.  To accomplish this, prior to the Petition Date, Mr. Shapiro, acting as trustee of RS Protection Trust, which is or controls the member of each of the Debtors, removed himself (and his affiliates) as manager of all of the Debtors and appointed the Independent

---

[14]     The Debtors continue to investigate all intercompany claims with respect to these entities and reserve all rights.

Manager (through WGC Independent Manager) as further described below. Following this transfer of authority, Mr. Shapiro was also removed as an officer of the each of the Debtors for which he previously served in such capacity.

26.     Mr. Shapiro has unique experience essential to the continued operation of the Debtors' business. He has personally overseen and managed the selection, acquisition, and development of the entire unique portfolio of real estate assets held by the Woodbridge Group Enterprise. The Independent Manager and I believe that Mr. Shapiro's extensive familiarity with the Debtors and their assets is essential to maximizing the value of the Debtors' estates for the benefit of all stakeholders—especially on the contemplated expedited path to propose plan confirmation during 2018. Further, because Mr. Shapiro has significant rights with respect to the Debtors (in part in his capacity as trustee of RS Protection Trust), including the control rights that he agreed to turn over to the Independent Manager, reaching an accommodation with him is critical to avoid involving the Debtors in protracted, expensive, and complex litigation while the Debtors seek to stabilize their business and maximize asset value.[15] Accordingly, the Independent Manager and I have agreed to three negotiated accommodations with Mr. Shapiro to ensure his cooperation in connection with the Debtors' restructuring efforts.

27.     *First*, at the request of the Independent Manager and me, Mr. Shapiro has agreed to continue to provide consulting services through his controlled entity WFS Holding Co. LLC ("WFS Holding") pursuant to a Transition Services Agreement entered into with Woodbridge Group of Companies, LLC with the consent of the Independent Manager (through WGC Independent Manager). A true and correct copy of the Transition Services Agreement is annexed hereto as Exhibit B. Under the Transition Services Agreement, WFS Holding will

---

[15]     All claims have been reserved and will be evaluated and/or pursued through the bankruptcy process.

receive a consulting fee of $175,000 per month in connection with Mr. Shapiro's services. Based on an analysis conducted after discussions with compensation consultants for senior executives in the real estate industry, I believe this to be a fair-market consulting fee.

28.      *Second*, two PropCo Debtors own properties located in California and Colorado, respectively, which are currently used as Mr. Shapiro's personal residences.  With the consent of the Independent Manager (through WGC Independent Manager), these entities and certain of the Funds entered into that certain forbearance agreement dated as of December 1, 2017 (the "Forbearance Agreement") and those two certain subordination, non-disturbance, and attornment agreements (the "SNDAs") permitting Mr. Shapiro to continue to occupy these properties without fear of foreclosure during the pendency of the Chapter 11 Cases as long as the existing leases for such properties remain in effect.  Pursuant to existing leases with certain of the Debtors, rent is paid on these properties, and Mr. Shapiro intends to ensure that this continues. To the extent that he does not, remedies can be pursued under the leases notwithstanding the Forbearance Agreement and the SNDAs, and if the leases are terminated, the forbearance under the Forbearance Agreement and the non-disturbance under the SNDAs are also terminated.[16]  A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit C.  True and correct copies of the SNDAs are attached hereto as Exhibits D and E.

29.      *Third*, with respect to two properties held by Non-Debtor Entities within the Woodbridge Group Enterprise currently under contract to be sold (the "Contracted Properties"), RS Protection Trust is the sole equity holder of the equity in these assets.  RS Protection Trust has not authorized WGC Independent Manager to assume authority over these entities and these entities have not filed bankruptcy petitions.  We understand that Mr. Shapiro intended that these

---

[16]      Based on an analysis, I have confirmed that the lease on the Colorado property reflects market rent, while the California lease is below market.

01:22617332.3

properties were to be sold under the pending contracts and that Mr. Shapiro intended to avoid disruption of those closings resulting from the bankruptcy cases.

30.     We further understand that Mr. Shapiro intended to conduct the sale of the Contracted Properties in accordance with the Distribution Arrangement set forth in the Contribution Agreement, as further described in Paragraph 36, *infra*.  These homes are being sold to third-party buyers for fair market value.  We expect that the Notes relating to these properties will be repaid and substantially all the equity raised by the sale of the Contracted Properties will be remitted to the estates or reserved.  Assuming that Mr. Shapiro performs according to his stated intentions, this arrangement will provide the Debtors with needed liquidity while segregating excess proceeds of the sale for future resolution.  The Debtors have reserved all rights with respect to the Contracted Properties.

31.     One of the Contracted Properties was sold on November 30, 2017, when certain Woodbridge Group Enterprise entities closed the sale of the property located at 4540 Hazeltine, Sherman Oaks, California, which was held by non-Debtor entity Frog Rock Investments, LLC (the "Frog Rock PropCo").  Frog Rock Investments, LLC is owned by non-Debtor entity M77 Frog Rock Holding Company, LLC (the "Frog Rock MezzCo").  Out of an abundance of caution, the Debtors are holding the proceeds of this sale in a segregated account, subject to the liens of the Noteholders of the Frog Rock PropCo and Frog Rock MezzCo, if any.  Following the satisfaction of any such liens, the remaining proceeds will be distributed in accordance with the terms of the Proceeds Arrangement.  The other Contracted Property, located at 1001 Hanover Drive, Beverly Hills, California, is held by non-Debtor entity Deerfield Park Investments, LLC, which is owned by non-Debtor entity H10 Deerfield Holding Company, LLC.  I understand that the sale of this property is scheduled to close during the week ending on January 5, 2018.

01:22617332.3

b)      <u>Current Independent Management of the Debtors</u>

32.     It is paramount to the interests of the Debtors' creditors that it continue development of its portfolio of real estate assets, and that the rights, interests, and expectations of investors be permanently resolved through the contemplated restructuring to be implemented in the Chapter 11 Cases.  The continuing financial distress of the business, coupled with allegations of non-compliance with securities laws, has posed substantial hurdles to the Debtors' operations.  To implement a resolution of these issues, Mr. Shapiro has appointed independent management to operate the Debtors' business during the pendency of the Chapter 11 Cases.

33.     An important step in the restructuring process was ceding control of the business to a well-regarded, independent restructuring professional, who lends independence and professional leadership to the Debtors during this critical time.  The Debtors have turned to Beilinson Advisory Group LLC ("<u>Beilinson Advisory Group</u>") to serve as the Independent Manager.  Beilinson Advisory Group, a financial restructuring and hospitality advisory group that specializes in assisting distressed companies, is wholly-owned and controlled by its managing partner, Marc Beilinson.  Since founding Beilinson Advisory Group, Mr. Beilinson has served as chief restructuring officer and a director of distressed companies including Westinghouse, Caesar's Acquisition Corp., Fisker Automotive, Eagle Hospitality, Innkeepers USA, and MF Global Assurance Company.  Throughout his career, Mr. Beilinson has been active in the restructuring of complex commercial and retail real estate portfolios throughout the United States and has also specialized in restructuring retail chains.

34.     To effect the transfer of authority to the Independent Manager, RS Protection Trust created a new subsidiary, WGC Independent Manager.  RS Protection Trust, the sole member of WGC Independent Manager, appointed the Independent Manager as sole manager of

01:22617332.3

WGC Independent Manager.  Thus, Mr. Shapiro, acting as trustee of RS Protection Trust, exercised RS Protection Trust's ownership rights over certain of the Debtors to execute a written consent (the "Management Consent") removing himself and his affiliates as manager of certain of such Debtors and appointing WGC Independent Manager as replacement manager.  WGC Independent Manager is managed by the Independent Manager.  A true and correct copy of the Management Consent is attached hereto as Exhibit F.  Following execution of the Management Consent, a second consent (the "Removal Consent") was executed removing Mr. Shapiro from his capacity as an officer of each entity controlled by WGC Independent Manager.  A true and correct copy of the Removal Consent is attached hereto as Exhibit G.

35.     To further provide management support, following its appointment as sole manager of WGC Independent Manager, Beilinson Advisory Group acted to appoint me to serve as Chief Restructuring Officer of WGC Independent Manager.  In this capacity, I have become further familiar with the Debtors' day-to-day operations, business affairs, and books and records.

36.     Through these steps, Marc Beilinson and I have been empowered to oversee and manage all legal, financial, operational and transactional aspects of the Debtors' business for the duration of the Chapter 11 Cases.

37.     In addition to ensuring that the Debtors would be operated by experienced and independent managers, Mr. Shapiro also took steps to ensure that the Debtors could obtain additional liquidity sufficient to fund its operations during the pendency of the Chapter 11 Cases so that a comprehensive restructuring could be achieved.  Specifically, Mr. Shapiro executed that certain contribution agreement dated as of December 1, 2017 (the "Contribution Agreement") in his capacity as trustee of the RS Protection Trust.  A true and correct copy of the Contribution Agreement is annexed hereto as Exhibit H.  Pursuant to the Contribution Agreement, RS

Protection Trust contributed its membership interests in the MezzCo Debtors and WMF Management, LLC to Woodbridge Group of Companies, LLC.  Further, the Contribution Agreement implements the following arrangement (the "Distribution Arrangement") with respect to the proceeds of sales of properties held by the PropCo Debtors.  After all Notes issued by the PropCos holding the Contracted Properties and the MezzCos holding such PropCos have been satisfied in full, (i) 50% of any remaining proceeds up to a cap of $500,000 will be promptly paid to RS Protection Trust as an advance on any distributions to which it may be entitled as the member of the MezzCos, and (ii) any remaining proceeds will be retained by the PropCo.  This arrangement will provide the Debtors with needed liquidity while segregating excess proceeds of the sale for future resolution.[17]

38.     In short, although RS Protection Trust retains its economic interests in the Debtors, it has relinquished its control rights over them to independent third parties.

B.     **The Debtors' Capitalization**

(i)     **Assets**

39.     The Debtors' principal assets consist of a portfolio of 138 properties ranging in estimated value from approximately $50,000 to $150,000,000.  These properties are in various stages of development or renovation.  For completed properties or near-completed properties, valuation estimates are based on an analysis of comparable property sales, consultation with the Debtors' management, and consultation with third-party brokers and employees of the Brokerage Entities.  For not-yet-completed homes and "raw land" properties, valuation was based on an

---

[17]     Due to the need to repay the DIP Loan from the proceeds of any near-term sales, it is not anticipated that any cash will be distributed to Mr. Shapiro from sales of these collateral properties in the near term.  All rights have been reserved with respect to the estates' interests in these properties.

estimate of "as-is" value: i.e., an estimate of the price that could be obtained if the property were to be sold in its current condition, without further investment or development.  "As is" values are estimated through consultation with the Debtors' management, third-party brokers, and the employees of the Brokerage Entities. In the aggregate the Debtors' assets have an estimated value of $650 million to $750 million.[18]  This estimate is based on the foregoing analysis of property values with respect to the Debtors' real estate assets, and an analysis of the Debtors' books and records, including their most recent internal quarterly balance sheet report dated as of September 30, 2017.

40.    The Debtors' assets include cash on hand as of the Petition Date of approximately $12 million held in the Debtors' primary operating account held by Woodbridge Group of Companies, LLC (the "General Proceeds Account").  This cash was obtained in the ordinary course of the Debtors' business as excess proceeds of the sales of properties owned by certain PropCos, from certain third-party borrowers, through investments made by the Noteholders and Unitholders, and through other operations of the Debtors and the Non-Filing Entities, including the Brokerage Companies, Whiteacre, and Silverleaf.[19]  The funds in the General Proceeds Account from each of these sources, including any funds arising out of past property sales, have been combined.

---

[18]    Our valuation of the Debtors' assets is ongoing, and accordingly this estimated range is subject to continuing analysis and review.

[19]    According to the Debtors' books and records, to the extent that any sales proceeds were delivered in connection with the sale of properties held by any PropCos, the Noteholders with interests in those properties through their loans to the applicable Funds were repaid in full or released their interests in connection with the closing of the sale.  Accordingly, no party has a security interest in any of the funds held in the general proceeds account.

41.     In addition, the Debtors own a portfolio of REO properties in various jurisdictions, with an estimated book value of approximately $10 million to $20 million.  Aside from the foregoing, the Debtors do not own any other material assets.

**(ii)    Liabilities.**

42.     The Debtors have no funded debt with the exception of three properties that have seller financing.  As of the Petition Date, the Funds owe approximately $750 million to the Noteholders.  As of September 30, 2017, the MezzCos and PropCos owed approximately $865 million to the Funds.  In addition, the MezzCos and SPVs have limited funded debt obligations to third parties.

43.     In addition to the liabilities described in the prior paragraph, there appear to be substantial intercompany claims that are in the process of being reconciled.  There is also approximately $6 million in trade debt owed to vendors and contractors.  Finally, there are also substantial obligations owed to third parties by the various entities making up the Debtors under executory contracts and leases.

### III.    Events Leading to the Chapter 11 Case

A.     **Securities Investigations and Liquidity Concerns**

44.     Since 2012, the Woodbridge Group Enterprise has operated a steadily growing real estate acquisition and development business.  This is a capital-intensive enterprise in which large projects are undertaken, adding substantial value through major construction projects and generating strong profits.  Mr. Shapiro has sought to continue to develop and grow this business in spite of the ongoing securities investigations and the negative secondary effects arising therefrom.

45.    The costs of acquisition, renovation, and maintenance of the business have been met through the private fundraising operation described above.  As the size and scope of the business has grown, the operating and development costs, together with the costs of regulatory compliance have left the Debtors unable to continue to meet their obligations as they come due without a re-capitalization.

46.    Following a variety of inquiries from state and federal regulators, the Debtors have suffered increased compliance costs, unexpected litigation, and unfavorable press reports. These factors have made it difficult to complete the process of modifying and institutionalizing its access to capital.

47.    In particular, since September of 2016, the Debtors have been under investigation by the United States Securities and Exchange Commission ("SEC").  The SEC has been investigating certain Woodbridge Group Enterprise entities (including certain of the Debtors) in connection with possible securities law violations, including the alleged offer and sale of unregistered securities, the sale of securities by unregistered brokers, and the commission of fraud in connection with the offer, purchase, and sale of securities.  While certain discovery-related disputes regarding administrative subpoenas issued by the SEC are currently proceeding before the District Court for the Southern District of Florida, as of the Petition Date, the SEC has not asserted any claims against any Woodbridge Group Enterprise entities.  The investigation and the subpoenas do not mean that the SEC has concluded that any Woodbridge Group Enterprise entities or any affiliated persons have violated any laws.

48.    Aside from the SEC, certain of the Debtors have received information requests from state securities regulators in approximately 25 states.  These Debtors have produced responsive documents in connection with these inquiries, and a substantial majority of cases have

01:22617332.3

not progressed past the investigation and discovery stage.  The concerns raised by state

regulators have generally focused on the alleged offer and sale of unregistered securities,

including by allegedly unregistered agents.  Three of these inquiries were resolved through

settlements, which included the entry of consent orders.  Proceedings against certain Debtors are

currently pending in Arizona, Colorado, Idaho, and Michigan; in each case, the Debtors' pre-

petition management was engaged in advanced settlement discussions with the applicable

regulators prior to the commencement of the Chapter 11 Cases.  In the settled cases, the

Woodbridge Group Enterprise entities agreed to provide regulators with the identities of all

referral agents compensated by such entities in connection with the sales of private placement

loans, and to offer rescission to Noteholders for a period of thirty to sixty days.  By information

and belief, the applicable Woodbridge Group Enterprise entities have complied with all the

conditions of the settlement agreements.

49.    The Debtors intend to fully cooperate with the SEC and state securities regulators'

investigations, and believe that the concerns relative to the management of the Debtors have

been adequately addressed by the Debtors' prepetition internal restructuring of the Debtors'

management in connection with the commencement of the Chapter 11 Cases, including through

the appointment of the Chief Restructuring Officer and the shifting of authority to the

Independent Manager.  Further, the Debtors believe that their plan to reorganize under chapter 11

of the Bankruptcy Code will maximize recoveries for all of their stakeholders.

50.    To implement its transition and restructuring process, the Debtors have identified

an institutional source of capital and independent management team.  The Debtors intend to

obtain financing through the Chapter 11 Cases and restructure their obligations to its existing

investors in order to emerge with a solid financial platform to permit the Debtors to continue

their successful operations and maximize recoveries to their creditors.

B.     **Efforts to Secure Financing**

51.     One of the critical elements to the Debtors' restructuring efforts is the availability

of financing to fund the Debtors' anticipated cash shortfalls during the bankruptcy case, as well

as the need for financing upon emergence from chapter 11.  With the assistance of their advisors,

beginning on November 7, 2017, the Debtors contacted fourteen potential lenders to inquire into

their willingness to provide financing during the Chapter 11 Cases.  Of the potential lenders, the

Debtors executed non-disclosure agreements with eleven institutions and received formal term

sheet proposals from five.

52.     Based on the responses received from potential lenders, the Debtors faced two

primary hurdles in obtaining financing from traditional sources.  *First*, the Debtors' pre-petition

capital structure is complex, consisting of over 250 entities and with the Debtors' primary

assets—their real estate holdings—held by separate PropCos and subject to claims from separate

Funds and their respective Noteholders.  While the Debtors believe that the Noteholders' liens on

the Third-Party Collateral are not properly perfected[20] and are thus subject to avoidance, out of

an abundance of caution, at this stage in the proceedings the Debtors are making available

conditional adequate protection to the Noteholders providing that the Noteholders will receive

liens and claims on other Debtor assets to the extent of any diminution on any valid, unavoidable

interests the Noteholders may have in such assets as of the Petition Date.  *Second*, since

September 2016, the Debtors have been under investigation by certain securities regulators,

including the SEC.

---

[20]     See note 8, above.

01:22617332.3

53.     The Debtors were able to negotiate a DIP Facility with Hankey, which will provide the Debtors with up to $100 million in postpetition financing (with $25 million to be available on an interim basis) through the DIP Lender to fund the Debtors' costs and expenses during the Chapter 11 Cases.  While the Debtors received and considered proposals from four other potential lenders, in the Debtors' business judgment the proposal from Hankey was the best offer based on its superior economics, favorable terms, Hankey's strong background in the high-end residential real estate market and familiarity with the Core Assets, and Hankey's willingness to consider providing exit financing.  In fact, there were no other financing proposals available to the Debtors with superior economic terms.

54.     In addition, the proposed DIP Facility overcomes all of the hurdles that the Debtors faced in identifying a potential financing source.  *First*, Hankey agreed to provide the DIP Facility secured only by priming liens on a set of 28 of the Debtors' properties (the Core Assets); by lending solely against specified assets rather than insisting on a traditional grant of a security interest in substantially all the assets of all the Debtors, the DIP Lender has provided the Debtors with the flexibility necessary to fund its continuing operations and the ability to provide conditional adequate protection to the Noteholders in the form of replacement liens on certain of the Debtors' properties other than the Core Assets.  Thus, the DIP Lender has agreed to structure the DIP Facility in a manner that will allow for the Debtors' turnaround efforts to be fully realized.  Further, subject to satisfaction of several conditions (including confirmation that loan-to-value ratios and market conditions are in line with those existing at the closing of the DIP Facility), the DIP Lender has indicated its willingness to consider providing the Debtors with an option to convert any principal and interest owing under the DIP Facility into exit financing upon confirmation of an acceptable chapter 11 plan and the Debtors' successful emergence from

01:22617332.3

chapter 11.  Such exit financing would provide the reorganized Debtors with additional operating liquidity that would create an opportunity for the Debtors to successfully complete their turnaround and fund the chapter 11 plan.  In other words, Hankey could represent both an immediate and longer-term solution to the Debtors' current liquidity needs.[21]

55.    Accordingly, the Debtors are seeking an order through the DIP Motion (as defined below) authorizing the (a) incurrence of postpetition indebtedness through the DIP Facility, (b) granting of interests and superpriority administrative expenses, and (c) use of cash collateral.  The Debtors have conducted diligence on the DIP Collateral, including by reviewing all lien and title reports with respect thereto, and have confirmed that none of the DIP Collateral (as defined in the DIP Motion) is subject to pre-existing security interests (other than the potential interests of the Noteholders, as described above in Section II-A-(i)).  I have reviewed the DIP Motion and the factual statements therein are true and correct.  Attached hereto as Exhibit I is a an initial thirteen-week cash flow budget (the "Cash Flow Projections"), which sets forth on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures and all necessary and required cumulative expenses which the Debtors expect to incur.  I supervised the preparation of the Budget.

56.    The DIP Facility gives the Debtors appropriate flexibility during the Chapter 11 Cases.  The Debtors need the cash available under the DIP Facility to fund ongoing operating expenses as well as the necessary administrative expenses of bankruptcy.  The Debtors considered whether they could operate using only the cash generated from postpetition operations, and determined that they could only do so for a very limited period of time.  Without the DIP Facility, the Debtors would not be able to fund ongoing operating expenses, including

---

[21]    For the avoidance of doubt, the Debtors are not seeking approval of any exit financing at this time.

payroll, on an ongoing basis, and bankruptcy-related expenses during these cases. The Company's ability to remain a viable operating entity depends on obtaining the interim and final relief requested in the DIP Motion.

57.     The DIP Lender has indicated that the DIP Facility and the DIP Documents set forth the only terms under which they would agree to provide the Debtors' financing.

58.     The Debtors negotiated the terms of the DIP Facility at arms' length and in good faith, with all relevant parties represented by counsel. I believe that the negotiated terms are the best available under the circumstances.

C.      **Administrative Staffing Review**

59.     Due to the transition from retail to institutional funding and concerns raised by regulators, including the SEC, the Debtors ceased all fundraising efforts following the transfer of authority to the Independent Manager. The Debtors are aware of the issues that the SEC and state regulators have raised with respect to past fundraising efforts.

60.     The new, independent management team has had no involvement with the Debtors' past fundraising operations. The Debtors are taking steps to review the involvement of any employees or contractors in prior fundraising, and will act appropriately to ensure that all of the Debtors' employees are complying and cooperating with all regulatory requirements and inquiries. In the course of this review, the Debtors may place certain employees or contractors on administrative leave or take other appropriate actions pending an investigation of their involvement in this activity.

## IV.    Expectations for Chapter 11 Case

### A.    Financing the Chapter 11 Cases

61.    The first step in transitioning the Debtors from retail funding to an institutional capital source is the DIP Financing being obtained from the DIP Lender.

62.    A description of the Debtors' efforts to secure the DIP Financing is set forth above in Section III-B.  The DIP Financing will provide the Debtors with up to $100 million in postpetition financing (with $25 million to be available on an interim basis) through the DIP Lender to fund the Debtors' costs and expenses during the Chapter 11 Cases.  The DIP Financing will be secured solely by the Core Assets and any other assets of the 27 PropCo Debtors owning the Core Assets.

63.    With respect to adequate protection, a subset of the Debtors hold properties with substantial equity value.  Specifically, the Debtors propose to provide replacement liens on the Owlwood Estate property located in Los Angeles, California (the "Adequate Protection Property"), which, based on a valuation analysis using the methodology described in Section II-B-(i), *supra*, I believe to have a total equity value well in excess of the $25 million dollar initial balance of the DIP Facility to be available on an interim basis, and substantially exceeding any potential diminution in the value of the Noteholders' interests, if any, in the properties.  The Adequate Protection Property is set forth as Annex A of the Interim DIP Order (as defined below).  In addition, the Debtors are reserving funds sufficient to pay interest on any notes that are found to have valid, unavoidable interests with sufficient security to require payment of interest.  These Debtors will be authorizing replacement liens and claims as conditional adequate protections to the Noteholders to the extent that such investors are found to have properly perfected liens securing their claims.

64.    Further, while the DIP Facility will prime liens held by the Funds, the Funds have consented to being primed.  The Funds have so consented based on their recognition that the provision of the facility in and of itself provides adequate protection to the Funds, because only through priming can the Funds gain access to the substantial liquidity necessary to preserve and enhance the value of the properties that serve as collateral for the Funds' primary assets.

**B.**    **Proposed Restructuring Efforts**

65.    Through these Chapter 11 Cases, the Debtors plan to operate in the ordinary course of their business, subject to the oversight of the Independent Manager and the Chief Restructuring Officer (each through WGC Independent Manager).  Following its pre-petition internal restructuring, concurrent with its operation in bankruptcy the Debtors will further restructure their corporate organization so that the rights of the investors to benefit from the development of the properties that are owned and developed by the Debtors will be as reflected in the company's business plan disclosures.  Through this process, the Debtors intend to address the substance of any pending investigations, complaints or litigation related to the Woodbridge Group Enterprise's past fundraising practices and to negotiate and settle disputes with any investors or regulators, including the SEC, with respect to the Woodbridge Group Enterprise's past conduct.

66.    The Debtors intend that within a year of the Petition Date, they will be able to confirm a plan of reorganization that ensures that its future capital structure, fundraising and other conduct will be in strict compliance with all of its commitments and regulatory obligations, and that the Debtors will maximize recoveries for their many constituents.

**C.**    **Proposed Postpetition Financing and Cash Flow Projections**

67.     The Cash Flow Projections were prepared at my direction and represent a reasonable estimate of the Debtors' projected cash flow needs over the next thirteen weeks.  As shown in the Cash Flow Projections, without the immediate ability to use all available cash collateral and immediate access to debtor-in-possession financing, the Debtors will not have sufficient funds to, among other things, pay suppliers and employees and fund other operational costs.

68.     The Debtors seek bankruptcy protection to obtain breathing space in order to continue to assess the value of their real estate portfolio, liquidate their creditors' claims and propose a plan of reorganization that will maintain the Debtors' business as a going concern and seek to maximize recoveries for all of the Debtors' stakeholders.

## V.     FIRST DAY PLEADINGS

69.     To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors have requested certain relief through the First Day Pleadings filed with the Bankruptcy Court concurrently herewith. The Debtors respectfully request that this Court enter the proposed orders granting the relief requested in such First Day Pleadings.  I believe that the relief sought in each of the First Day Pleadings (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) is necessary to avoid immediate and irreparable harm to the Debtors businesses.

70.     The First Day Pleadings that are sought to be heard at the First Day hearing in these Chapter 11 Cases are:

1.     *Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases*;

01:22617332.3

2.      *Debtors' Application for an Order Appointing Garden City Group, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 2002-1(f) Nunc Pro Tunc to the Petition Date*;

3.      *Debtors' Motion for Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment*;

4.      *Debtors' Motion for Order (A) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto*;

5.      *Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*;

6.      *Debtors' Motion for Entry of an Order (A) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation; (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis; (C) Authorizing Reimbursement to Employees for Expenses Incurred Prepetition; (D) Authorizing Payment of Withholding and Payroll-Related Taxes; (E) Authorizing Payment of Workers' Compensation Obligations; and (F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers*;

7.      *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code, Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors and Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related to the Foregoing*;

8.      *Debtors' Motion for an Order (A) Authorizing the Debtors to Pay, in the Ordinary Course of Business, Claims for Goods Ordered Prepetition and Delivered Postpetition; (B) Authorizing the Debtors to Pay Certain Prepetition Claims of Shippers, Warehousemen, Mechanic's/Materialman's Lien Claimants, and Joint Check Beneficiaries; and (C) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers*;

9.      *Debtors' Motion For Interim and Final Orders Authorizing Payment of their Obligations to Homeowner Associations, Condominium Associations, and Other Community Organizations*;

10.     *Debtors' Motion for an Order Authorizing (A) the Maintenance of Cash Management System; (B) Maintenance of the Existing Bank Accounts; (C) Continued Use of Existing Business Forms; and (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims;* and

11.     *Debtors' Motion for Interim and Final Orders (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 Authorizing Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief* (the "DIP Motion")

71.     I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

72.     Furthermore, as a result of my personal knowledge, information supplied to me by other members of Debtors' management (including the Independent Manager) and from my colleagues that perform services for the Debtors, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy, to avoid immediate and irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates and other stakeholders.

01:22617332.3

In conclusion, for the reasons stated herein and in each First Day Pleading, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 4, 2017                    /s/ Lawrence R. Perkins
                                           Lawrence R. Perkins
                                           CEO & Founder
                                           SierraConstellation Partners LLC

P

**Exhibit A**

**Organizational Chart**

# Woodbridge Group Enterprise
## Corporate Organization Chart



1. Not managed by WGC Independent Management, LLC.

| Schedule A-1: Collateral First Day Filers | | |
|---|---|---|
| # | PropCo | HoldCo |
| 1 | Addison Park Investments, LLC | H31 Addison Park Holding Company, LLC |
| 2 | Bluff Point Investments, LLC | H20 Bluff Point Holding Company, LLC |
| 3 | Summit Cut Investments, LLC | H47 Summit Cut Holding Company, LLC |
| 4 | Lilac Meadow Investments, LLC | H6 Lilac Meadow Holding Company, LLC |
| 5 | Diamond Cove Investments, LLC | H76 Diamond Cove Holding Company, LLC |
| 6 | Heilbron Manor Investments, LLC | H66 Heilbron Manor Holding Company, LLC |
| 7 | Thornbury Farm Investments, LLC | H65 Thornbury Farm Holding Company, LLC |
| 8 | Sagebrook Investments, LLC | M62 Sagebrook Holding Company, LLC |
| 9 | Imperial Aly Investments, LLC | H74 Imperial Aly Holding Company, LLC |
| 10 | Gravenstein Investments, LLC | H26 Gravenstein Holding Company, LLC |
| 11 | Silver Maple Investments, LLC | H30 Silver Maple Holding Company, LLC |
| 12 | Goosebrook Investments, LLC | M68 Goosebrook Holding Company, LLC |
| 13 | Elstar Investments, LLC | H25 Elstar Holding Company, LLC |
| 14 | Hornbeam Investments, LLC | H35 Hornbeam Holding Company, LLC |
| 15 | Silk City Investments, LLC | H11 Silk City Holding Company, LLC |
| 16 | Hollyline Owners, LLC | Hollyline Holdings, LLC |
| 17 | Crowfield Investments, LLC | M63 Crowfield Holding Company, LLC |
| 18 | Centershot Investments, LLC | M25 Centershot Holding Company, LLC |
| 19 | Graeme Park Investments, LLC | H68 Graeme Park Holding Company, LLC |
| 20 | Mason Run Investments, LLC | M73 Mason Run Holding Company, LLC |
| 21 | Pinney Investments, LLC | M70 Pinney Holding Company, LLC |
| 22 | Drawspan Investments, LLC | M22 Drawspan Holding Company, LLC |
| 23 | Doubleleaf Investments, LLC | M15 Doubleleaf Holding Company, LLC |
| 24 | White Birch Investments, LLC | H12 White Birch Holding Company, LLC |
| 25 | Lincolnshire Investments, LLC | M17 Lincolnshire Holding Company, LLC |
| 26 | Arlington Ridge Investments, LLC | H2 Arlington Ridge Holding Company, LLC |
| 27 | Bay Village Investments, LLC | H13 Bay Village Holding Company, LLC |

| # | PropCo | HoldCo |
|---|--------|--------|
| | **Schedule A-2: Non Collateral First Day Filers** | |
| 1 | Sturmer Pippin Investments, LLC | H36 Sturmer Pippin Holding Company, LLC |
| 2 | Grand Midway Investments, LLC | H61 Grand Midway Holding Company, LLC |
| 3 | Bishop White Investments, LLC | H70 Bishop White Holding Company, LLC |
| 4 | Goose Rocks Investments, LLC | M93 Goose Rocks Holding Company, LLC |
| 5 | Pawtuckaway Investments, LLC | H4 Pawtuckaway Holding Company, LLC |
| 6 | Varga Investments, LLC | M74 Varga Holding Company, LLC |
| 7 | Winding Road Investments, LLC | M94 Winding Road Holding Company, LLC |
| 8 | Cablestay Investments, LLC | M13 Cablestay Holding Company, LLC |
| 9 | Squaretop Investments, LLC | M49 Squaretop Holding Company, LLC |
| 10 | Eldredge Investments, LLC | M71 Eldredge Holding Company, LLC |
| 11 | Green Gables Investments, LLC | H44 Green Gables Holding Company, LLC |
| 12 | Riley Creek Investments, LLC | M75 Riley Creek Holding Company, LLC |
| 13 | Craven Investments, LLC | H56 Craven Holding Company, LLC |
| 14 | Chestnut Investments, LLC | M79 Chestnut Company, LLC |
| 15 | Chestnut Ridge Investments, LLC | H5 Chestnut Ridge Holding Company, LLC |
| 16 | Longbourn Investments, LLC | M40 Longbourn Holding Company, LLC |
| 17 | Rising Sun Investments, LLC | H59 Rising Sun Holding Company, LLC |
| 18 | Willow Grove Investments, LLC | H52 Willow Grove Holding Company, LLC |
| 19 | Cannington Investments, LLC | M31 Cannington Holding Company, LLC |
| 20 | Emerald Lake Investments, LLC | H19 Emerald Lake Holding Company, LLC |
| 21 | Pemberley Investments, LLC | M38 Pemberley Holding Company, LLC |
| 22 | Carbondale Glen River Mesa, LLC | Crystal Valley Holdings, LLC |
| 23 | Old Maitland Investments, LLC | H55 Old Maitland Holding Company, LLC |
| 24 | Donnington Investments, LLC | M9 Donnington Holding Company, LLC |
| 25 | Mountain Spring Investments, LLC | M67 Mountain Spring Holding Company, LLC |
| 26 | Clover Basin Investments, LLC | M45 Clover Basin Holding Company, LLC |

| # | PropCo | HoldCo |
|---|--------|--------|
| | **Schedule A-2: Non Collateral First Day Filers** | |
| 27 | Summerfree Investments, LLC | H21 Summerfree Holding Company, LLC |
| 28 | Pepperwood Investments, LLC | M95 Pepperwood Holding Company, LLC |
| 29 | Zestar Investments, LLC | H29 Zestar Holding Company, LLC |
| 30 | Gateshead Investments, LLC | M10 Gateshead Holding Company, LLC |
| 31 | Beech Creek Investments, LLC | H46 Beech Creek Holding Company, LLC |
| 32 | Baleroy Investments, LLC | H58 Baleroy Holding Company, LLC |
| 33 | Moravian Investments, LLC | H60 Moravian Holding Company, LLC |
| 34 | Quarterpost Investments, LLC | M34 Quarterpost Holding Company, LLC |
| 35 | Topchord Investments, LLC | M37 Topchord Holding Company, LLC |
| 36 | Silverthorne Investments, LLC | M41 Silverthorne Holding Company, LLC |
| 37 | Springline Investments, LLC | M36 Springline Holding Company, LLC |
| 38 | Derbyshire Investments, LLC | M39 Derbyshire Holding Company, LLC |
| 39 | 215 North 12th Street, LLC | |
| 40 | Dollis Brook Investments, LLC | M32 Dollis Brook Holding Company, LLC |
| 41 | Archivolt Investments, LLC | M26 Archivolt Holding Company, LLC |
| 42 | Carbondale Glen Sundance Ponds, LLC | |
| 43 | Fieldpoint Investments, LLC | M24 Fieldpoint Holding Company, LLC |
| 44 | Anchorpoint Investments, LLC | M11 Anchorpoint Holding Company, LLC |
| 45 | White Dome Investments, LLC | M43 White Dome Holding Company, LLC |
| 46 | Carbondale Spruce 101, LLC | |
| 47 | Carbondale Glen Lot A-5, LLC | |
| 48 | Arrowpoint Investments, LLC | M19 Arrowpoint Holding Company, LLC |
| 49 | Hackmatack Investments, LLC | M87 Hackmatack Hills Holding Company, LLC |
| 50 | Bramley Investments, LLC | H40 Bramley Holding Company, LLC |
| 51 | Hazelpoint Investments, LLC | M80 Hazelpoint Holding Company, LLC |
| 52 | Broadsands Investments, LLC | M28 Broadsands Holding Company, LLC |

| # | PropCo | HoldCo |
|---|--------|--------|
| | **Schedule A-2: Non Collateral First Day Filers** | |
| 53 | Pinova Investments, LLC | H23 Pinova Holding Company, LLC |
| 54 | Seven Stars Investments, LLC | H54 Seven Stars Holding Company, LLC |
| 55 | Thunder Basin Investments, LLC | M60 Thunder Basin Holding Company, LLC |
| 56 | Papirovka Investments, LLC | H22 Papirovka Holding Company, LLC |
| 57 | Lenni Heights Investments, LLC | H43 Lenni Heights Holding Company, LLC |
| 58 | Haralson Investments, LLC | H39 Haralson Holding Company, LLC |
| 59 | Monadnock Investments, LLC | H16 Monadnock Holding Company, LLC |
| 60 | Dixville Notch Investments, LLC | H14 Dixville Notch Holding Company, LLC |
| 61 | Pemigewasset Investments, LLC | H17 Pemigewasset Holding Company, LLC |
| 62 | Mutsu Investments, LLC | H38 Mutsu Holding Company, LLC |
| 63 | Newville Investments, LLC | M91 Newville Holding Company, LLC |
| 64 | Lonetree Investments, LLC | M54 Lonetree Holding Company, LLC |
| 65 | Black Locust Investments, LLC | H28 Black Locust Holding Company, LLC |
| 66 | Crystal Woods Investments, LLC | M92 Crystal Woods Holding Company, LLC |
| 67 | Mt. Holly Investments, LLC | M83 Mt. Holly Holding Company, LLC |
| 68 | Steele Hill Investments, LLC | M86 Steele Hill Holding Company, LLC |
| 69 | Strawberry Fields Investments, LLC | H9 Strawberry Fields Holding Company, LLC |
| 70 | Grumblethorpe Investments, LLC | H41 Grumblethorpe Holding Company, LLC |
| 71 | Mineola Investments, LLC | M61 Mineola Holding Company, LLC |
| 72 | Glenn Rich Investments, LLC | M85 Glenn Rich Holding Company, LLC |
| 73 | Merrimack Valley Investments, LLC | M90 Merrimack Valley Holding Company, LLC |
| 74 | Idared Investments, LLC | H37 Idared Holding Company, LLC |
| 75 | Carbondale Glen Lot SD-23, LLC | |
| 76 | Black Bass Investments, LLC | H53 Black Bass Holding Company, LLC |
| 77 | Dogwood Valley Investments, LLC | H7 Dogwood Valley Holding Company, LLC |
| 78 | Old Carbon Investments, LLC | H51 Old Carbon Holding Company, LLC |

| # | PropCo | HoldCo |
|---|--------|--------|
| | **Schedule A-2: Non Collateral First Day Filers** | |
| 79 | Stepstone Investments, LLC | M5 Stepstone Holding Company, LLC |
| 80 | Carbondale Glen Lot SD-14, LLC | |
| 81 | Carbondale Glen Mesa Lot 19, LLC | |
| 82 | Carbondale Glen Sweetgrass Vista, LLC | |
| 83 | Vallecito Investments, LLC | M48 Vallecito Holding Company, LLC |
| 84 | Castle Pines Investments, LLC | M53 Castle Pines Holding Company, LLC |
| 85 | Chaplin Investments, LLC | M76 Chaplin Holding Company, LLC |
| 86 | Franconia Notch Investments, LLC | M88 Franconia Notch Holding Company, LLC |
| 87 | Grenadier Investments, LLC | H27 Grenadier Holding Company, LLC |
| 88 | Melody Lane Investments, LLC | H8 Melody Lane Holding Company, LLC |
| 89 | Ridgecrest Investments, LLC | M57 Ridgecrest Holding Company, LLC |
| 90 | Wildernest Investments, LLC | M44 Wildernest Holding Company, LLC |
| 91 | Arborvitae Investments, LLC | H32 Arborvitae Holding Company, LLC |
| 92 | Carbondale Glen Lot GV-13, LLC | |
| 93 | Owl Ridge Investments, LLC | M46 Owl Ridge Holding Company, LLC |
| 94 | Wetterhorn Investments, LLC | M50 Wetterhorn Holding Company, LLC |
| 95 | Daleville Investments, LLC | M72 Daleville Holding Company, LLC |
| 96 | Bear Brook Investments, LLC | H15 Bear Brook Holding Company, LLC |
| 97 | Bowman Investments, LLC | H49 Bowman Holding Company, LLC |
| 98 | Carbondale Glen Lot E-24, LLC | |
| 99 | Coffee Creek Investments, LLC | M51 Coffee Creek Holding Company, LLC |
| 100 | Stayman Investments, LLC | H24 Stayman Holding Company, LLC |
| 101 | Brise Soleil Investments, LLC | M27 Brise Soleil Holding Company, LLC |
| 102 | Brynderwen Investments, LLC | M29 Brynderwen Holding Company, LLC |
| 103 | Crossbeam Investments, LLC | M14 Crossbeam Holding Company, LLC |

| Schedule A-2: Non Collateral First Day Filers |
|---|---|---|
| # | PropCo | HoldCo |
| 104 | Haffenburg Investments, LLC | M56 Haffenburg Holding Company, LLC |
| 105 | Ironsides Investments, LLC | M99 Ironsides Holding Company, LLC |
| 106 | Red Woods Investments, LLC | M97 Red Woods Holding Company, LLC |
| 107 | Harringworth Investments, LLC | M33 Harringworth Holding Company, LLC |

A-2 Non Coll Filers

| Schedule B: Other First Day Filers | |
|---|---|
| # | Entity Name |
| 1 | Woodbridge Investments, LLC |
| 2 | Woodbridge Capital Investments, LLC |
| 3 | Carbondale Sundance Lot 15, LLC |
| 4 | Carbondale Sundance Lot 16, LLC |

| Schedule C: Other Non First Day Filers | |
|---|---|
| **#** | **Entity Name** |
| 1 | WFS Holding Company, LLC |

C Non-Filers (Non Trust)

| Schedule D: Brokerage Non Filers | |
|---|---|
| # | Entity Name |
| 1 | Riverdale Funding, LLC |
| 2 | Woodbridge Realty of Colorado, LLC |
| 3 | Mercer Vine,  Inc. |

D Brokerage Non Filers

| Schedule E: Inactive Non Filers | | | |
|---|---|---|---|
| # | PropCo / Direct Sub | | HoldCo |
| 1 | 1336, LLC | | |
| 2 | 14068 Davana Holding Company, LLC | | |
| 3 | 14068 Davana Terrace, LLC | | |
| 4 | 15672 Castlewoods Drive, LLC | | |
| 5 | 15672 Castlewoods Owners, LLC | | |
| 6 | 15714 Castlewoods Drive, LLC | | |
| 7 | 15714 Castlewoods Owners, LLC | | |
| 8 | Woodbridge Lending Fund 1, LLC | 81 | A Plus Holdings, LLC |
| 9 | Archstone Investments, LLC | 82 | M1 Archstone Holding Company, LLC |
| 10 | Ashburton Way Investments, LLC | 83 | H88 Ashburton Way Holding Company, LLC |
| 11 | Atalaya Circle Investments, LLC | 84 | H79 Atalaya Circle Holding Company, LLC |
| 12 | Bearingside Investments, LLC | 85 | M12 Bearingside Holding Company, LLC |
| 13 | Bellmire Investments, LLC | 86 | M47 Bellmire Holding Company, LLC |
| 14 | Birchwood Manor Investments, LLC | 87 | H85 Birchwood Manor Holding Company, LLC |
| 15 | Boiling Spring Investments, LLC | 88 | M81 Boilling Spring Holding Company, LLC |
| 16 | Bonifacio Hill Investments, LLC | 89 | H86 Bonifacio Hill Holding Company, LLC |
| 17 | Bowstring Investments, LLC | 90 | M20 Bowstring Holding Company, LLC |
| 18 | Breckenridge Investments, LLC | 91 | M7 Breckenridge Holding Company, LLC |
| 19 | Breckenridge, LLC | | |
| 20 | Caisson Investments, LLC | 92 | M2 Caisson Holding Company, LLC |
| 21 | Calder Grove Investments, LLC | 93 | M30 Calder Grove Holding Company, LLC |
| 22 | Calendonia Circle Investments, LLC | | |
| 23 | California Commercial Lenders, LLC | 94 | H71 Calendonia Circle Holding Company, LLC |
| 24 | Cantilever Investments, LLC | 95 | M3 Cantilever Holding Company, LLC |
| 25 | Carbondale Glen Lot E-15, LLC | | |
| 26 | Carbondale Glen Lot E-38, LLC | | |
| 27 | Carbondale Glen Lot E-8, LLC | | |

| # | PropCo / Direct Sub | | HoldCo |
|---|---|---|---|
| 28 | Carbondale Glen Lot GV-6, LLC | | |
| 29 | Carbondale Glen Lot IS - 11, LLC | | |
| 30 | Casper Falls Investments, LLC | 96 | M59 Casper Falls Holding Company, LLC |
| 31 | Clementina Park Investments, LLC | 97 | H72 Clementina Park Holding Company, LLC |
| 32 | Cliff Park Investments, LLC | 98 | H57 Cliff Park Holding Company, LLC |
| 33 | Conneaut Lake Investments, LLC | 99 | H69 Conneaut Lake Holding Company, LLC |
| 34 | Copper Sands Investments, LLC | 100 | H87 Copper Sands Holding Company, LLC |
| 35 | Crestmark Investments, LLC | 101 | M21 Crestmark Holding Company, LLC |
| 36 | Crosskeys Investments, LLC | 102 | M8 Crosskeys Holding Company, LLC |
| 37 | Dixmont State Investments, LLC | 103 | H63 Dixmont State Holding Company, LLC |
| 38 | DVDO Design, LLC | | |
| 39 | DVDO Holding Company, LLC | | |
| 40 | Elm City Investments, LLC | 104 | M98 Elm City Holding Company, LLC |
| 41 | Evergreen Way Investments, LLC | 105 | H3 Evergreen Way Holding Company, LLC |
| 42 | Foxridge Investments, LLC | 106 | M69 Foxridge Holding Company, LLC |
| 43 | Fulton Underwood, LLC | | |
| 44 | Glenhaven Heights Investments, LLC | 107 | H73 Glenhaven Heights Holding Company, LLC |
| 45 | Golden Gate Investments, LLC | 108 | H81 Golden Gate Holding Company, LLC |
| 46 | Graywater Investments, LLC | 109 | M78 Graywater Holding Company, LLC |
| 47 | Great Sand Investments, LLC | 110 | M55 Great Sand Holding Company, LLC |
| 48 | Harbor Point Investments, LLC | 111 | H90 Harbor Point Holding Company, LLC |
| 49 | Hays Investments, LLC | 112 | M64 Hays Holding Company, LLC |
| 50 | Hillview Investments, LLC | 113 | H42 Hillview Holding Company, LLC |
| 51 | Holly Park Investments, LLC | 114 | H84 Holly Park Holding Company, LLC |
| 52 | Holmesburg Investments, LLC | 115 | H62 Holmesburg Holding Company, LLC |
| 53 | Ingleside Path Investments, LLC | 116 | H78 Ingleside Path Holding Company, LLC |
| 54 | Irondale Inn Investments, LLC | 117 | H48 Irondale Inn Holding Company, LLC |
| 55 | Ivy Circle, LLC | | |
| 56 | Junipero Serra Investments, LLC | 118 | H80 Junipero Serra Holding Company, LLC |

E Inactive Non Filers

| # | PropCo / Direct Sub | | HoldCo |
|---|---|---|---|
| 57 | Lockwood Investments, LLC | 119 | M52 Lockwood Holding Company, LLC |
| 58 | New Montgomery Investments, LLC | 120 | H77 New Montgomery Holding Company, LLC |
| 59 | Orchard Mesa Investments, LLC | 121 | M42 Orchard Mesa Holding Company, LLC |
| 60 | Pacific Heights Investments, LLC | 122 | H75 Pacific Heights Holding Company, LLC |
| 61 | Pearmain Investments, LLC | 123 | H34 Pearman Holding Company, LLC |
| 62 | Pembroke Academy Investments, LLC | 124 | M84 Pembroke Academy Holding Company, LLC |
| 63 | Phillipsburg Investments, LLC | 125 | M65 Phillipsburg Holding Company, LLC |
| 64 | Powel House Investments, LLC | 126 | H67 Powel House Holding Company, LLC |
| 65 | RHS Capital, LLC | | |
| 66 | SAC Holding Company of Aspen, LLC | | |
| 67 | SAC Management, LLC | | |
| 68 | Saddlemount Investments, LLC | 127 | M35 Saddlemount Holding Company, LLC |
| 69 | Seacliff Run Holding Company, LLC | 128 | H83 Seacliff Run Holding Company, LLC |
| 70 | Sidespar Investments, LLC | 129 | M4 Sidespar Holding Company, LLC |
| 71 | Sightline Investments, LLC | 130 | M23 Sightline Holding Company, LLC |
| 72 | Silverbaron Investments, LLC | 131 | H1 Silverbaron Holding Company, LLC |
| 73 | Texas Co-Lenders 01, LLC | | |
| 74 | Trestlewood Investments, LLC | 132 | M6 Trestlewood Holding Company, LLC |
| 75 | Twin Pier Investments, LLC | 133 | M18 Twin Pier Holding Company, LLC |
| 76 | U Street Holdings, LLC | 134 | H82 Van Ness Holding Company, LLC |
| 77 | Van Ness Investments, LLC | 135 | H89 Vista Verde Holding Company, LLC |
| 78 | Vista Verde Investments, LLC | | |
| 79 | Winnisquam Investments, LLC | 136 | M82 Winnisquam Holding Company, LLC |
| 80 | Woodbridge Luxury Homes, LLC | 137 | L1 Luxury Holdings, LLC |
| | | 138 | H45 Harmony Inn Holding Company, LLC |
| | | 139 | H64 Pennhurst Holding Company, LLC |

E Inactive Non Filers

| Schedule F: Filers Under Woodbridge Group of Companies | | |
|---|---|---|
| # | HoldCo | Subsidiary of HoldCo |
| 1 | Woodbridge Structured Funding, LLC | Cuco Settlement, LLC |
| 2 | Basswood Holding, LLC | |

| Schedule G-1: Filers Under WMF Management, LLC | |
|---|---|
| # | Entity Name |
| 1 | Woodbridge Mezzanine Fund 1, LLC |

| Schedule G-2: Other Subsidiaries of WMF Management LLC | |
|---|---|
| # | Entity Name |
| 1 | Woodbridge Guarantee, LLC |
| 2 | Woodbridge Guarantee Holding, LLC |

| Schedule H-1: Other Subsidiaries of WMF Management, LLC ||
|---|---|
| **#** | **HoldCo** |
| 1 | Carbondale Glen Lot D-22, LLC |
| 2 | Whiteacre Funding, LLC |
| 3 | Silverleaf Funding, LLC |

H-1 Filers (Fund 1 subs)

| Schedule H-2: Non Filers | |
|---|---|
| # | Entity Name |
| 1 | Alpine Rose, LLC |

| Schedule I: Subsidiaries of Woodbridge Investment Fund 4 | |
|---|---|
| # | Entity Name |
| 1 | Foothill CL Nominee, LLC |

## Exhibit B

**Transition Services Agreement**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), is entered into by and between Woodbridge Group of Companies, LLC, a Delaware limited liability company (the "Company"), on the one hand, and WFS Holding Co LLC, a Delaware limited liability company ("Consultant"), on the other hand, as of December 1, 2017.

## RECITALS

A.    Consultant has significant experience and knowledge with respect to the business and operations of the Company and its affiliates.

B.    The Company anticipates filing a voluntary petition for relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Petition") and desires to secure the services of Consultant in order to ensure the continuous smooth and orderly conduct of the Company's business.

C.    The Company and Consultant desire to enter into this Agreement setting forth the terms and conditions of Consultant's service with the Company.

D.    In consideration of the mutual covenants and agreements hereinafter set forth, the Company and Consultant agree as set forth herein:

## AGREEMENT

1.    **AGREEMENT FOR SERVICES.** This Agreement shall be in effect for a period commencing on December 1, 2017 (the "Effective Date"), and continuing in full force and effect until the one-year anniversary of the Effective Date, unless amended or terminated earlier pursuant to the terms hereof (the "Initial Term"). After expiration of the Initial Term, this Agreement will automatically renew for successive twelve (12) month periods, unless amended or terminated earlier pursuant to the terms hereof (a "Consecutive Term" and together with the Initial Term, the "Term"). During the Term, Consultant agrees to serve as a consultant to the Company and to assist the Company in providing the services set forth on Appendix A hereto (the "Services"). Consultant agrees that the Services shall be performed by Robert Shapiro as an agent of Consultant, unless the Company consents (which consent may be withheld in the Company's sole discretion) in writing in advance to another individual performing the Services hereunder on behalf of Consultant (any such person, including Robert Shapiro, an "Approved Agent").

2.    **COMPENSATION.** During the Term, the Company agrees to pay Consultant for the Services a monthly consulting fee of $175,000, for the provision of services, payable monthly in advance (the "Fee"), with the first such monthly payment due concurrently with the execution hereof. In addition to the Fee, during the Term, Consultant shall have the right to participate, at no expense to the Consultant, in all medical insurance plans maintained by the Company from time to time to the extent that Consultant is eligible to participate in such plans in accordance with the terms of such plans. In addition, the Company will provide Consultant with those resources appropriate, necessary and desirable to the carrying out of the Services, including but not limited to, office space, staff assistance and support, and office equipment and

electronics. Consultant shall be permitted to use such resources for matters unrelated to the Services; provided that Consultant shall compensate the Company for such usage at a market rate reasonably agreed between Consultant and the Company (which compensation the Company may offset against any amounts otherwise payable to Consultant). Consultant understands and acknowledges that the remuneration described in this Section 2 of this Agreement shall be in lieu of any and all other compensation, benefits and plans for the Services.

**3.    EXPENSES.**  Upon submission of itemized expense statements in the manner specified by the Company, Consultant shall be entitled to reimbursement for reasonable travel and other reasonable business expenses duly incurred by Consultant in the performance of his duties under this Agreement, subject to the terms and conditions of the Company's expense reimbursement policy as in effect from time to time.

**4.    INDEPENDENT CONTRACTOR.**  Consultant shall perform the Services as an independent contractor and shall not be deemed an employee of the Company or any of its affiliates. Accordingly, the Company will not withhold federal or state income, social security, or other taxes from the Fee paid under the terms of this Agreement, unless otherwise required by law. Consultant agrees that Consultant will be fully and solely responsible for any income or other tax liability imposed on Consultant in its capacity as an "independent contractor."

**5.    CONSULTANT'S BUSINESS ACTIVITIES.**  The parties agree and understand that the services performed by Consultant under this Agreement will require Consultant to engage in full-time efforts for the Company.

**6.    TERMINATION OF SERVICE.**  The Term and Services shall only be terminable by the Company (i) at the termination of the Initial Term or a Consecutive Term, with thirty (30) days' prior written notice thereof, or (ii) at any time for "Cause". The Term and Services may be terminated by Consultant at any time, with thirty (30) days' prior written notice thereof. In the event of any termination of the Term and this Agreement, the obligations of the Company and the rights of Consultant under this Agreement shall terminate, except that the Company shall pay to Consultant the Fee and amounts otherwise due and payable under this Agreement on or before such termination. For purposes of this Agreement, "Cause" means: (A) a breach of this Agreement by Consultant and such breach, if curable, has not been cured within ten (10) business days following Consultant's receipt of written notice thereof from the Company specifying in reasonable detail the nature and terms of such breach; (B) action by the Consultant, including any Approved Agent, constituting gross negligence, willful misconduct, bad faith, reckless disregard of its duties in connection with the performance of any Services, as determined by the Company in its good faith discretion; or (C) the engagement by the Consultant (as determined in the good faith discretion of the Company), including any Approved Agent, in any fraudulent, dishonest or other acts of moral turpitude with respect to the Company in connection with the performance of any Services. For the avoidance of doubt, no action or state of facts that occurred or existed prior to the date hereof, nor Consultant (or any Approved Agent) exercising any rights protected under the United States Constitution after the date hereof, shall constitute "Cause." The parties acknowledge that, in the event the Company were to terminate this Agreement or the Term and Services hereunder prior to the expiration of the Initial Term or then-applicable Consecutive Term for any reason other than for "Cause," the actual damages of Consultant would be difficult to accurately determine, and accordingly, the parties agree that, in

2

such event, Consultant shall be entitled to liquidated damages equal to the aggregate amount of the Fee that would be payable for six months of Services hereunder, which the parties acknowledge and agree constitute a reasonable estimate of the damages Consultant would suffer as a result of such termination.

**7.    ASSIGNMENT AND TRANSFER.**  Consultant's rights and obligations under this Agreement shall not be transferable by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void.  This Agreement shall inure to the benefit of, and be enforceable by, any purchaser of substantially all of the Company's assets, any corporate successor to the Company or any assignee thereof.

**8.    NO INCONSISTENT OBLIGATIONS.**  Consultant is aware of no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with his undertaking service with the Company.  Consultant will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others.

**9.    NEGOTIATION.**  The Company acknowledges that the terms of this Agreement are the result of an arms'-length negotiation between the Company, which is managed and controlled solely by WGC Independent Manager LLC (the "Independent Manager"), and Consultant, and in connection with such negotiation, the Independent Manager reviewed relevant information regarding the market for the Services, which informed the Independent Manager's business judgment that the terms of this Agreement are fair and consistent with such market.

**10.    BANKRUPTCY PROCEEDINGS.**  In the event that any action is brought in connection with the Bankruptcy Petition to avoid, reject or otherwise terminate or amend the rights and obligations of the parties pursuant to this Agreement, the Company agrees that it shall use all commercially reasonable efforts to take, or cause to be taken, at the Company's cost and expense, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to defend the enforceability of this Agreement and to prevent any such avoidance, rejection, termination or amendment.  Consultant shall reasonably cooperate and assist the Company in defending and resolving such action.

**11.    MISCELLANEOUS.**

11.1    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

11.2    <u>Entire Agreement</u>.  This Agreement contains the entire agreement and understanding between the parties hereto, as well as Robert Shapiro, and supersedes any prior or contemporaneous written or oral agreements between them respecting the subject matter hereof.

11.3    <u>Amendment</u>.  This Agreement may be amended only by a writing signed by Consultant and by a duly authorized representative of the Company.

11.4    <u>Severability</u>.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision,

covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

       11.5   <u>Construction</u>.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Consultant.

       11.6   <u>Rights Cumulative</u>.  The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by either party hereto (or by its successor), whether pursuant to this Agreement, to any other agreement, or to law, shall not preclude or waive its right to exercise any or all other rights and remedies.

       11.7   <u>Nonwaiver</u>.  No failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by an officer of the Company (other than Consultant) or other person duly authorized by the Company.

       11.8   <u>Notices</u>.  Any notice, request, consent or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, with postage prepaid, to Consultant's residence (as noted in the Company's records), or to the Company's principal office, as the case may be.

[<em>Signature Page Follows</em>]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the first date set forth above.

THE COMPANY:

**Woodbridge Group of Companies, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name: Lawrence Perkins
Title:  Chief Restructuring Officer

CONSULTANT:

**WFS Holding Co LLC**

By: _____
Name: Robert Shapiro
Title: Manager

# APPENDIX A

## Services

1. Advice on the development of the estate properties as it relates to construction, design, marketing and purchase and selling strategy, including:
    a. Monitoring and advising with respect to brokers;
    b. Monitoring and advising with respect to the project managers developing properties;
    c. Visiting properties in California and Colorado to monitor construction progress;
    d. Monitoring contractors and architects;
    e. Monitoring and negotiating renovation contracts;
    f. Monitoring litigation and foreclosures;
    g. Overseeing and managing relationship with Mercer Vine, Inc. and Riverdale Funding, LLC.
2. Advice on the investments and capitalization of the Company and its funds, including:
    a. Monitoring litigation and foreclosure actions related to the debt owned by the funds;
    b. Identifying new real estate projects in which to invest;
    c. Identifying new loan opportunities;
    d. Meeting with investment bankers and lenders to assist in raising capital for the Company's business.
3. Support related to Company employees and outside consultants, including monitoring and advising with respect to the management thereof.
4. Support in research related to the Company's historical business practices, including:
    a. Investigating and evaluating lender's claims against the Company;
    b. Assisting the Manager of the Company in understanding the past operation of the Company.
5. Support and advice related to potential buyers of Company assets, either under way or that have previously expressed interest, including:
    a. Identifying and negotiating with potential buyers;
    b. Monitoring brokers.
6. Meeting regularly with the Manager and Chief Restructuring Officer of WGC Independent Manager LLC with respect to the operation of the Company's business.

## Exhibit C

**Forbearance Agreement**

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (the "*Agreement*") is made and entered into as of December 1, 2017 (the "*Effective Date*"), by and among ("*Lessee*"), Emerald Lake Investments, LLC, a Delaware limited liability company ("*CA Owner*"), H19 Emerald Lake Holding Company, LLC, a Delaware limited liability company ("*CA Mezz Owner*"), Woodbridge Mortgage Investment Fund 3, LLC, a Delaware limited liability company ("*CA Lender*"), Carbondale Glen River Mesa, LLC, a Colorado limited liability company ("*CO Owner*"), Woodbridge Mortgage Investment Fund 1, LLC, a Delaware limited liability company ("*CO Lender 1*"), Woodbridge Mortgage Investment Fund 3A, LLC, a Delaware limited liability company ("*CO Lender 2*"), and WGC Independent Manager LLC, a Delaware limited liability company ("*Independent Manager*").

## RECITALS

A.    Reference is made to: (i) that certain California Residential Lease Agreement, dated as of May 1, 2017 (as amended, supplemented or modified as of the date hereof, the "*CA Lease*"), by and between Lessee and CA Owner with respect to the property located at
(the "*CA Property*"), (ii) that certain Promissory Note Secured by Deed of Trust, dated as of February 4, 2016 (as amended, supplemented or modified as of the date hereof, the "*CA Note*"), issued by CA Owner to CA Lender in principal sum of Four Million Six Hundred and Ninety Thousand and 00/100 Dollars ($4,690,000.00) and that certain Deed of Trust, Security Agreement, and Fixture Filing with Assignment of Rents and Agreements, dated as of February 4, 2016 (as amended, supplemented or modified as of the date hereof, the "*CA Deed of Trust*" and, together with the Note and any other documents in connection therewith, the "*CA Mortgage*"), by CA Owner for the benefit of CA Lender, and (iii) that certain Mezzanine Promissory Note, dated as of February 19, 2016 (as amended, supplemented or modified as of the date hereof, the "*CA Mezz Note*"), issued by CA Mezz Owner to CA Lender in principal sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), that certain Mezzanine Loan Agreement, dated as of February 19, 2016 (as amended, supplemented or modified as of the date hereof, the "*CA Mezz Agreement*"), by and between CA Mezz Owner and CA Lender, and that certain Pledge and Security Agreement with respect thereto (as amended, supplemented or modified as of the date hereof, the "*CA Mezz Pledge*" and, together with the CA Mezz Note, the CA Mezz Agreement and any other documents in connection therewith, the "*CA Mezz Documents*").

B.    Reference is made to: (i) that certain Residential Lease, dated as of November ___, 2017 (as amended, supplemented or modified as of the date hereof, "*CO Lease*"), by and between Lessee and CO Owner with respect to the properties located at
(the "*CO Property*"), (ii) that certain Promissory Note, dated as of July 1, 2014 (as amended, supplemented or modified as of the date hereof, the "*CO Note 1*"), issued by CO Owner to CO Lender 1 in principal sum of Five Hundred Twenty-Five Thousand and 00/100 Dollars ($525,000.00), that certain Deed of Trust, dated as of July 1, 2014 (as amended, supplemented or modified as of the date hereof, the "*CO Deed of Trust 1*" and, together with the CO Note 1, the "*CO Mortgage 1*") by CO Owner for the benefit of CO Lender 1, (iii) that certain Promissory

Note, dated as of June 15, 2016 (as amended, supplemented or modified as of the date hereof, the "**CO Note 2**"), issued by CO Owner to CO Lender 2 in principal sum of Six Hundred Thousand and 00/100 Dollars ($600,000.00), that certain Deed of Trust, dated as of June 15, 2016 (as amended, supplemented or modified as of the date hereof, the "**CO Deed of Trust 2**" and, together with the CO Note 2, the "**CO Mortgage 2**") by CO Owner for the benefit of CO Lender 2, (iv) that certain Construction Promissory Note, dated as of June 15, 2016 (as amended, supplemented or modified as of the date hereof, the "**CO Construction Note**"), issued by CO Owner to CO Lender 2 in principal sum of Three Million Five Hundred Twenty Thousand and 00/100 Dollars ($3,520,000.00), that certain Construction Loan Agreement, dated as of June 15, 2016 (as amended, supplemented or modified as of the date hereof, the "**CO Construction Agreement**"), by and between CO Owner and CO Lender 2, that certain Construction Deed of Trust, dated as of June 15, 2016 (as amended, supplemented or modified as of the date hereof, the "**CO Construction Deed of Trust**" and, together with the CO Construction Note and CO Construction Agreement, the "**CO Construction Documents**"), by CO Owner for the benefit of CO Lender 2, and (v) that certain Promissory Note, dated as of February 12, 2014 (as amended, supplemented or modified as of the date hereof, and together with any other documents in connection therewith, the "**CO Note 3**"), issued by CO Owner to CO Lender 1 in principal sum of Eight Hundred Sixty-One Thousand Two Hundred Fifty and 00/100 Dollars ($861,250.00).

C.    CA Lender, CA Owner, CA Mezz Owner, CO Lender 1, CO Lender 2, CO Owner, and Lessee wish to enter into this Agreement to set forth the terms and conditions pursuant to which (i) CA Lender shall agree to forbear in its exercise of remedies in respect of the CA Mortgage and the CA Mezz Documents, (ii) CO Lender 1 shall agree to forbear in its exercise of remedies in respect of the CO Mortgage 1 the CO Note 3, and (iii) CO Lender 2 shall agree to forbear in its exercise of remedies in respect of the CO Mortgage 2 and the CO Construction Documents.

D.    Independent Manager and Lessee wish to enter into this Agreement to set forth their agreement with respect to any other entities, if any, holding a lien on either the CA Property or the CO Property for which Independent Manager is the manager (the "**Other Lienholders**").

**NOW, THEREFORE**, in consideration of the above premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

1.    **Forbearance Period**.  Subject to the terms and conditions set forth herein, (a) CA Lender agrees that it shall refrain from exercising any of its remedies under the CA Mortgage, the CA Mezz Documents or under applicable law with respect to the CA Mortgage or the CA Mezz Documents from the Effective Date through and including the date of a CA Forbearance Termination Event, (b) CO Lender 1 agrees that it shall refrain from exercising any of its remedies under the CO Mortgage 1, the CO Note 3 or under applicable law with respect to the CO Mortgage 1 or the CO Note 3 from the Effective Date through and including the date of a CO Forbearance Termination Event, and (c) CO Lender 2 agrees that it shall refrain from exercising any of its remedies under the CO Mortgage 2, the CO Construction Documents or under applicable law with respect to the CO Mortgage 2 or the CO Construction Documents

from the Effective Date through and including the date of a CO Forbearance Termination Event. As used herein, "*CA Forbearance Termination Event*" shall mean the expiration or termination of the CA Lease in accordance with the terms thereof, and "*CO Forbearance Termination Event*" shall mean the expiration or termination of the CO Lease in accordance with the terms thereof.

2.    **Remedies**.  Upon the occurrence of a CA Forbearance Termination Event, (a) the forbearance hereunder in respect of the CA Mortgage and the CA Mezz Documents shall terminate automatically, (b) all obligations owed to CA Lender shall, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, be forthwith due and payable, and (c) CA Lender may immediately, and without expiration of any period of grace or any further period of reinstatement or redemption, enforce payment of all obligations owed under the CA Mortgage and the CA Mezz Documents, and may exercise any and all other rights, powers and remedies granted to it under the CA Mortgage or the CA Mezz Documents, at law, in equity, or otherwise.  Upon the occurrence of a CO Forbearance Termination Event, (a) the forbearance hereunder in respect of the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 and the CO Construction Documents shall terminate automatically, (b) all obligations owed to CO Lender 1 or CO Lender 2 shall, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, be forthwith due and payable, and (c) CO Lender 1 and CO Lender 2 may immediately, and without expiration of any period of grace or any further period of reinstatement or redemption, enforce payment of all obligations owed under the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 and the CO Construction Documents, and may exercise any and all other rights, powers and remedies granted to it under the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents, at law, in equity, or otherwise.

3.    **Termination of Leases**.  Notwithstanding anything to the contrary in the CA Lease or the CO Lease, in the event that certain Transition Services Agreement, dated as of the date hereof ("*TSA*"), by and between Woodbridge Group of Companies, LLC and WFS Holding Co LLC, is terminated for any reason, Lessee shall have the option to terminate either or both of the CA Lease or the CO Lease upon written notice to CA Owner or CO Owner, respectively, no later than thirty (30) days following the date of the termination of the TSA.

4.    **Advice of Counsel**.  Lessee acknowledges that it has sought the advice of, and has been advised by, legal counsel of its choice, in connection with the negotiation of this Agreement, and that Lessee has willingly entered into this Agreement with full understanding of the legal and financial consequences of this Agreement.

5.    **Non-Impairment**.  Except as expressly provided herein, nothing in this Agreement shall alter or affect any provision, condition or covenant contained in the CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents, or affect or impair any rights, powers, or remedies hereunder or thereunder, it being the intent of the parties hereto that the provisions of the CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 and the CO Construction Documents shall continue in full force and effect except as expressly modified hereby.

6. **No Waiver**. No failure to exercise, and no delay in exercising any right, power or remedy hereunder or under the CA Mortgage, the CA Mezz Documents, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents shall impair any right, power or remedy which CA Lender, CO Lender 1 or CO Lender 2 may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or an acquiescence in any breach or default under any of the CA Mortgage, CA Mezz Documents, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents, nor shall any waiver of any breach or default of Lessee, CA Owner, CA Mezz Owner or CO Owner hereunder be deemed a waiver of any breach or default subsequently occurring. The rights and remedies herein specified are cumulative and not exclusive of any rights or remedies which CA Lender, CO Lender 1 or CO Lender 2 would otherwise have.

7. **Integration; Interpretation**. The CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3, the CO Construction Documents and this Agreement contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein, and supersede all prior negotiations and documents, but the CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 and the CO Construction Documents are not being superseded by this Agreement, except to the limited extent that this Agreement expressly provides. This Agreement shall not be modified except by written instrument executed by all parties.

8. **No Further Commitment**. Without limiting the foregoing, Lessee, CA Owner, CA Mezz Owner and CO Owner expressly acknowledge that, except as specifically set forth in this Agreement, neither CA Lender nor CO Lender 1 nor CO Lender 2 has made nor is making any commitment for, and there is no understanding, explicit or implicit, relating to, or affecting (a) the terms of any further forbearance which may be entered into with respect to the CA Mortgage, the CA Mezz Documents, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents or (b) any amendment or waiver of any of CA Lender's, CO Lender 1's or CO Lender 2's rights under the CA Mortgage, the CA Mezz Documents, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents, as applicable, all of which are expressly preserved.

9. **Independent Manager**. Independent Manager, on behalf of each Other Lienholder, agrees to forbear in its exercise of remedies related to any lien on the CA Property or the CO Property on the same terms and conditions pursuant to which CA Lender, CO Lender 1 and CO Lender 2 agree hereunder,

10. **Miscellaneous**. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California, without regard to conflicts of law principles. In the event any provision of this Agreement is deemed to conflict with the CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3 or the CO Construction Documents, the provisions of this Agreement shall control.

11. **Headings; Severability**. The headings used in this Agreement are for convenience only and shall be disregarded in interpreting the substantive provisions of this Agreement. Time is of the essence of each term of the CA Lease, the CA Mortgage, the CA

Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3, the CO Construction Documents and this Agreement. If any provision of the CA Lease, the CA Mortgage, the CA Mezz Documents, the CO Lease, the CO Mortgage 1, the CO Mortgage 2, the CO Note 3, the CO Construction Documents or this Agreement shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed therefrom, and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been a part thereof.

12.     **Counterparts**. This Agreement may be executed by facsimile or other electronic means, and in any number of counterparts, each of which when executed and delivered to the other parties hereto will be deemed to be an original and all of which, taken together, will be deemed to be one and the same instrument.

[SIGNATURES FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**CA LENDER:**

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**CO LENDER 1:**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**CO LENDER 2:**

**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**CA OWNER:**

**EMERALD LAKE INVESTMENTS, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**CA MEZZ OWNER:**

**H19 EMERALD LAKE HOLDING COMPANY, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**CO OWNER:**

**CARBONDALE GLEN RIVER MESA, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**INDEPENDENT MANAGER**

**WGC INDEPENDENT MANAGER LLC**

By: _____

Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

**LESSEE:**

By: _____
Name: ██████████

## INDEPENDENT MANAGER

**WGC INDEPENDENT MANAGER
LLC**

By: _____
Name:  Lawrence Perkins
Title:  Chief Restructuring Officer

## LESSEE:

By: __
Name:

**Exhibit D**

**First Subordination, Non-Disturbance, and Attornment Agreement**

This **SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT** (the "*Agreement*") is dated as of December 1, 2017, and is by and among Emerald Lake Investments, LLC, Delaware limited liability company ("*Landlord*"), ▉▉▉▉▉ ("*Tenant*"), Woodbridge Mortgage Investment Fund 3, LLC, Delaware limited liability company, as lender (together with its successors and assigns, "*Lender*"), and WGC Independent Manager LLC, a Delaware limited liability company ("*Independent Manager*").

WHEREAS, Lender has made a loan to Landlord (the "*Loan*"), which Loan is evidenced by a promissory note (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Promissory Note*") and secured by, among other things, a certain Deed of Tust, Security Agreement, and Fixture Filing with Assignment of Rents and Agreements (as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time, the "*Mortgage*") encumbering the real property located at ▉▉▉▉▉ more particularly described on **Exhibit A** annexed hereto and made a part hereof (the "*Property*");

WHEREAS, by a lease agreement (the "*Lease*") dated May 1, 2017, between Landlord (or Landlord's predecessor in title) and Tenant, Landlord leased to Tenant a portion of the Property, as said portion is more particularly described in the Lease (such portion of the Property hereinafter referred to as the "*Premises*");

WHEREAS, Tenant acknowledges that Lender will rely on this Agreement in making the Loan to Landlord;

WHEREAS, Lender and Tenant desire to evidence their understanding with respect to the Mortgage and the Lease as hereinafter provided; and

WHEREAS, Independent Manager and Tenant desire to evidence their understanding with respect to any lien on the Property held by any other entities for which Independent Manager is the manager (the "*Other Lienholders*").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.      Tenant covenants, stipulates and agrees that the Lease and all of Tenant's right, title and interest in and to the Property thereunder (including but not limited to any option to purchase, right of first refusal to purchase or right of first offer to purchase the Property or any portion thereof) is hereby, and shall at all times continue to be, subordinated and made secondary and inferior in each and every respect to the Mortgage and the lien thereof, to all of the terms, conditions and provisions thereof and to any and all advances made or to be made thereunder, so that at all times the Mortgage shall be and remain a lien on the Property prior to and superior to the Lease for all purposes, subject to the provisions set forth herein. Subordination is to have the same force and effect as if the Mortgage and such renewals, modifications, consolidations, replacements and extensions had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2.      Lender agrees that if Lender exercises any of its rights under the Mortgage, including entry or foreclosure of the Mortgage or exercise of a power of sale under the Mortgage,

Lender will not disturb Tenant's right to use, occupy and possess the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period under any term, covenant or condition of the Lease.

3.      If, at any time Lender (or any person, or such person's successors or assigns, who acquires the interest of Landlord under the Lease through foreclosure of the Mortgage or otherwise) shall succeed to the rights of Landlord under the Lease as a result of a default or event of default under the Mortgage, Tenant shall attorn to and recognize such person so succeeding to the rights of Landlord under the Lease (herein sometimes called "*Successor Landlord*") as Tenant's landlord under the Lease, said attornment to be effective and self-operative without the execution of any further instruments.  Although said attornment shall be self-operative, Tenant agrees to execute and deliver to Lender or to any Successor Landlord, such other instrument or instruments as Lender or such other person shall from time to time request in order to confirm said attornment.

4.      Landlord authorizes and directs Tenant to honor any written demand or notice from Lender instructing Tenant to pay rent or other sums to Lender rather than Landlord (a "*Payment Demand*"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand.  Tenant may rely upon any notice, instruction, Payment Demand, certificate, consent or other document from, and signed by, Lender and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given.  Any payment made by Tenant to Lender or in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

5.      If Lender shall become the owner of the Property or the Property shall be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage or if the Property shall be transferred by deed in lieu of foreclosure, Lender or any Successor Landlord shall not be:

(a)      liable for any act or omission of any prior landlord (including Landlord) or bound by any obligation to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any prior landlord (including Landlord); or

(b)      obligated to cure any defaults of any prior landlord (including Landlord) which occurred, or to make any payment to Tenant which was required to be paid by any prior landlord (including Landlord), prior to the time that Lender or any Successor Landlord succeeded to the interest of such landlord under the Lease; or

(c)      obligated to perform any construction obligations of any prior landlord (including Landlord) under the Lease or liable for any defects (latent, patent or otherwise) in the design, workmanship, materials, construction or otherwise with respect to improvements and buildings constructed on the Property; or

(d)      subject to any offsets, defenses or counterclaims which Tenant may be entitled to assert against any prior landlord (including Landlord); or

(e)      bound by any payment of rent or additional rent by Tenant to any prior landlord (including Landlord) for more than one month in advance; or

- 2 -

(f)     bound by any amendment, modification, termination or surrender of the Lease made without the written consent of Lender; or

(g)     liable or responsible for or with respect to the retention, application and/or return to Tenant of any security deposit paid to any prior landlord (including Landlord), whether or not still held by such prior landlord, unless and until Lender or any Successor Landlord has actually received said deposit for its own account as the landlord under the Lease as security for the performance of Tenant's obligation under the Lease (which deposit shall, nonetheless, be held subject to the provisions of the Lease).

6.      Tenant hereby represents, warrants, covenants and agrees to and with Lender:

(a)     to deliver to Lender, by certified mail, return receipt requested, a duplicate of each notice of default delivered by Tenant to Landlord at the same time as such notice is given to Landlord and no such notice of default shall be deemed given by Tenant under the Lease unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right (but shall not be obligated) to cure such default. Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. Tenant further agrees to afford Lender a period of thirty (30) days beyond any period afforded to Landlord for the curing of such default during which period Lender may elect (but shall not be obligated) to seek to cure such default, or, if such default cannot be cured within that time, then such additional time as may be necessary to cure such default (including but not limited to commencement of foreclosure proceedings) during which period Lender may elect (but shall not be obligated) to seek to cure such default, prior to taking any action to terminate the Lease. If the Lease shall terminate for any reason, upon Lender's written request given within thirty (30) days after such termination, Tenant, within fifteen (15) days after such request, shall execute and deliver to Lender a new lease of the Premises for the remainder of the term of the Lease and upon all of the same terms, covenants and conditions of the Lease;

(b)     that Tenant is the sole owner of the leasehold estate created by the Lease; and

(c)     to promptly certify in writing to Lender, in connection with any proposed assignment of the Mortgage, whether or not any default on the part of Landlord then exists under the Lease and to deliver to Lender any tenant estoppel certificates required under the Lease.

7.      Tenant acknowledges that the interest of Landlord under the Lease is assigned to Lender solely as security for the Promissory Note, and Lender shall have no duty, liability or obligation under the Lease or any extension or renewal thereof, unless Lender shall specifically undertake such liability in writing or Lender becomes and then only with respect to periods in which Lender becomes, the fee owner of the Property.

8.     Independent Manager, on behalf of each Other Lienholder, agrees not to disturb Tenant and the Lease, with respect to any lien on the Property, on the same terms and conditions pursuant to which Lender agrees hereunder, and Tenant agrees to suborn and attorn with respect to such Other Lienholder related to any lien on the Property held by such Other Lienholder on the same terms and conditions pursuant to which Tenant suborns and attorns with respect to Lender hereunder.

9.     This Agreement shall be governed by and construed in accordance with the laws of the State in which the Premises is located (excluding the choice of law rules thereof).

10.     This Agreement and each and every covenant, agreement and other provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns (including, without limitation, any successor holder of the Promissory Note) and may be amended, supplemented, waived or modified only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

11.     All notices to be given under this Agreement shall be in writing and shall be deemed served upon receipt by the addressee if served personally or, if mailed, upon the first to occur of receipt or the refusal of delivery as shown on a return receipt, after deposit in the United States Postal Service certified mail, postage prepaid, addressed to the address of Landlord, Tenant, or Lender appearing below. Such addresses may be changed by notice given in the same manner. If any party consists of multiple individuals or entities, then notice to any one of same shall be deemed notice to such party.

| If to Lender: | 14225 Ventura Blvd, Suite 100<br>Sherman Oaks, California 91423 |
| If to Tenant: | ███████████████████████ |
| If to Landlord: | 14225 Ventura Blvd, Suite 100<br>Sherman Oaks, California 91423 |

12.     If this Agreement conflicts with the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of nondisturbance agreements by the holder of, the Mortgage.

13.     In the event Lender shall acquire Landlord's interest in the Premises, Tenant shall look only to the estate and interest, if any, of Lender in the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by Lender as a Successor Landlord under the Lease or under this Agreement, and no other property or assets of Lender shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the

- 4 -

Lease, the relationship of the landlord and tenant under the Lease or Tenant's use or occupancy of the Premises or any claim arising under this Agreement.

14.     If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

15.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**TENANT:**



**LANDLORD:**

EMERALD LAKE INVESTMENTS, LLC

By: WGC Independent Manager LLC
Its: Manager

By: _____
      Name: Lawrence Perkins
      Title: Chief Restructuring Officer

**LENDER:**

WOODBRIDGE MORTGAGE INVESTMENT
FUND 3, LLC

By: WGC Independent Manager LLC
Its: Manager

By: _____
      Name: Lawrence Perkins
      Title: Chief Restructuring Officer

**INDEPENDENT MANAGER:**

WGC INDEPENDENT MANAGER LLC

By: _____
      Name: Lawrence Perkins
      Title: Chief Restructuring Officer

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.



State of California         )
County of _LOS ANGELES_   )

On _12-1-17_ _____ before me, _KARLA BOTTOMLEY_ _____, a Notary Public,
personally appeared ███████████ _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Karla J Bottomley_ (Seal)

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**TENANT:**

**LANDLORD:**

EMERALD LAKE INVESTMENTS, LLC

By:    WGC Independent Manager LLC
Its:    Manager

By:    _____
         Name:  Lawrence Perkins
         Title:  Chief Restructuring Officer

**LENDER:**

WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC

By:    WGC Independent Manager LLC
Its:    Manager

By:    _____
         Name:  Lawrence Perkins
         Title:  Chief Restructuring Officer

**INDEPENDENT MANAGER:**

WGC INDEPENDENT MANAGER LLC

By:    _____
         Name:  Lawrence Perkins
         Title:  Chief Restructuring Officer

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

State of California          )
County of *Los Angeles*      )

On *Dec. 1, 2017*     before me, *Pamela Santos*                , a Notary Public,
personally appeared *Lawrence Perkins*                                              ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)



PAMELA SANTOS
Commission # 2080477
Notary Public - California
Los Angeles County
My Comm. Expires Sep 1, 2018

**Exhibit A**

Legal Description of Property

(Attached)

**Exhibit E**

**Second Subordination, Non-Disturbance, and Attornment Agreement**

This **SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT** (the "*Agreement*") is dated as of December 1, 2017, and is by and among Carbondale Glen River Mesa, LLC, a Colorado limited liability company ("*Landlord*"), ▇▇ ▇▇▇▇ ("*Tenant*"), Woodbridge Mortgage Investment Fund 1, LLC, Delaware limited liability company, Woodbridge Mortgage Investment Fund 3A, LLC, Delaware limited liability company, as lenders (collectively, together with their respective successors and assigns, "*Lenders*"), and WGC Independent Manager LLC, a Delaware limited liability company ("*Independent Manager*").

WHEREAS, Lenders have made loans to Landlord (the "*Loans*"), which Loans are evidenced by promissory notes (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Promissory Notes*") and secured by, among other things, certain Deeds of Trust (as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time, the "*Mortgages*") encumbering the real property located at ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ more particularly described on **Exhibit A** annexed hereto and made a part hereof (the "*Properties*");

WHEREAS, by a lease agreement (the "*Lease*") dated November __, 2017, between Landlord (or Landlord's predecessor in title) and Tenant, Landlord leased to Tenant a portion of the Property, as said portion is more particularly described in the Lease (such portion of the Property hereinafter referred to as the "*Premises*");

WHEREAS, Tenant acknowledges that Lenders will rely on this Agreement in making the Loans to Landlord;

WHEREAS, Lenders and Tenant desire to evidence their understanding with respect to the Mortgages and the Lease as hereinafter provided; and

WHEREAS, Independent Manager and Tenant desire to evidence their understanding with respect to any lien on the Property held by any other entities for which Independent Manager is the manager (the "*Other Lienholders*").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.      Tenant covenants, stipulates and agrees that the Lease and all of Tenant's right, title and interest in and to the Property thereunder (including but not limited to any option to purchase, right of first refusal to purchase or right of first offer to purchase the Property or any portion thereof) is hereby, and shall at all times continue to be, subordinated and made secondary and inferior in each and every respect to the Mortgages and the lien thereof, to all of the terms, conditions and provisions thereof and to any and all advances made or to be made thereunder, so that at all times the Mortgages shall be and remain a lien on the Property prior to and superior to the Lease for all purposes, subject to the provisions set forth herein. Subordination is to have the same force and effect as if the Mortgages and such renewals, modifications, consolidations, replacements and extensions had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2.    Lenders agree that if any Lender exercises any of its rights under any Mortgage, including entry or foreclosure of such Mortgage or exercise of a power of sale under such Mortgage, such Lender will not disturb Tenant's right to use, occupy and possess the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period under any term, covenant or condition of the Lease.

3.    If, at any time any Lender (or any person, or such person's successors or assigns, who acquires the interest of Landlord under the Lease through foreclosure of any Mortgage or otherwise) shall succeed to the rights of Landlord under the Lease as a result of a default or event of default under any Mortgage, Tenant shall attorn to and recognize such person so succeeding to the rights of Landlord under the Lease (herein sometimes called "*Successor Landlord*") as Tenant's landlord under the Lease, said attornment to be effective and self-operative without the execution of any further instruments. Although said attornment shall be self-operative, Tenant agrees to execute and deliver to such Lender or to any Successor Landlord, such other instrument or instruments as such Lender or such other person shall from time to time request in order to confirm said attornment.

4.    Landlord authorizes and directs Tenant to honor any written demand or notice from any Lender instructing Tenant to pay rent or other sums to such Lender rather than Landlord (a "*Payment Demand*"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand. Tenant may rely upon any notice, instruction, Payment Demand, certificate, consent or other document from, and signed by, any Lender and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given. Any payment made by Tenant to any Lender or in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

5.    If any Lender shall become the owner of the Property or the Property shall be sold by reason of foreclosure or other proceedings brought to enforce any Mortgage or if the Property shall be transferred by deed in lieu of foreclosure, such Lender or any Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord) or bound by any obligation to make any payment to Tenant which was required to be made prior to the time such Lender succeeded to any prior landlord (including Landlord); or

(b)    obligated to cure any defaults of any prior landlord (including Landlord) which occurred, or to make any payment to Tenant which was required to be paid by any prior landlord (including Landlord), prior to the time that such Lender or any Successor Landlord succeeded to the interest of such landlord under the Lease; or

(c)    obligated to perform any construction obligations of any prior landlord (including Landlord) under the Lease or liable for any defects (latent, patent or otherwise) in the design, workmanship, materials, construction or otherwise with respect to improvements and buildings constructed on the Property; or

(d)     subject to any offsets, defenses or counterclaims which Tenant may be entitled to assert against any prior landlord (including Landlord); or

(e)     bound by any payment of rent or additional rent by Tenant to any prior landlord (including Landlord) for more than one month in advance; or

(f)     bound by any amendment, modification, termination or surrender of the Lease made without the written consent of such Lender; or

(g)     liable or responsible for or with respect to the retention, application and/or return to Tenant of any security deposit paid to any prior landlord (including Landlord), whether or not still held by such prior landlord, unless and until such Lender or any Successor Landlord has actually received said deposit for its own account as the landlord under the Lease as security for the performance of Tenant's obligation under the Lease (which deposit shall, nonetheless, be held subject to the provisions of the Lease).

6.     Tenant hereby represents, warrants, covenants and agrees to and with Lenders:

(a)     to deliver to Lenders, by certified mail, return receipt requested, a duplicate of each notice of default delivered by Tenant to Landlord at the same time as such notice is given to Landlord and no such notice of default shall be deemed given by Tenant under the Lease unless and until a copy of such notice shall have been so delivered to Lenders. Lenders shall have the right (but shall not be obligated) to cure such default. Tenant shall accept performance by Lenders of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. Tenant further agrees to afford Lenders a period of thirty (30) days beyond any period afforded to Landlord for the curing of such default during which period Lenders may elect (but shall not be obligated) to seek to cure such default, or, if such default cannot be cured within that time, then such additional time as may be necessary to cure such default (including but not limited to commencement of foreclosure proceedings) during which period Lenders may elect (but shall not be obligated) to seek to cure such default, prior to taking any action to terminate the Lease. If the Lease shall terminate for any reason, upon any Lender's written request given within thirty (30) days after such termination, Tenant, within fifteen (15) days after such request, shall execute and deliver to Lenders a new lease of the Premises for the remainder of the term of the Lease and upon all of the same terms, covenants and conditions of the Lease;

(b)     that Tenant is the sole owner of the leasehold estate created by the Lease; and

(c)     to promptly certify in writing to Lenders, in connection with any proposed assignment of the Mortgages, whether or not any default on the part of Landlord then exists under the Lease and to deliver to Lenders any tenant estoppel certificates required under the Lease.

7.     Tenant acknowledges that the interest of Landlord under the Lease is assigned to Lenders solely as security for the Promissory Note, and Lenders shall have no duty,

liability or obligation under the Lease or any extension or renewal thereof, unless Lenders shall specifically undertake such liability in writing or Lenders become and then only with respect to periods in which Lenders become, the fee owner of the Property.

       8.     Independent Manager, on behalf of each Other Lienholder, agrees not to disturb Tenant and the Lease, with respect to any lien on the Property, on the same terms and conditions pursuant to which Lenders agree hereunder, and Tenant agrees to suborn and attorn with respect to such Other Lienholder related to any lien on the Property held by such Other Lienholder on the same terms and conditions pursuant to which Tenant suborns and attorns with respect to Lenders hereunder.

       9.     This Agreement shall be governed by and construed in accordance with the laws of the State in which the Premises is located (excluding the choice of law rules thereof).

       10.    This Agreement and each and every covenant, agreement and other provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns (including, without limitation, any successor holder of the Promissory Notes) and may be amended, supplemented, waived or modified only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

       11.    All notices to be given under this Agreement shall be in writing and shall be deemed served upon receipt by the addressee if served personally or, if mailed, upon the first to occur of receipt or the refusal of delivery as shown on a return receipt, after deposit in the United States Postal Service certified mail, postage prepaid, addressed to the address of Landlord, Tenant, or Lenders appearing below. Such addresses may be changed by notice given in the same manner. If any party consists of multiple individuals or entities, then notice to any one of same shall be deemed notice to such party.

     If to Lenders:       14225 Ventura Blvd, Suite 100
                                Sherman Oaks, California 91423

     If to Tenant:

     If to Landlord:    14225 Ventura Blvd, Suite 100
                                Sherman Oaks, California 91423

       12.    If this Agreement conflicts with the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of nondisturbance agreements by the holder of, the Mortgages.

       13.    In the event Lenders shall acquire Landlord's interest in the Premises, Tenant shall look only to the estate and interest, if any, of Lenders in the Property for the

- 4 -

satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by Lenders as a Successor Landlord under the Lease or under this Agreement, and no other property or assets of Lenders shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease, the relationship of the landlord and tenant under the Lease or Tenant's use or occupancy of the Premises or any claim arising under this Agreement.

14.    If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

15.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**TENANT:**



**LANDLORD:**

CARBONDALE GLEN RIVER MESA, LLC

By:    WGC Independent Manager LLC
Its:    Manager

By: _____
       Name: Lawrence Perkins
       Title: Chief Restructuring Officer

**LENDERS:**

WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC

WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC

WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

By:    WGC Independent Manager LLC
Its:    Manager

By: _____
       Name: Lawrence Perkins
       Title: Chief Restructuring Officer

**INDEPENDENT MANAGER:**

WGC INDEPENDENT MANAGER LLC

By: _____
       Name: Lawrence Perkins
       Title: Chief Restructuring Officer

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California          )
County of ___LOS ANGELES_____          )

On __12/1/17_____ before me, _KARLA BOTTOMLEY , NOTARY PUBLIC_,
　　　　Date　　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared ___████████████_____
　　　　　　　　　　　　　　　　Name(s) of Signer(s)

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

KARLA J. BOTTOMLEY
Comm. #2209704
Notary Public · California
Los Angeles County
Comm. Expires Aug 12, 2021

Signature __X Karla J. Bottomley_____
　　　　　　　Signature of Notary Public

Place Notary Seal Above

──────────── OPTIONAL ────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT_
Document Date: __12/1/17_____ Number of Pages: ___6____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: ████████ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☒ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2016 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)    Item #5907

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

## TENANT:

_____

██████████

## LANDLORD:

CARBONDALE GLEN RIVER MESA, LLC

By: WGC Independent Manager LLC
Its: Manager

By: _____
Name: Lawrence Perkins
Title: Chief Restructuring Officer

## LENDERS:

WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC

WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC

WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC

By: WGC Independent Manager LLC
Its: Manager

By: _____
Name: Lawrence Perkins
Title: Chief Restructuring Officer

## INDEPENDENT MANAGER:

WGC INDEPENDENT MANAGER LLC

By: _____
Name: Lawrence Perkins
Title: Chief Restructuring Officer

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

State of California          )
County of _Los Angeles_      )

On _Dec. 1, 2017_ before me, _Pamela Santos_ , a Notary Public,
personally appeared _Lawrence Perkins_ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____  (Seal)

PAMELA SANTOS
Commission # 2080477
Notary Public - California
Los Angeles County
My Comm. Expires Sep 1, 2018

**Exhibit A**

Legal Description of Property

(Attached)

**<u>Exhibit F</u>**

**Management Consent**

# ACTION BY WRITTEN CONSENT
# OF THE
# SOLE MEMBER OF
# WOODBRIDGE GROUP OF COMPANIES, LLC
# AND CERTAIN AFFILIATES

### and

## AMENDMENT OF LLC AGREEMENTS

### December 1, 2017

Each of the undersigned, being either the sole member (the "*Member*") of one or more of the limited liability companies whose names are set forth on Schedule 1 attached hereto (each, a "*Company*" and collectively, the "*Companies*") or a Company, in each case in accordance with each Company's LLC Agreement (as hereinafter defined) and with the applicable limited liability company laws of the jurisdiction of formation of each Company (the "*LLC Laws*"), hereby consents to and approves the adoption of the following resolutions and each and every action effected thereby or pursuant thereto by written consent as if such actions had been taken at a meeting of the sole member of each such Company.

## APPOINTMENT OF INDEPENDENT MANAGER OF THE COMPANIES

**WHEREAS**, such Member has reviewed and considered materials presented by legal and financial advisors of the Companies regarding the potential liabilities of the Companies, the strategic alternatives available to it, and the impact of the foregoing on the business of the Companies;

**WHEREAS**, pursuant to the limited liability company agreement, operating agreement, or other governing agreement (each an "*LLC Agreement*"), as applicable, of each Company, such Company shall be managed by one Manager (as defined in the applicable LLC Agreement), the Member of such Company may remove the Manager of such Company, and the Member of such Company may unilaterally appoint a successor Manager for such Company;

**WHEREAS**, the Member of each of the Companies has determined it to be in the best interests of each such Company, its creditors, members and other stakeholders to appoint a Manager that is disinterested and independent to consider, review, negotiate and approve any strategic alternatives available to such Company, and the impact of the foregoing on the business and stakeholders of such Company;

**WHEREAS**, each such Member has determined that Beilinson Advisory Group LLC ("*Beilinson*") is disinterested and independent;

**WHEREAS**, WGC Independent Manager LLC, a Delaware limited liability company ("*Independent Manager*"), has been created with Beilinson as its sole manager with the full, exclusive and complete power to manage and control the business and affairs of Independent

1

Manager pursuant to the Limited Liability Company Agreement of Independent Manager, dated as of December 1, 2017,  attached hereto as <u>Exhibit A</u>;

**WHEREAS**, the Member of Woodbridge Group of Companies, LLC ("***Woodbridge***") has reviewed the proposed engagement letter by and between Beilinson and Woodbridge in the form attached hereto as <u>Exhibit B</u> (the "***Beilinson Engagement Letter***") and has determined it to be in the best interests of Woodbridge and its stakeholders for Woodbridge to enter into the Beilinson Engagement Letter and to consummate the transactions contemplated thereby; and

**WHEREAS**, the Member of each of the Companies has determined it to be in the best interests of each such Company, its creditors, members and other stakeholders to remove the existing Manager of such Company and to appoint Independent Manager as the Manager of such Company.

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms and provisions of the Beilinson Engagement Letter be, and they hereby are, approved, and that the existing Manager of Woodbridge be, and hereby is, authorized and directed to execute and deliver the Beilinson Engagement Letter in the name and on behalf of Woodbridge.

**RESOLVED FURTHER**, that, immediately following the execution and delivery of the Beilinson Engagement Letter, the existing Manager of each Company be, and hereby is, removed from its positions as Manager of such Company; and

**RESOLVED FURTHER**, that Independent Manager be, and hereby is, appointed as the Manager of each Company, and shall have all rights and powers afforded to the Manager under the organizational documents of such Company and the LLC Laws, until its successor shall be duly appointed by the Member.

## AMENDMENT OF OPERATING AGREEMENTS OF THE COMPANIES

**WHEREAS**, pursuant to the respective LLC Agreements of each Company, the LLC Agreement of such Company may be amended by a written instrument adopted and executed by the Member of such Company and the Company; and

**WHEREAS**, the Member of each Company and each such Company desire to amend the LLC Agreement of such Company as set forth herein.

**NOW, THEREFORE, BE IT RESOLVED**, that prior to the appointment of the Independent Manager as the Manager of each Company as set forth above, each Company and the Member of such Company hereby amend the LLC Agreement  of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, no member of such Company shall cease to be a member of such Company upon the happening of any of the events set forth in Section 18-304(1) of the LLC Laws of the State of Delaware (or any similar provision of the applicable LLC Laws of any State other than Delaware with respect to any Company that is existing under the LLC Laws of a State other than the State of Delaware);

**RESOLVED FURTHER,** that each Company and the Member of such Company hereby amend the LLC Agreement of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, there shall be no restrictions on the ability of any member of such Company to transfer or assign its membership interest in the Company or its rights and obligations under the LLC Agreement of such Company;

**RESOLVED FURTHER,** that each Company and the Member of such Company hereby amend the LLC Agreement of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, such Company may put into effect and carry out any decrees and orders of a court or judge having jurisdiction over a proceeding pursuant to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or any successor statute, in which proceeding an order for relief has been entered with respect to such Company, and may take any action provided or directed by such decrees and orders, in each case without a vote or other consent or approval by such Company's managers or members;

**RESOLVED FURTHER,** that each Company and the Member of such Company hereby amend the LLC Agreement of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, from the filing by such Company of a voluntary petition for relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") until (i) the confirmation of a chapter 11 plan involving such Company, (ii) appointment of a chapter 11 trustee or a receiver for such Company, (iii) conversion of the bankruptcy case of such Company to a case under chapter 7 of the Bankruptcy Code, (iv) dismissal of the bankruptcy case of such Company, or (v) a settlement or dismissal of all enforcement actions commenced by the United States Securities and Exchange Commission against Robert Shapiro, following the appointment of WGC Independent Manager LLC as the Manager of the Company, (x) the Manager of such Company may not be removed by the Member of such Company and (y) the Member shall not amend, alter, change or repeal such operating agreement or any other document governing the formation, management or operation of such Company, unless the Manager consents in writing;

**RESOLVED FURTHER,** that each Company and the Member of such Company hereby amend the LLC Agreement of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, the Manager of such Company shall be an intended third-party beneficiary of any provision of such LLC Agreement related to the rights and obligations of the Manager;

**RESOLVED FURTHER,** that each Company and the Member of such Company hereby amend the LLC Agreement of such Company to provide that, notwithstanding any provision of the LLC Agreement of such Company to the contrary, the business and affairs of the Company shall be managed by or under the direction of one Manager who shall have the full, exclusive and complete power to manager and control the business and affairs of such Company and shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of such Company without the consent or approval of the Member of such Company, including the power to sell or dispose of any assets of such Company or to file a petition for relief under the Bankruptcy Code, and except as otherwise required by law, the Member of such Company shall not have any power to manage or control the business and affairs of such Company; and

**RESOLVED, FURTHER,** that each Company and the Member of such Company, by execution of this Action by Written Consent and Amendment of LLC Agreements, intends that this Action by Written Consent and Amendment of LLC Agreements be a written instrument to amend the LLC Agreement of each of the respective Companies.

## GENERAL AUTHORITY

**RESOLVED,** that any specific resolutions that may be required to have been adopted by any Member or any Company in connection with the actions and transactions contemplated by the foregoing resolutions be, and they hereby are, adopted, and the proper officers and managers be, and each of them acting alone hereby is, authorized to certify as to the adoption of any and all such resolutions;

**RESOLVED FURTHER,** that all actions heretofore or hereafter taken by any officer or manager of any Company in connection with or otherwise in contemplation of the matters contemplated by any of the foregoing resolutions be, and they hereby are, approved, ratified and affirmed in all respects; and

**RESOLVED FURTHER,** that the officers and manager of each Company be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of such Company, to take or cause to be taken all actions (including, without limitation, the engagement of any third-party and the payment of all fees and expenses) and to execute and deliver all such agreements, instruments, certificates, filings and other documents which any officer or manager approves as necessary or desirable in connection with the foregoing resolutions, such approval to be conclusively evidenced by the taking of any such action or the execution and delivery of any such agreement, instrument, certificate or other document by such officer or manager.

**[Remainder of Page Left Intentionally Blank]**

IN WITNESS WHEREOF, the each of the undersigned has executed this Action by Written Consent to be effective as of the date first written above.

**1336, LLC**
**14068 DAVANA HOLDING COMPANY, LLC**
**14068 DAVANA TERRACE, LLC**
**15672 CASTLEWOODS DRIVE, LLC**
**15672 CASTLEWOODS OWNERS, LLC**
**15714 CASTLEWOODS DRIVE, LLC**
**15714 CASTLEWOODS OWNERS, LLC**
**215 NORTH 12TH STREET, LLC**
**A PLUS HOLDINGS, LLC**
**ADDISON PARK INVESTMENTS, LLC**
**ALPINE ROSE, LLC**
**ANCHORPOINT INVESTMENTS, LLC**
**ARBORVITAE INVESTMENTS, LLC**
**ARCHIVOLT INVESTMENTS, LLC**
**ARCHSTONE INVESTMENTS, LLC**
**ARLINGTON RIDGE INVESTMENTS, LLC**
**ARROWPOINT INVESTMENTS, LLC**
**ASHBURTON WAY INVESTMENTS, LLC**
**ATALAYA CIRCLE INVESTMENTS, LLC**
**BALEROY INVESTMENTS, LLC**
**BASSWOOD HOLDING, LLC**
**BAY VILLAGE INVESTMENTS, LLC**
**BEAR BROOK INVESTMENTS, LLC**
**BEARINGSIDE INVESTMENTS, LLC**
**BEECH CREEK INVESTMENTS, LLC**
**BELLMIRE INVESTMENTS, LLC**
**BIRCHWOOD MANOR INVESTMENTS, LLC**
**BISHOP WHITE INVESTMENTS, LLC**
**BLACK BASS INVESTMENTS, LLC**
**BLACK LOCUST INVESTMENTS, LLC**
**BLUFF POINT INVESTMENTS, LLC**
**BOILING SPRING INVESTMENTS, LLC**
**BONIFACIO HILL INVESTMENTS, LLC**
**BOWMAN INVESTMENTS, LLC**
**BOWSTRING INVESTMENTS, LLC**
**BRAMLEY INVESTMENTS, LLC**
**BRECKENRIDGE INVESTMENTS, LLC**
**BRECKENRIDGE, LLC**
**BRISE SOLEIL INVESTMENTS, LLC**
**BROADSANDS INVESTMENTS, LLC**
**BRYNDERWEN INVESTMENTS, LLC**
**CABLESTAY INVESTMENTS, LLC**
**CAISSON INVESTMENTS, LLC**
**CALDER GROVE INVESTMENTS, LLC**
**CALENDONIA CIRCLE INVESTMENTS, LLC**
**CALIFORNIA COMMERCIAL LENDERS, LLC**
**CANNINGTON INVESTMENTS, LLC**

CANTILEVER INVESTMENTS, LLC
CARBONDALE DOOCY, LLC
CARBONDALE GLEN LOT A-5, LLC
CARBONDALE GLEN LOT D-22, LLC
CARBONDALE GLEN LOT E-15, LLC
CARBONDALE GLEN LOT E-24, LLC
CARBONDALE GLEN LOT E-38, LLC
CARBONDALE GLEN LOT E-8, LLC
CARBONDALE GLEN LOT GV-13, LLC
CARBONDALE GLEN LOT GV-6, LLC
CARBONDALE GLEN LOT IS-11, LLC
CARBONDALE GLEN LOT SD-14, LLC
CARBONDALE GLEN LOT SD-23, LLC
CARBONDALE GLEN MESA LOT 19, LLC
CARBONDALE GLEN RIVER MESA, LLC
CARBONDALE GLEN SUNDANCE PONDS, LLC
CARBONDALE GLEN SWEETGRASS VISTA, LLC
CARBONDALE SPRUCE 101, LLC
CARBONDALE SUNDANCE LOT 15, LLC
CARBONDALE SUNDANCE LOT 16, LLC
CASPER FALLS INVESTMENTS, LLC
CASTLE PINES INVESTMENTS, LLC
CENTERSHOT INVESTMENTS, LLC
CHAPLIN INVESTMENTS, LLC
CHESTNUT INVESTMENTS, LLC
CHESTNUT RIDGE INVESTMENTS, LLC
CLEMENTINA PARK INVESTMENTS, LLC
CLIFF PARK INVESTMENTS, LLC
CLOVER BASIN INVESTMENTS, LLC
COFFEE CREEK INVESTMENTS, LLC
CONNEAUT LAKE INVESTMENTS, LLC
COPPER SANDS INVESTMENTS, LLC
CRAVEN INVESTMENTS, LLC
CROSSBEAM INVESTMENTS, LLC
CROSSKEYS INVESTMENTS, LLC
CROWFIELD INVESTMENTS, LLC
CRYSTAL VALLEY HOLDINGS, LLC
CRYSTAL WOODS INVESTMENTS, LLC
CUCO SETTLEMENT, LLC
DALEVILLE INVESTMENTS, LLC
DERBYSHIRE INVESTMENTS, LLC
DIAMOND COVE INVESTMENTS, LLC
DIXMONT STATE INVESTMENTS, LLC
DIXVILLE NOTCH INVESTMENTS, LLC
DOGWOOD VALLEY INVESTMENTS, LLC
DOLLIS BROOK INVESTMENTS, LLC
DONNINGTON INVESTMENTS, LLC
DOUBLELEAF INVESTMENTS, LLC
DRAWSPAN INVESTMENTS, LLC
DVDO DESIGN, LLC
DVDO HOLDING COMPANY, LLC

ELDREDGE INVESTMENTS, LLC
ELM CITY INVESTMENTS, LLC
ELSTAR INVESTMENTS, LLC
EMERALD LAKE INVESTMENTS, LLC
EVERGREEN WAY INVESTMENTS, LLC
FIELDPOINT INVESTMENTS, LLC
FOOTHILL CL NOMINEE, LLC
FOXRIDGE INVESTMENTS, LLC
FRANCONIA NOTCH INVESTMENTS, LLC
FULTON UNDERWOOD, LLC
GATESHEAD INVESTMENTS, LLC
GLENHAVEN HEIGHTS INVESTMENTS, LLC
GLENN RICH INVESTMENTS, LLC
GOLDEN GATE INVESTMENTS, LLC
GOOSE ROCKS INVESTMENTS, LLC
GOOSEBROOK INVESTMENTS, LLC
GRAEME PARK INVESTMENTS, LLC
GRAND MIDWAY INVESTMENTS, LLC
GRAVENSTEIN INVESTMENTS, LLC
GRAYWATER INVESTMENTS, LLC
GREAT SAND INVESTMENTS, LLC
GREEN GABLES INVESTMENTS, LLC
GRENADIER INVESTMENTS, LLC
GRUMBLETHORPE INVESTMENTS, LLC
H1 SILVERBARON HOLDING COMPANY, LLC
H11 SILK CITY HOLDING COMPANY, LLC
H12 WHITE BIRCH HOLDING COMPANY, LLC
H13 BAY VILLAGE HOLDING COMPANY, LLC
H14 DIXVILLE NOTCH HOLDING COMPANY, LLC
H15 BEAR BROOK HOLDING COMPANY, LLC
H16 MONADNOCK HOLDING COMPANY, LLC
H17 PEMIGEWASSET HOLDING COMPANY, LLC
H19 EMERALD LAKE HOLDING COMPANY, LLC
H2 ARLINGTON RIDGE HOLDING COMPANY, LLC
H20 BLUFF POINT HOLDING COMPANY, LLC
H21 SUMMERFREE HOLDING COMPANY, LLC
H22 PAPIROVKA HOLDING COMPANY, LLC
H23 PINOVA HOLDING COMPANY, LLC
H24 STAYMAN HOLDING COMPANY, LLC
H25 ELSTAR HOLDING COMPANY, LLC
H26 GRAVENSTEIN HOLDING COMPANY, LLC
H27 GRENADIER HOLDING COMPANY, LLC
H28 BLACK LOCUST HOLDING COMPANY, LLC
H29 ZESTAR HOLDING COMPANY, LLC
H3 EVERGREEN WAY HOLDING COMPANY, LLC
H30 SILVER MAPLE HOLDING COMPANY, LLC
H31 ADDISON PARK HOLDING COMPANY, LLC
H32 ARBORVITAE HOLDING COMPANY, LLC
H33 HAWTHORN HOLDING COMPANY, LLC
H34 PEARMAN HOLDING COMPANY, LLC
H35 HORNBEAM HOLDING COMPANY, LLC

**H36 STURMER PIPPIN HOLDING COMPANY, LLC**
**H37 IDARED HOLDING COMPANY, LLC**
**H38 MUTSU HOLDING COMPANY, LLC**
**H39 HARALSON HOLDING COMPANY, LLC**
**H4 PAWTUCKAWAY HOLDING COMPANY, LLC**
**H40 BRAMLEY HOLDING COMPANY, LLC**
**H41 GRUMBLETHORPE HOLDING COMPANY, LLC**
**H42 HILLVIEW HOLDING COMPANY, LLC**
**H43 LENNI HEIGHTS HOLDING COMPANY, LLC**
**H44 GREEN GABLES HOLDING COMPANY, LLC**
**H45 HARMONY INN HOLDING COMPANY, LLC**
**H46 BEECH CREEK HOLDING COMPANY, LLC**
**H47 SUMMIT CUT HOLDING COMPANY, LLC**
**H48 IRONDALE INN HOLDING COMPANY, LLC**
**H49 BOWMAN HOLDING COMPANY, LLC**
**H5 CHESTNUT RIDGE HOLDING COMPANY, LLC**
**H51 OLD CARBON HOLDING COMPANY, LLC**
**H52 WILLOW GROVE HOLDING COMPANY, LLC**
**H53 BLACK BASS HOLDING COMPANY, LLC**
**H54 SEVEN STARS HOLDING COMPANY, LLC**
**H55 OLD MAITLAND HOLDING COMPANY, LLC**
**H56 CRAVEN HOLDING COMPANY, LLC**
**H57 CLIFF PARK HOLDING COMPANY, LLC**
**H58 BALEROY HOLDING COMPANY, LLC**
**H59 RISING SUN HOLDING COMPANY, LLC**
**H6 LILAC MEADOW HOLDING COMPANY, LLC**
**H60 MORAVIAN HOLDING COMPANY LLC**
**H61 GRAND MIDWAY HOLDING COMPANY, LLC**
**H62 HOLMESBURG HOLDING COMPANY, LLC**
**H63 DIXMONT STATE HOLDING COMPANY, LLC**
**H64 PENNHURST HOLDING COMPANY, LLC**
**H65 THORNBURY FARM HOLDING COMPANY, LLC**
**H66 HEILBRON MANOR HOLDING COMPANY, LLC**
**H67 POWEL HOUSE HOLDING COMPANY, LLC**
**H68 GRAEME PARK HOLDING COMPANY, LLC**
**H69 CONNEAUT LAKE HOLDING COMPANY, LLC**
**H7 DOGWOOD VALLEY HOLDING COMPANY, LLC**
**H70 BISHOP WHITE HOLDING COMPANY, LLC**
**H71 CALENDONIA CIRCLE HOLDING COMPANY, LLC**
**H72 CLEMENTINA PARK HOLDING COMPANY, LLC**
**H73 GLENHAVEN HEIGHTS HOLDING COMPANY, LLC**
**H74 IMPERIAL ALY HOLDING COMPANY, LLC**
**H75 PACIFIC HEIGHTS HOLDING COMPANY, LLC**
**H76 DIAMOND COVE HOLDING COMPANY, LLC**
**H77 NEW MONTGOMERY HOLDING COMPANY, LLC**
**H78 INGLESIDE PATH HOLDING COMPANY, LLC**
**H79 ATALAYA CIRCLE HOLDING COMPANY, LLC**
**H8 MELODY LANE HOLDING COMPANY, LLC**
**H80 JUNIPERO SERRA HOLDING COMPANY, LLC**
**H81 GOLDEN GATE HOLDING COMPANY, LLC**
**H82 VAN NESS HOLDING COMPANY, LLC**

SIGNATURE PAGE TO ACTION BY WRITTEN CONSENT

**H83 SEACLIFF RUN HOLDING COMPANY, LLC**
**H84 HOLLY PARK HOLDING COMPANY, LLC**
**H85 BIRCHWOOD MANOR HOLDING COMPANY, LLC**
**H86 BONIFACIO HILL HOLDING COMPANY, LLC**
**H87 COPPER SANDS HOLDING COMPANY, LLC**
**H88 ASHBURTON WAY HOLDING COMPANY, LLC**
**H89 VISTA VERDE HOLDING COMPANY, LLC**
**H9 STRAWBERRY FIELDS HOLDING COMPANY, LLC**
**H90 HARBOR POINT HOLDING COMPANY, LLC**
**HACKMATACK INVESTMENTS, LLC**
**HAFFENBURG INVESTMENTS, LLC**
**HARALSON INVESTMENTS, LLC**
**HARBOR POINT INVESTMENTS, LLC**
**HARMONY INN INVESTMENTS, LLC**
**HARRINGWORTH INVESTMENTS, LLC**
**HAWTHORN INVESTMENTS, LLC**
**HAYS INVESTMENTS, LLC**
**HAZELPOINT INVESTMENTS, LLC**
**HEILBRON MANOR INVESTMENTS, LLC**
**HILLVIEW INVESTMENTS, LLC**
**HOLLY PARK INVESTMENTS, LLC**
**HOLLYLINE HOLDINGS, LLC**
**HOLMESBURG INVESTMENTS, LLC**
**HORNBEAM INVESTMENTS, LLC**
**IDARED INVESTMENTS, LLC**
**IMPERIAL ALY INVESTMENTS, LLC**
**INGLESIDE PATH INVESTMENTS, LLC**
**IRONDALE INN INVESTMENTS, LLC**
**IRONSIDES INVESTMENTS, LLC**
**IVY CIRCLE, LLC**
**JUNIPERO SERRA INVESTMENTS, LLC**
**L1 LUXURY HOLDINGS, LLC**
**LENNI HEIGHTS INVESTMENTS, LLC**
**LILAC CIRCLE, LLC**
**LILAC MEADOW INVESTMENTS, LLC**
**LINCOLNSHIRE INVESTMENTS, LLC**
**LOCKWOOD INVESTMENTS, LLC**
**LONETREE INVESTMENTS, LLC**
**LONGBOURN INVESTMENTS, LLC**
**M1 ARCHSTONE HOLDING COMPANY, LLC**
**M10 GATESHEAD HOLDING COMPANY, LLC**
**M11 ANCHORPOINT HOLDING COMPANY, LLC**
**M12 BEARINGSIDE HOLDING COMPANY, LLC**
**M13 CABLESTAY HOLDING COMPANY, LLC**
**M14 CROSSBEAM HOLDING COMPANY, LLC**
**M15 DOUBLELEAF HOLDING COMPANY, LLC**
**M17 LINCOLNSHIRE HOLDING COMPANY, LLC**
**M18 TWIN PIER HOLDING COMPANY, LLC**
**M19 ARROWPOINT HOLDING COMPANY, LLC**
**M2 CAISSON HOLDING COMPANY, LLC**
**M20 BOWSTRING HOLDING COMPANY, LLC**

**M21 CRESTMARK HOLDING COMPANY, LLC**
**M22 DRAWSPAN HOLDING COMPANY, LLC**
**M23 SIGHTLINE HOLDING COMPANY, LLC**
**M24 FIELDPOINT HOLDING COMPANY, LLC**
**M24 ANCHORPOINT HOLDING COMPANY, LLC**
**M25 CENTERSHOT HOLDING COMPANY, LLC**
**M26 ARCHIVOLT HOLDING COMPANY, LLC**
**M27 BRISE SOLEIL HOLDING COMPANY, LLC**
**M28 BROADSANDS HOLDING COMPANY, LLC**
**M29 BRYNDERWEN HOLDING COMPANY, LLC**
**M3 CANTILEVER HOLDING COMPANY, LLC**
**M30 CALDER GROVE HOLDING COMPANY, LLC**
**M31 CANNINGTON HOLDING COMPANY, LLC**
**M32 DOLLIS BROOK HOLDING COMPANY, LLC**
**M33 HARRINGWORTH HOLDING COMPANY, LLC**
**M34 QUARTERPOST HOLDING COMPANY, LLC**
**M35 SADDLEMOUNT HOLDING COMPANY, LLC**
**M36 SPRINGLINE HOLDING COMPANY, LLC**
**M37 TOPCHORD HOLDING COMPANY, LLC**
**M38 PEMBERLEY HOLDING COMPANY, LLC**
**M39 DERBYSHIRE HOLDING COMPANY, LLC**
**M4 SIDESPAR HOLDING COMPANY, LLC**
**M40 LONGBOURN HOLDING COMPANY, LLC**
**M41 SILVERTHORNE HOLDING COMPANY, LLC**
**M42 ORCHARD MESA HOLDING COMPANY, LLC**
**M43 WHITE DOME HOLDING COMPANY, LLC**
**M44 WILDERNEST HOLDING COMPANY, LLC**
**M45 CLOVER BASIN HOLDING COMPANY, LLC**
**M46 OWL RIDGE HOLDING COMPANY, LLC**
**M47 BELLMIRE HOLDING COMPANY, LLC**
**M48 VALLECITO HOLDING COMPANY, LLC**
**M49 SQUARETOP HOLDING COMPANY, LLC**
**M5 STEPSTONE HOLDING COMPANY, LLC**
**M50 WETTERHORN HOLDING COMPANY, LLC**
**M51 COFFEE CREEK HOLDING COMPANY, LLC**
**M52 LOCKWOOD HOLDING COMPANY, LLC**
**M53 CASTLE PINES HOLDING COMPANY, LLC**
**M54 LONETREE HOLDING COMPANY, LLC**
**M55 GREAT SAND HOLDING COMPANY, LLC**
**M56 HAFFENBURG HOLDING COMPANY, LLC**
**M57 RIDGECREST HOLDING COMPANY, LLC**
**M59 CASPER FALLS HOLDING COMPANY, LLC**
**M6 TRESTLEWOOD HOLDING COMPANY, LLC**
**M60 THUNDER BASIN HOLDING COMPANY, LLC**
**M61 MINEOLA HOLDING COMPANY, LLC**
**M62 SAGEBROOK HOLDING COMPANY, LLC**
**M63 CROWFIELD HOLDING COMPANY, LLC**
**M64 HAYS HOLDING COMPANY, LLC**
**M65 PHILLIPSBURG HOLDING COMPANY, LLC**
**M66 WONDERVIEW HOLDING COMPANY, LLC**
**M67 MOUNTAIN SPRING HOLDING COMPANY, LLC**

SIGNATURE PAGE TO ACTION BY WRITTEN CONSENT

M68 GOOSEBROOK HOLDING COMPANY, LLC
M69 FOXRIDGE HOLDING COMPANY, LLC
M7 BRECKENRIDGE HOLDING COMPANY, LLC
M70 PINNEY HOLDING COMPANY, LLC
M71 ELDREDGE HOLDING COMPANY, LLC
M72 DALEVILLE HOLDING COMPANY, LLC
M73 MASON RUN HOLDING COMPANY, LLC
M74 VARGA HOLDING COMPANY, LLC
M75 RILEY CREEKHOLDING COMPANY, LLC
M76 CHAPLIN HOLDING COMPANY, LLC
M78 GRAYWATER HOLDING COMPANY, LLC
M79 CHESTNUT COMPANY, LLC
M8 CROSSKEYS HOLDING COMPANY, LLC
M80 HAZELPOINT HOLDING COMPANY, LLC
M81 BOILLING SPRING HOLDING COMPANY, LLC
M83 MT. HOLLY HOLDING COMPANY, LLC
M84 PEMBROKE ACADEMY HOLDING COMPANY, LLC
M85 GLENN RICH HOLDING COMPANY, LLC
M86 STEELE HILL HOLDING COMPANY, LLC
M87 HACKMATACK HILLS HOLDING COMPANY, LLC
M88 FRANCONIA NOTCH HOLDING COMPANY, LLC
M9 DONNINGTON HOLDING COMPANY, LLC
M90 MERRIMACK VALLEY HOLDING COMPANY, LLC
M91 NEWVILLE HOLDING COMPANY, LLC
M92 CRYSTAL WOODS HOLDING COMPANY, LLC
M93 GOOSE ROCKS HOLDING COMPANY, LLC
M94 WINDING ROAD HOLDING COMPANY, LLC
M95 PEPPERWOOD HOLDING COMPANY, LLC
M97 RED WOODS HOLDING COMPANY, LLC
M98 ELM CITY HOLDING COMPANY, LLC
M99 IRONSIDES HOLDING COMPANY, LLC
MANDEVILLA CIRCLE, LLC
MASON RUN INVESTMENTS, LLC
MELODY LANE INVESTMENTS, LLC
MERRIMACK VALLEY INVESTMENTS, LLC
MINEOLA INVESTMENTS, LLC
MONADNOCK INVESTMENTS, LLC
MORAVIAN INVESTMENTS, LLC
MOUNTAIN SPRING INVESTMENTS, LLC
MT. HOLLY INVESTMENTS, LLC
MUTSU INVESTMENTS, LLC
NEW MONTGOMERY INVESTMENTS, LLC
NEWVILLE INVESTMENTS, LLC
OLD CARBON INVESTMENTS, LLC
OLD MAITLAND INVESTMENTS, LLC
ORCHARD MESA INVESTMENTS, LLC
OWL RIDGE INVESTMENTS, LLC
PACIFIC HEIGHTS INVESTMENTS, LLC
PAPIROVKA INVESTMENTS, LLC
PAWTUCKAWAY INVESTMENTS, LLC
PEARMAIN INVESTMENTS, LLC

PEMBERLEY INVESTMENTS, LLC
PEMBROKE ACADEMY INVESTMENTS, LLC
PEMIGEWASSET INVESTMENTS, LLC
PEPPERWOOD INVESTMENTS, LLC
PHILLIPSBURG INVESTMENTS, LLC
PINNEY INVESTMENTS, LLC
PINOVA INVESTMENTS, LLC
POPPY CIRCLE, LLC
POWEL HOUSE INVESTMENTS, LLC
QUARTERPOST INVESTMENTS, LLC
RED WOODS INVESTMENTS, LLC
RHS CAPITAL, LLC
RIDGECREST INVESTMENTS, LLC
RILEY CREEK INVESTMENTS, LLC
RISING SUN INVESTMENTS, LLC
RS PROTECTON TRUST
SAC HOLDING COMPANY OF ASPEN, LLC
SAC MANAGEMENT, LLC
SADDLEMOUNT INVESTMENTS, LLC
SAGEBROOK INVESTMENTS, LLC
SEACLIFF RUN HOLDING COMPANY, LLC
SEVEN STARS INVESTMENTS, LLC
SIDESPAR INVESTMENTS, LLC
SIGHTLINE INVESTMENTS, LLC
SILK CITY INVESTMENTS, LLC
SILVER MAPLE INVESTMENTS, LLC
SILVERBARON INVESTMENTS, LLC
SILVERLEAF FUNDING, LLC
SILVERTHORNE INVESTMENTS, LLC
SPRINGLINE INVESTMENTS, LLC
SQUARETOP INVESTMENTS, LLC
STAYMAN INVESTMENTS, LLC
STEELE HILL INVESTMENTS, LLC
STEPSTONE INVESTMENTS, LLC
STRAWBERRY FIELDS INVESTMENTS, LLC
STURMER PIPPIN INVESTMENTS, LLC
SUMMERFREE INVESTMENTS, LLC
SUMMIT CUT INVESTMENTS, LLC
THORNBURY FARM INVESTMENTS, LLC
THUNDER BASIN INVESTMENTS, LLC
TOPCHORD INVESTMENTS, LLC
TRESTLEWOOD INVESTMENTS, LLC
TWEEDIA SQUARE FUNDING, LLC
TWIN PIER INVESTMENTS, LLC
U STREET HOLDINGS, LLC
VALLECITO INVESTMENTS, LLC
VAN NESS INVESTMENTS, LLC
VARGA INVESTMENTS, LLC
VISTA VERDE INVESTMENTS, LLC
WETTERHORN INVESTMENTS, LLC
WFS HOLDING COMPANY, LLC

**WHITE BIRCH INVESTMENTS, LLC**
**WHITE DOME INVESTMENTS, LLC**
**WHITEACRE FUNDING, LLC**
**WILDERNEST INVESTMENTS, LLC**
**WILLOW GROVE INVESTMENTS, LLC**
**WINDING ROAD INVESTMENTS, LLC**
**WINNISQUAM INVESTMENTS, LLC**
**WMF MANAGEMENT, LLC**
**WONDERVIEW INVESTMENTS, LLC**
**WOODBRIDGE BARIC PRE-SETTLEMENT**
**INVESTMENTS, LLC**
**WOODBRIDGE CAPITAL INVESTMENTS, LLC**
**WOODBRIDGE GROUP OF COMPANIES, LLC**
**WOODBRIDGE GUARANTEE HOLDING, LLC**
**WOODBRIDGE GUARANTEE, LLC**
**WOODBRIDGE INVESTMENTS, LLC**
**WOODBRIDGE LENDING FUND 1, LLC**
**WOODBRIDGE LUXURY HOMES, LLC**
**WOODBRIDGE MEZZANINE FUND 1, LLC**
**WOODBRIDGE STRUCTURED FUNDING, LLC**
**ZESTAR INVESTMENTS, LLC**

By:_____
    Name:  Robert Shapiro
    Title:   Manager


**HOLLYLINE OWNERS, LLC**


By:  Hollyline Holdings, LLC
Its:  Manager


By:_____
    Name:  Robert Shapiro
    Title:   Manager

**CRESTMARK INVESTMENTS, LLC**

By: M21 Crestmark Holding Company, LLC
Its: Manager


By:_____
    Name: Robert Shapiro
    Title: Manager


**WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 1, LLC**
**WOODBRIDGE COMMERCIAL BRIDGE LOAN FUND 2, LLC**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 1, LLC**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 2, LLC**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 3A, LLC**
**WOODBRIDGE MORTGAGE INVESTMENT FUND 4, LLC**

By: WMF Management, LLC
Its: Manager


By:_____
    Name: Robert Shapiro
    Title: Manager


**TEXAS CO-LENDERS 01, LLC**


By: Woodbridge Mortgage Investment Fund 4, LLC
Its: Manager


By:_____
    Name: Robert Shapiro
    Title: Manager

ACKNOWLEDGED:

By:_____
Name:  Robert Shapiro

## SCHEDULE 1

### The Companies

| Company |
| --- |
| 1336, LLC |
| 14068 Davana Holding Company, LLC |
| 14068 Davana Terrace, LLC |
| 15672 Castlewoods Drive, LLC |
| 15672 Castlewoods Owners, LLC |
| 15714 Castlewoods Drive, LLC |
| 15714 Castlewoods Owners, LLC |
| 215 North 12th Street, LLC |
| A Plus Holdings, LLC |
| Addison Park Investments, LLC |
| Alpine Rose, LLC |
| Anchorpoint Investments, LLC |
| Arborvitae Investments, LLC |
| Archivolt Investments, LLC |
| Archstone Investments, LLC |
| Arlington Ridge Investments, LLC |
| Arrowpoint Investments, LLC |
| Ashburton Way Investments, LLC |
| Atalaya Circle Investments, LLC |
| Baleroy Investments, LLC |
| Basswood Holding, LLC |
| Bay Village Investments, LLC |
| Bear Brook Investments, LLC |
| Bearingside Investments, LLC |
| Beech Creek Investments, LLC |
| Bellmire Investments, LLC |
| Birchwood Manor Investments, LLC |
| Bishop White Investments, LLC |
| Black Bass Investments, LLC |
| Black Locust Investments, LLC |
| Bluff Point Investments, LLC |
| Boiling Spring Investments, LLC |
| Bonifacio Hill Investments, LLC |
| Bowman Investments, LLC |
| Bowstring Investments, LLC |
| Bramley Investments, LLC |
| Breckenridge Investments, LLC |
| Breckenridge, LLC |

| |
|---|
| Brise Soleil Investments, LLC |
| Broadsands Investments, LLC |
| Brynderwen Investments, LLC |
| Cablestay Investments, LLC |
| Caisson Investments, LLC |
| Calder Grove Investments, LLC |
| Calendonia Circle Investments, LLC |
| California Commerical Lenders, LLC |
| Cannington Investments, LLC |
| Cantilever Investments, LLC |
| Carbondale Doocy, LLC |
| Carbondale Glen Lot A-5, LLC |
| Carbondale Glen Lot D-22, LLC |
| Carbondale Glen Lot E-15, LLC |
| Carbondale Glen Lot E-24, LLC |
| Carbondale Glen Lot E-38, LLC |
| Carbondale Glen Lot E-8, LLC |
| Carbondale Glen Lot GV-13, LLC |
| Carbondale Glen Lot GV-6, LLC |
| Carbondale Glen Lot IS-11, LLC |
| Carbondale Glen Lot SD-14, LLC |
| Carbondale Glen Lot SD-23, LLC |
| Carbondale Glen Mesa Lot 19, LLC |
| Carbondale Glen River Mesa, LLC |
| Carbondale Glen Sundance Ponds, LLC |
| Carbondale Glen Sweetgrass Vista, LLC |
| Carbondale Spruce 101, LLC |
| Carbondale Sundance Lot 15, LLC |
| Carbondale Sundance Lot 16, LLC |
| Casper Falls Investments, LLC |
| Castle Pines Investments, LLC |
| Centershot Investments, LLC |
| Chaplin Investments, LLC |
| Chestnut Investments, LLC |
| Chestnut Ridge Investments, LLC |
| Clementina Park Investments, LLC |
| Cliff Park Investments, LLC |
| Clover Basin Investments, LLC |
| Coffee Creek Investments, LLC |
| Conneaut Lake Investments, LLC |
| Copper Sands Investments, LLC |
| Craven Investments, LLC |
| Crestmark Investments, LLC |

| |
|---|
| Crossbeam Investments, LLC |
| Crosskeys Investments, LLC |
| Crowfield Investments, LLC |
| Crystal Valley Holdings, LLC |
| Crystal Woods Investments, LLC |
| Cuco Settlement, LLC |
| Daleville Investments, LLC |
| Derbyshire Investments, LLC |
| Diamond Cove Investments, LLC |
| Dixmont State Investments, LLC |
| Dixville Notch Investments, LLC |
| Dogwood Valley Investments, LLC |
| Dollis Brook Investments, LLC |
| Donnington Investments, LLC |
| Doubleleaf Investments, LLC |
| Drawspan Investments, LLC |
| DVDO Design, LLC |
| DVDO Holding Company, LLC |
| Eldredge Investments, LLC |
| Elm City Investments, LLC |
| Elstar Investments, LLC |
| Emerald Lake Investments, LLC |
| Evergreen Way Investments, LLC |
| Fieldpoint Investments, LLC |
| Foothill CL Nominee, LLC |
| Foxridge Investments, LLC |
| Franconia Notch Investments, LLC |
| Fulton Underwood, LLC |
| Gateshead Investments, LLC |
| Glenhaven Heights Investments, LLC |
| Glenn Rich Investments, LLC |
| Golden Gate Investments, LLC |
| Goose Rocks Investments, LLC |
| Goosebrook Investments, LLC |
| Graeme Park Investments, LLC |
| Grand Midway Investments, LLC |
| Gravenstein Investments, LLC |
| Graywater Investments, LLC |
| Great Sand Investments, LLC |
| Green Gables Investments, LLC |
| Grenadier Investments, LLC |
| Grumblethorpe Investments, LLC |
| H1 Silverbaron Holding Company, LLC |

| |
|---|
| H11 Silk City Holding Company, LLC |
| H12 White Birch Holding Company, LLC |
| H13 Bay Village Holding Company, LLC |
| H14 Dixville Notch Holding Company, LLC |
| H15 Bear Brook Holding Company, LLC |
| H16 Monadnock Holding Company, LLC |
| H17 Pemigewasset Holding Company, LLC |
| H19 Emerald Lake Holding Company, LLC |
| H2 Arlington Ridge Holding Company, LLC |
| H20 Bluff Point Holding Company, LLC |
| H21 Summerfree Holding Company, LLC |
| H22 Papirovka Holding Company, LLC |
| H23 Pinova Holding Company, LLC |
| H24 Stayman Holding Company, LLC |
| H25 Elstar Holding Company, LLC |
| H26 Gravenstein Holding Company, LLC |
| H27 Grenadier Holding Company, LLC |
| H28 Black Locust Holding Company, LLC |
| H29 Zestar Holding Company, LLC |
| H3 Evergreen Way Holding Company, LLC |
| H30 Silver Maple Holding Company, LLC |
| H31 Addison Park Holding Company, LLC |
| H32 Arborvitae Holding Company, LLC |
| H34 Pearman Holding Company, LLC |
| H35 Hornbeam Holding Company, LLC |
| H36 Sturmer Pippin Holding Company, LLC |
| H37 Idared Holding Company, LLC |
| H38 Mutsu Holding Company, LLC |
| H39 Haralson Holding Company, LLC |
| H4 Pawtuckaway Holding Company, LLC |
| H40 Bramley Holding Company, LLC |
| H41 Grumblethorpe Holding Company, LLC |
| H42 Hillview Holding Company, LLC |
| H43 Lenni Heights Holding Company, LLC |
| H44 Green Gables Holding Company, LLC |
| H45 Harmony Inn Holding Company, LLC |
| H46 Beech Creek Holding Company, LLC |
| H47 Summit Cut Holding Company, LLC |
| H48 Irondale Inn Holding Company, LLC |
| H49 Bowman Holding Company, LLC |
| H5 Chestnut Ridge Holding Company, LLC |
| H51 Old Carbon Holding Company, LLC |
| H52 Willow Grove Holding Company, LLC |

| | |
|---|---|
| H53 | Black Bass Holding Company, LLC |
| H54 | Seven Stars Holding Company, LLC |
| H55 | Old Maitland Holding Company, LLC |
| H56 | Craven Holding Company, LLC |
| H57 | Cliff Park Holding Company, LLC |
| H58 | Baleroy Holding Company, LLC |
| H59 | Rising Sun Holding Company, LLC |
| H6 | Lilac Meadow Holding Company, LLC |
| H60 | Moravian Holding Company LLC |
| H61 | Grand Midway Holding Company, LLC |
| H62 | Holmesburg Holding Company, LLC |
| H63 | Dixmont State Holding Company, LLC |
| H64 | Pennhurst Holding Company, LLC |
| H65 | Thornbury Farm Holding Company, LLC |
| H66 | Heilbron Manor Holding Company, LLC |
| H67 | Powel House Holding Company, LLC |
| H68 | Graeme Park Holding Company, LLC |
| H69 | Conneaut Lake Holding Company, LLC |
| H7 | Dogwood Valley Holding Company, LLC |
| H70 | Bishop White Holding Company, LLC |
| H71 | Calendonia Circle Holding Company, LLC |
| H72 | Clementina Park Holding Company, LLC |
| H73 | Glenhaven Heights Holding Company, LLC |
| H74 | Imperial Aly Holding Company, LLC |
| H75 | Pacific Heights Holding Company, LLC |
| H76 | Diamond Cove Holding Company, LLC |
| H77 | New Montgomery Holding Company, LLC |
| H78 | Ingleside Path Holding Company, LLC |
| H79 | Atalaya Circle Holding Company, LLC |
| H8 | Melody Lane Holding Company, LLC |
| H80 | Junipero Serra Holding Company, LLC |
| H81 | Golden Gate Holding Company, LLC |
| H82 | Van Ness Holding Company, LLC |
| H83 | Seacliff Run Holding Company, LLC |
| H84 | Holly Park Holding Company, LLC |
| H85 | Birchwood Manor Holding Company, LLC |
| H86 | Bonifacio Hill Holding Company, LLC |
| H87 | Copper Sands Holding Company, LLC |
| H88 | Ashburton Way Holding Company, LLC |
| H89 | Vista Verde Holding Company, LLC |
| H9 | Strawberry Fields Holding Company, LLC |
| H90 | Harbor Point Holding Company, LLC |
| Hackmatack Investments, LLC | |

| |
|---|
| Haffenburg Investments, LLC |
| Haralson Investments, LLC |
| Harbor Point Investments, LLC |
| Harringworth Investments, LLC |
| Hawthorn Investments, LLC |
| Hays Investments, LLC |
| Hazelpoint Investments, LLC |
| Heilbron Manor Investments, LLC |
| Hillview Investments, LLC |
| Holly Park Investments, LLC |
| Hollyline Holdings, LLC |
| Hollyline Owners, LLC |
| Holmesburg Investments, LLC |
| Hornbeam Investments, LLC |
| Idared Investments, LLC |
| Imperial Aly Investments, LLC |
| Ingleside Path Investments, LLC |
| Irondale Inn Investments, LLC |
| Ironsides Investments, LLC |
| Ivy Circle, LLC |
| Junipero Serra Investments, LLC |
| L1 Luxury Holdings, LLC |
| Lenni Heights Investments, LLC |
| Lilac Circle, LLC |
| Lilac Meadow Investments, LLC |
| Lincolnshire Investments, LLC |
| Lockwood Investments, LLC |
| Lonetree Investments, LLC |
| Longbourn Investments, LLC |
| M1 Archstone Holding Company, LLC |
| M10 Gateshead Holding Company, LLC |
| M11 Anchorpoint Holding Company, LLC |
| M12 Bearingside Holding Company, LLC |
| M13 Cablestay Holding Company, LLC |
| M14 Crossbeam Holding Company, LLC |
| M15 Doubleleaf Holding Company, LLC |
| M17 Lincolnshire Holding Company, LLC |
| M18 Twin Pier Holding Company, LLC |
| M19 Arrowpoint Holding Company, LLC |
| M2 Caisson Holding Company, LLC |
| M20 Bowstring Holding Company, LLC |
| M21 Crestmark Holding Company, LLC |
| M22 Drawspan Holding Company, LLC |

| M23 Sightline Holding Company, LLC |
| M24 Fieldpoint Holding Company, LLC |
| M25 Centershot Holding Company, LLC |
| M26 Archivolt Holding Company, LLC |
| M27 Brise Soleil Holding Company, LLC |
| M28 Broadsands Holding Company, LLC |
| M29 Brynderwen Holding Company, LLC |
| M3 Cantilever Holding Company, LLC |
| M30 Calder Grove Holding Company, LLC |
| M31 Cannington Holding Company, LLC |
| M32 Dollis Brook Holding Company, LLC |
| M33 Harringworth Holding Company, LLC |
| M34 Quarterpost Holding Company, LLC |
| M35 Saddlemount Holding Company, LLC |
| M36 Springline Holding Company, LLC |
| M37 Topchord Holding Company, LLC |
| M38 Pemberley Holding Company, LLC |
| M39 Derbyshire Holding Company, LLC |
| M4 Sidespar Holding Company, LLC |
| M40 Longbourn Holding Company, LLC |
| M41 Silverthorne Holding Company, LLC |
| M42 Orchard Mesa Holding Company, LLC |
| M43 White Dome Holding Company, LLC |
| M44 Wildernest Holding Company, LLC |
| M45 Clover Basin Holding Company, LLC |
| M46 Owl Ridge Holding Company, LLC |
| M47 Bellmire Holding Company, LLC |
| M48 Vallecito Holding Company, LLC |
| M49 Squaretop Holding Company, LLC |
| M5 Stepstone Holding Company, LLC |
| M50 Wetterhorn Holding Company, LLC |
| M51 Coffee Creek Holding Company, LLC |
| M52 Lockwood Holding Company, LLC |
| M53 Castle Pines Holding Company, LLC |
| M54 Lonetree Holding Company, LLC |
| M55 Great Sand Holding Company, LLC |
| M56 Haffenburg Holding Company, LLC |
| M57 Ridgecrest Holding Company, LLC |
| M59 Casper Falls Holding Company, LLC |
| M6 Trestlewood Holding Company, LLC |
| M60 Thunder Basin Holding Company, LLC |
| M61 Mineola Holding Company, LLC |

| |
|---|
| M62 Sagebrook Holding Company, LLC |
| M63 Crowfield Holding Company, LLC |
| M64 Hays Holding Company, LLC |
| M65 Phillipsburg Holding Company, LLC |
| M66 Wonderview Holding Company, LLC |
| M67 Mountain Spring Holding Company, LLC |
| M68 Goosebrook Holding Company, LLC |
| M69 Foxridge Holding Company, LLC |
| M7 Breckenridge Holding Company, LLC |
| M70 Pinney Holding Company, LLC |
| M71 Eldredge Holding Company, LLC |
| M72 Daleville Holding Company, LLC |
| M73 Mason Run Holding Company, LLC |
| M74 Varga Holding Company, LLC |
| M75 Riley Creekholding Company, LLC |
| M76 Chaplin Holding Company, LLC |
| M78 Graywater Holding Company, LLC |
| M79 Chestnut Company, LLC |
| M8 Crosskeys Holding Company, LLC |
| M80 Hazelpoint Holding Company, LLC |
| M81 Boilling Spring Holding Company, LLC |
| M82 Winnisquam Holding Company, LLC |
| M83 Mt. Holly Holding Company, LLC |
| M84 Pembroke Academy Holding Company, LLC |
| M85 Glenn Rich Holding Company, LLC |
| M86 Steele Hill Holding Company, LLC |
| M87 Hackmatack Hills Holding Company, LLC |
| M88 Franconia Notch Holding Company, LLC |
| M9 Donnington Holding Company, LLC |
| M90 Merrimack Valley Holding Company, LLC |
| M91 Newville Holding Company, LLC |
| M92 Crystal Woods Holding Company, LLC |
| M93 Goose Rocks Holding Company, LLC |
| M94 Winding Road Holding Company, LLC |
| M95 Pepperwood Holding Company, LLC |
| M97 Red Woods Holding Company, LLC |
| M98 Elm City Holding Company, LLC |
| M99 Ironsides Holding Company, LLC |
| Mandevilla Circle, LLC |
| Mason Run Investments, LLC |
| Melody Lane Investments, LLC |
| Merrimack Valley Investments, LLC |
| Mineola Investments, LLC |

| |
|---|
| Monadnock Investments, LLC |
| Moravian Investments, LLC |
| Mountain Spring Investments, LLC |
| Mt. Holly Investments, LLC |
| Mutsu Investments, LLC |
| New Montgomery Investments, LLC |
| Newville Investments, LLC |
| Old Carbon Investments, LLC |
| Old Maitland Investments, LLC |
| Orchard Mesa Investments, LLC |
| Owl Ridge Investments, LLC |
| Pacific Heights Investments, LLC |
| Papirovka Investments, LLC |
| Pawtuckaway Investments, LLC |
| Pearmain Investments, LLC |
| Pemberley Investments, LLC |
| Pembroke Academy Investments, LLC |
| Pemigewasset Investments, LLC |
| Pepperwood Investments, LLC |
| Phillipsburg Investments, LLC |
| Pinney Investments, LLC |
| Pinova Investments, LLC |
| Poppy Circle, LLC |
| Powel House Investments, LLC |
| Quarterpost Investments, LLC |
| Red Woods Investments, LLC |
| RHS Capital, LLC |
| Ridgecrest Investments, LLC |
| Riley Creek Investments, LLC |
| Rising Sun Investments, LLC |
| SAC Holding Company of Aspen, LLC |
| SAC Management, LLC |
| Saddlemount Investments, LLC |
| Sagebrook Investments, LLC |
| Seacliff Run Holding Company, LLC |
| Seven Stars Investments, LLC |
| Sidespar Investments, LLC |
| Sightline Investments, LLC |
| Silk City Investments, LLC |
| Silver Maple Investments, LLC |
| Silverbaron Investments, LLC |
| Silverleaf Funding, LLC |
| Silverthorne Investments, LLC |

| |
|---|
| Springline Investments, LLC |
| Squaretop Investments, LLC |
| Stayman Investments, LLC |
| Steele Hill Investments, LLC |
| Stepstone Investments, LLC |
| Strawberry Fields Investments, LLC |
| Sturmer Pippin Investments, LLC |
| Summerfree Investments, LLC |
| Summit Cut Investments, LLC |
| Texas Co-Lenders 01, LLC |
| Thornbury Farm Investments, LLC |
| Thunder Basin Investments, LLC |
| Topchord Investments, LLC |
| Trestlewood Investments, LLC |
| Tweedia Square Funding, LLC |
| Twin Pier Investments, LLC |
| U Street Holdings, LLC |
| Vallecito Investments, LLC |
| Van Ness Investments, LLC |
| Varga Investments, LLC |
| Vista Verde Investments, LLC |
| Wetterhorn Investments, LLC |
| WFS Holding Company, LLC |
| White Birch Investments, LLC |
| White Dome Investments, LLC |
| Whiteacre Funding, LLC |
| Wildernest Investments, LLC |
| Willow Grove Investments, LLC |
| Winding Road Investments, LLC |
| Winnisquam Investments, LLC |
| WMF Management, LLC |
| Wonderview Investments, LLC |
| Woodbridge Capital Investments, LLC |
| Woodbridge Commercial Bridge Loan Fund 1, LLC |
| Woodbridge Commercial Bridge Loan Fund 2, LLC |
| Woodbridge Group of Companies, LLC |
| Woodbridge Guarantee Holding, LLC |
| Woodbridge Guarantee, LLC |
| Woodbridge Investments, LLC |
| Woodbridge Lending Fund 1, LLC |
| Woodbridge Luxury Homes, LLC |
| Woodbridge Mezzanine Fund 1, LLC |
| Woodbridge Mortgage Investment Fund 1, LLC |

| |
|---|
| Woodbridge Mortgage Investment Fund 2, LLC |
| Woodbridge Mortgage Investment Fund 3, LLC |
| Woodbridge Mortgage Investment Fund 3A, LLC |
| Woodbridge Mortgage Investment Fund 4, LLC |
| Woodbridge Structured Funding, LLC |
| Zestar Investments, LLC |

# EXHIBIT A

## Organizational Documents of Independent Manager

### [attached]

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## WGC INDEPENDENT MANAGER LLC

This Limited Liability Company Agreement (this "Agreement") of WGC Independent Manager LLC (the "Company") is entered into by RS Protection Trust, as the sole member (the "Member").

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, *et seq.*), as amended from time to time (the "Act"), and hereby agrees as follows:

1.     Name.  The name of the limited liability company formed hereby is WGC Independent Manager LLC.

2.     Filing of Certificates.  Eric Yang, is hereby designated an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware.  Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, his powers as an "authorized person" shall cease, and the Manager (as defined below) shall thereupon become a designated "authorized person" within the meaning of the Act.

3.     Purposes.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act, including serving as the manager of certain affiliates of the Member (the "Managed Affiliates").

4.     Powers.  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have and may exercise all the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Act and all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 3.

5.     Principal Business Office.  The principal business office of the Company shall be located at such location as may hereafter be determined by the Manager.

6.     Registered Office.  The address of the registered office of the Company in the State of Delaware is as stated in the Certificate of Formation, or as hereafter determined by the Manager.

7.     <u>Registered Agent</u>.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is as stated in the Certificate of Formation, or as hereafter determined by the Manager.

8.     <u>Member</u>.  The name and the mailing address of the Member are as follows:

Name                  Address

RS Protection Trust        14225 Ventura Blvd., Suite 100

Sherman Oaks, CA 91423

9.     <u>Limited Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither the Member nor the Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or acting as manager of the Company.

10.     <u>Capital Contributions</u>.  The Member is deemed admitted as a member of the Company upon its execution and delivery of this Agreement.  The Member has contributed the amount in cash set forth on <u>Schedule I</u> hereto, and no other property, to the Company.

11.     <u>Additional Contributions</u>.  The Member is not required to make any additional capital contribution to the Company.  However, the Member may voluntarily make additional capital contributions to the Company at any time with the written consent of the Manager.  To the extent that the Member makes an additional capital contribution to the Company, <u>Schedule I</u> hereto shall be revised accordingly.

12.     <u>Maintenance of Separate Existence</u>.  The Company shall do all things necessary to maintain its limited liability company existence separate and apart from the Member and any affiliate of the Member, including maintaining its books and records on a current basis separate from that of any affiliate of the Company or any other person or entity, and shall not commingle the Company's assets with those of any affiliate of the Company or any other person or entity.  In furtherance, and not in limitation, of the foregoing, the Company shall not:

(a)     fail to (i) maintain or cause to be maintained by an agent under the Company's control physical possession of the records required to be kept under the Act, (ii) account for and manage all of its liabilities separately from those of any other person or entity, including payment by it of administrative expenses and taxes, other than income taxes, from its own assets or (iii) identify or cause to be identified separately all of its assets from those of any other person or entity;

(b)     commingle, or permit the commingling of, its funds with the funds of the Member or any affiliate of the Member or use its funds for uses other than the Company's uses; or

(c)     maintain, or permit the maintenance of, joint bank accounts or other depository accounts to which the Member would have independent access.

2

13.     Allocation of Profits and Losses.  For so long as the Member is the sole member of the Company, the Company's profits and losses shall be allocated solely to the Member.

14.     Distributions.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

15.     Management.

(a)     The business and affairs of the Company shall be managed by or under the direction of one manager (the "Manager"), who shall serve as Manager until removed by the Member, with or without cause and at any time, and any such vacancy caused by any such removal may be filled by the Member.  The initial Manager shall be Beilinson Advisory Group LLC.  The Manager shall have the full, exclusive and complete power to manage and control the business and affairs of the Company and shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by managers of a limited liability company under the laws of the State of Delaware.  The Manager is hereby designated a "manager" of the Company within the meaning of the Act.  Except as otherwise required by law, approval of any action by the Manager in accordance with this Agreement shall constitute approval of such action by the Company.  To the extent of his or her powers set forth in this Agreement the Manager is an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such powers set forth in this Agreement shall bind the Company.  Except as otherwise required by law or as provided in this Agreement, the Member shall not have any power to manage or control the business and affairs of the Company and shall not have the authority to execute and deliver any document on behalf of the Company or to otherwise bind the Company.

(b)     Notwithstanding anything to the contrary herein, from the filing of a voluntary petition for relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by any of the Managed Affiliates until a Termination Event (the "Restricted Period"), the Manager may be removed by the Member for Cause or without Cause, and no removal of the Manager for Cause shall be effective without at least three (3) business days' prior written notice from the Member to the United States Bankruptcy Court, and no removal of the Manger without Cause or resignation of the Manager shall be effective without at least ten (10) business days' prior written notice from the Member to the United States Bankruptcy Court.  "Cause" means (i) acts or omissions by the Manager that constitute systematic and persistent or willful disregard of the Manager's duties, (ii) the Manager has been indicted or convicted for any crime or crimes of moral turpitude or dishonesty, or (iii) any other reason for which the prior written consent of the United States Bankruptcy Court shall have been obtained.  "Termination Event" means (i) the confirmation of a chapter 11 plan involving such Managed Affiliates, (ii) appointment of a chapter 11 trustee or a receiver for such Managed Affiliates, (iii) conversion of the bankruptcy cases of such Managed Affiliates to a case under chapter 7 of the Bankruptcy Code, (iv) dismissal of the bankruptcy cases of such Managed

3

Affiliates, or (v) a settlement or dismissal of all enforcement actions commenced by the United States Securities and Exchange Commission against Robert Shapiro.

16.    Officers.  The officers of the Company (each, an "Officer") shall be chosen by the Manager as it shall deem necessary or advisable, and the Manager shall have the power to appoint and prescribe the duties of any Officer.  Each Officer shall be appointed for such term as shall be determined from time to time by the Manager.  Each Officer shall hold office until a successor shall have been duly chosen and qualified or until such Officer's earlier death, disqualification, resignation or removal.  Any Officer may be removed, with or without cause, at any time by the Manager.  Any Officer may resign at any time by giving written notice of his or her resignation to the Manager.  Any such resignation shall take effect at the time specified therein, or, if the time is not specified, upon receipt thereof by the Manager.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. A vacancy in any office for any reason shall be filled by the Manager for the unexpired portion of the term thereof and until a successor shall have been duly chosen and qualified, or until such Officer's earlier death, disqualification, resignation or removal.  The Officers, to the extent of their powers vested in them by action of the Manager, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

17.    Exculpation and Indemnification.

(a)    No current or former Member, Manager, Officer, employee or agent of the Company and no affiliate, stockholder, officer, director, employee or agent of the Member (collectively, the "Covered Persons") shall be liable to the Company, the Member, any Manager or any other person or entity who is a party to or is otherwise bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, the Covered Person engaged in any act or omission that constituting a bad faith violation of the implied contractual covenant of good faith and fair dealing.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for (and the Company shall maintain insurance for the benefit of the Company and such Covered Persons with respect to) any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's act or omission that constituting a bad faith violation of the implied contractual covenant of good faith and fair dealing; provided, however, that any indemnity under this Section shall be provided out of and to the extent of Company assets only, and the Member shall have no personal liability on account thereof.

(c)    To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit

4

or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section.

(d)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by the person or entity as to matters the Covered Person reasonably believes are within such other person or entity's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     The foregoing provisions of this Section shall survive any termination of this Agreement.

18.     Assignments. The Member may at any time assign in whole or in part its limited liability company interest in the Company. If the Member transfers any of its interest in the Company pursuant to this Section, the transferee shall be admitted to the Company, subject to Section 19, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its interest in the Company pursuant to this Section, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19.     Admission of Additional Members. One or more additional members of the Company may be admitted to the Company with the written consent of the Member and upon such terms (including with respect to participation in the management, profits, losses and distributions of the Company) as may be determined by the Member and the additional persons or entities to be admitted.

20.     Creditors of Members. To the fullest extent permitted by law, no creditor of the Member (including, without limitation, any judgment creditor who obtains a charging order with respect to such member's interest under Section18-703 of the Act) shall, without the prior written consent of the Member, be entitled to share in any profits or losses, receive any distribution or distributions, receive any allocation of income, gain, loss, deduction or credit or similar item or acquire, possess or exercise any right to participate in the management of the business and affairs of the Company to which the Member was, is, or will be entitled under the Act, this Agreement of otherwise. No creditor who obtains any interest in or rights with respect to all or any portion of the interest of a Member shall be admitted as member of the Company, or have or acquire any rights of a member (including, without limitation, any right to participate in the management of the business and affairs of the Company).

21.     Tax Elections. The Manager shall have the power to cause the Company to make all elections required or permitted to be made for income tax purposes. Unless otherwise elected by the Manager, during such time as there is only one member of the Company (1) the Company

shall not be treated as an association or corporation for income tax purposes; (2) the Company shall be disregarded for federal and state income tax purposes; and (3) the income, gain, loss, and deductions of the Company shall be treated as the income, gain, loss, and deduction of the Member as provided in Treas. Reg. § 301.7701-2(c)(2).

22.    Dissolution.

(a)    The Company shall dissolve and its affairs shall be wound up upon the first to occur of: (i) the written consent of the Member, (ii) any time there are no members of the Company, unless the Company is continued in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets or proceeds from the sale of the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

23.    Benefits of Agreement; No Third-Party Rights.  Except for the Manager with respect to Section 15 of this Agreement, the provisions of this Agreement are intended solely to benefit the Member and Covered Persons and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor (other than Covered Persons) of the Company, any Managed Affiliate or the Member (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall have no duty or obligation to any creditor of the Company to make any contributions or payments to the Company.

24.    Severability of Provisions.  Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

25.    Entire Agreement.  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

26.    Governing Law.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

27.    Amendments.  This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, executed and delivered by the Member. Notwithstanding the foregoing, during the Restricted Period, the Member shall not amend, alter, change or repeal Section 15 or 23 of this Agreement (the "Restrictive Provisions"), or any other provision of this or any other provision of this or any other document governing the formation, management or operation of the Company in a manner that is inconsistent with the Restrictive Provisions, unless the Manager consents in writing.  In the event of any conflict between the Restrictive Provisions and any other provision of this or any other document governing the formation, management or operation of the Company, the Restrictive Provisions shall control.

[The remainder of this page is intentionally left blank.]

The undersigned duly authorized representative of the Company has executed this Agreement as of the date first set forth above.

Woodbridge Group of Companies, LLC

By:_____,_____

Name:  Robert Shapiro

Title:  Manager

Accepted and agreed:

Beilinson Advisory Group LLC

By: _____

Name: Marc Beilinson

4

SCHEDULE I

| Name | Capital Contribution |
|------|---------------------|
| RS Protection Trust | $0 |

## EXHIBIT B

**Beilinson Engagement Letter**

**[attached]**

December 1, 2017

Beilinson Advisory Group, LLC
Attention: Marc Beilinson

Dear Mr. Beilinson:

This letter (this "Agreement") will serve as an agreement between Woodbridge Group of Companies, LLC (the "Company") and its affiliates set forth on schedule A (the "Managed Affiliates") and Beilinson Advisory Group LLC (the "Independent Director") relating to the appointment and designation of the Independent Director as described herein.

1.    Background.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Independent Manager Entity's operating agreement dated as of December 1, 2017 (the "Operating Agreement").  The Company represents and warrants to the Independent Director as follows: (a) on December 1, 2017, the managers of the Company and each of the Managed Affiliates was removed by their respective sole members, (b) on December 1, 2017, WGC Independent Manager LLC (the "Independent Manager Entity") was appointed manager of the Company and each of the Managed Affiliates, (c) the Operating Agreement is in full force and effect, without amendment or modification, (d) the Operating Agreement provides that the business and affairs of the Independent Manager shall be managed by the Manager, who shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Independent Manager Entity to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of the Independent Manager Entity's business, (d) on or about December 4, 2017, the Company together with certain of the Managed Affiliates are expected to file for protection under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware  (the "Bankruptcy Court") and (e) the Company desires to appoint the Independent Director as the Manager of the Independent Manager Entity.

2.    Appointment as Independent Managing Member.  The Independent Director was appointed the Manager of the Independent Manager Entity pursuant to the Operating Agreement. The Company and the Independent Director recognize that the services of the Independent Director are to be rendered to the Independent Manager Entity on a non-exclusive basis by Marc Beilinson.  As the Company is or will be under chapter 11 of the United States Code (the "Bankruptcy Code"), the Company shall provide notice to the United States Bankruptcy Court (the "Bankruptcy Court") of the Independent Director's appointment.

3.    Compensation.  As compensation for the services to be provided, the Company shall pay the Independent Director an initial monthly fee equal to $40,000 (the "Fee").  Upon the conclusion of the first six months, the compensation can be adjusted upward or downward in the event the commitment is higher or less than the expectation of the parties upon execution of this agreement.  The Fee shall be payable in advance on the fifteenth day of each month, with the first month's Fee to be paid upon execution of this Agreement by the Company.  The Company agrees to pay the Fee to the Independent Director for an initial twelve-month period regardless of whether the Company uses the services of the Independent Director during the entire period,

1

such that in no event shall the total compensation payable to the Independent Director be less than $480,000 for the one year period ending December 1, 2018 (the "Guaranteed Fee"). In the event of (a) the closing of a transaction that results in (i) a sale of all or substantially all of the assets of the Company and the Managed Affiliates, (ii) a sale of more than a majority of the Company's equity, (iii) a merger or consolidation of the Company or (iv) similar transaction, or (b) the confirmation of a Chapter 11 plan, any unpaid portion of the Guaranteed Fee shall be due and payable simultaneously with the closing of such transaction or entry of an order confirming such plan. In addition to the compensation described in this Section, the Independent Director shall be entitled to be reimbursed for its reasonable out of pocket expenses incurred in connection with the performance of its duties hereunder. The fees, costs, and indemnification claims of the Independent Director shall be administrative expenses under section 503(b) of the Bankruptcy Code. In addition to the above fees, the Company and the Independent Director agree that the Independent Director may, in the future, request a success fee upon the confirmation of a plan of reorganization or upon the occurrence of a significant milestone to be later defined and determined in the Bankruptcy Cases and approved and agreed to by the Company and the Independent Director, subject to approval by the Bankruptcy Court.

4.      Term.  The initial term of this Agreement shall be for a one-year period from the execution and delivery hereof and shall extend automatically for successive one-month periods thereafter (the "Term"); provided, however, (a) that this Agreement shall be terminable at will at any time and for any reason or no reason by the Independent Director immediately upon written notice thereof to the Company and (b) that this Agreement may be terminated by the Company during the initial Term only for cause and during successive terms with or without cause, in all cases subject to the obligations of the parties hereto that survive termination hereof. Each of the provisions in Sections 3, 5, 6, 7, 8 and 9 shall survive the termination hereof; provided, however, that if the Independent Director terminates this Agreement pursuant to Section 4(a) hereof, then the Independent Director shall not be entitled to receive any additional Fee payments or the remainder of any unpaid portion of the Guaranteed Fee.

5.      D&O Insurance. The Company agrees to use its commercially reasonable efforts to obtain a "claims made" directors' and officers' insurance policy for the Independent Manager Entity in form, substance and amount reasonably acceptable to the Independent Director (the "D&O Policy") within fifteen (15) days of this Agreement. The Company understands and agrees that the Company obtaining the D&O Policy is a material inducement to the Independent Director entering into this Agreement.

6.      Indemnification. The Company hereby acknowledges and agrees that the Independent Director shall receive the benefit of Section 18 (Exculpation and Indemnification) of the Operating Agreement as the Manager. In addition to and not in limitation of any rights of indemnification under applicable law and the Operating Agreement, the Company agrees to indemnify and hold harmless the Independent Director from any and all loss, claim, damage or cause of action, including reasonable attorneys' fees related thereto ("Claims") incurred by the Independent Director in the performance of the Independent Director's duties and obligations under this Agreement or otherwise in respect of the Independent Director serving as the Manager; provided, however, that the Independent Director shall not be so indemnified for Claims if they arise from the Independent Director's bad faith, gross negligence or willful misconduct. The benefits of this Section shall survive the termination of this Agreement.

2

Claims if they arise from the Independent Director's bad faith, gross negligence or willful misconduct. The benefits of this Section shall survive the termination of this Agreement.

7.    <u>Representations</u>. The Company hereby represents and warrants to the Independent Director (a) that the Company has duly authorized the execution and delivery of this Agreement, and (b) that the Agreement has been duly executed by the Company and constitutes the legal, valid and binding obligation of the Company enforceable in accordance with its terms.

8.    <u>Governing Law; Disputes</u>. This Agreement shall be governed by the internal laws of the State of Delaware. Any legal action, claim, action, suit, arbitration, hearing, inquiry, proceeding (administrative or otherwise) or investigation by or before any governmental authority (an "<u>Action</u>") arising out of or relating to this Agreement shall be heard and determined exclusively in the Bankruptcy Court, if jurisdiction is available, and otherwise in any state or federal court in the State of Delaware. In any Action brought to enforce any provision of this Agreement, or where any provision hereof or thereof is validly asserted as a defense, the successful party shall be entitled to recover reasonable attorneys' fees, including for any appeals, in addition to any other available remedy.

9.    <u>Miscellaneous</u>. This Agreement and the Indemnification Agreement constitute the entire agreement between the parties with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision hereof can be waived, only by a written instrument making specific reference to this Agreement or the Indemnification Agreement and duly executed by the parties thereto. This Agreement supersedes all prior agreements and understandings between the parties with respect to the matters set forth herein. Neither party shall assign its rights or obligations hereunder without the prior written consent of the other party and any attempt to do so shall be of no force or effect. This Agreement shall be binding upon and inure to the benefit of each party hereto and their respective permitted successors and assigns. If any provision of this Agreement or in any document referred to herein shall be determined to be illegal, void or unenforceable, all other provisions of this Agreement or in any other document referred to herein shall not be affected and shall remain in full force and effect. This Agreement may be executed in any number of counterparts, including by facsimile, PDF scan or other electronic transmission, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

If you are in agreement, please indicate as such by executing a counterpart signature page hereto.

[signature page follows]

3

The undersigned duly authorized representative of the Company has executed this Agreement as of the date first set forth above.

Woodbridge Group of Companies, LLC

By:_____
Name:  Robert Shapiro
Title:  Manager

Accepted and agreed:

Beilinson Advisory Group LLC

By:_____
Name: Marc Beilinson

**<u>Exhibit G</u>**

**Removal Consent**

**ACTION BY WRITTEN CONSENT
OF THE
MANAGER OF
WOODBRIDGE GROUP OF COMPANIES, LLC
AND CERTAIN AFFILIATES**

**December 1, 2017**

The undersigned, being the Manager of each of the limited liability companies whose names are set forth on Schedule 1 attached hereto (each, a "**Company**" and collectively, the "**Companies**"), in each case in accordance with each Company's LLC Agreement (as hereinafter defined) and with the applicable limited liability company laws of the jurisdiction of formation of each Company, hereby consents to and approves the adoption of the following resolutions and each and every action effected thereby or pursuant thereto by written consent as if such actions had been taken at a meeting of the Manager of each such Company.

**REMOVAL OF OFFICER**

**WHEREAS**, pursuant to the limited liability company agreement, operating agreement, or other governing agreement (each an "**LLC Agreement**"), as applicable, of each Company, the Manager of such Company may remove any officer of such Company; and

**WHEREAS**, the Manager of each of the Companies has determined it to be in the best interests of each such Company, its creditors, members and other stakeholders to remove Robert Shapiro from any officer position that he may hold at such Company.

**NOW, THEREFORE, BE IT RESOLVED**, that Robert Shapiro be, and hereby is, removed from any officer position of such Company that he may hold at such Company.

**GENERAL AUTHORITY**

**RESOLVED**, that any specific resolutions that may be required to have been adopted by the Manager of any of the Companies in connection with the actions and transactions contemplated by the foregoing resolutions be, and they hereby are, adopted, and any officer of Manager be, and each of them acting alone hereby is, authorized to certify as to the adoption of any and all such resolutions;

**RESOLVED FURTHER**, that all actions heretofore or hereafter taken by any officer or manager of the Companies in connection with or otherwise in contemplation of the matters contemplated by any of the foregoing resolutions be, and they hereby are, approved, ratified and affirmed in all respects; and

**RESOLVED FURTHER**, that the officers of the Companies and Manager be, and each of them hereby is, authorized, empowered and directed, in the name and on behalf of each of the Companies or the Manager, as applicable, to take or cause to be taken all actions (including, without limitation, the engagement of any third-party and the payment of all fees and expenses) and to execute and deliver all such agreements, instruments, certificates, filings  and other documents which any such officer approves as necessary or desirable in connection with the

1

foregoing resolutions, such approval to be conclusively evidenced by the taking of any such action or the execution and delivery of any such agreement, instrument, certificate or other document by any such officer of the Companies or Manager.

**[Remainder of Page Left Intentionally Blank]**

IN WITNESS WHEREOF, the undersigned has executed this Action by Written Consent to be effective as of the date first written above.

**WGC INDEPENDENT MANAGER LLC**

By: _____
    Name:  Lawrence Perkins
    Title:   Chief Restructuring Officer

## SCHEDULE 1

**The Companies**

| Company |
| --- |
| 1336, LLC |
| 14068 Davana Holding Company, LLC |
| 14068 Davana Terrace, LLC |
| 15672 Castlewoods Drive, LLC |
| 15672 Castlewoods Owners, LLC |
| 15714 Castlewoods Drive, LLC |
| 15714 Castlewoods Owners, LLC |
| 215 North 12th Street, LLC |
| A Plus Holdings, LLC |
| Addison Park Investments, LLC |
| Alpine Rose, LLC |
| Anchorpoint Investments, LLC |
| Arborvitae Investments, LLC |
| Archivolt Investments, LLC |
| Archstone Investments, LLC |
| Arlington Ridge Investments, LLC |
| Arrowpoint Investments, LLC |
| Ashburton Way Investments, LLC |
| Atalaya Circle Investments, LLC |
| Baleroy Investments, LLC |
| Basswood Holding, LLC |
| Bay Village Investments, LLC |
| Bear Brook Investments, LLC |
| Bearingside Investments, LLC |
| Beech Creek Investments, LLC |
| Bellmire Investments, LLC |
| Birchwood Manor Investments, LLC |
| Bishop White Investments, LLC |
| Black Bass Investments, LLC |
| Black Locust Investments, LLC |
| Bluff Point Investments, LLC |
| Boiling Spring Investments, LLC |
| Bonifacio Hill Investments, LLC |
| Bowman Investments, LLC |
| Bowstring Investments, LLC |
| Bramley Investments, LLC |
| Breckenridge Investments, LLC |
| Breckenridge, LLC |

| |
|---|
| Brise Soleil Investments, LLC |
| Broadsands Investments, LLC |
| Brynderwen Investments, LLC |
| Cablestay Investments, LLC |
| Caisson Investments, LLC |
| Calder Grove Investments, LLC |
| Calendonia Circle Investments, LLC |
| California Commerical Lenders, LLC |
| Cannington Investments, LLC |
| Cantilever Investments, LLC |
| Carbondale Doocy, LLC |
| Carbondale Glen Lot A-5, LLC |
| Carbondale Glen Lot D-22, LLC |
| Carbondale Glen Lot E-15, LLC |
| Carbondale Glen Lot E-24, LLC |
| Carbondale Glen Lot E-38, LLC |
| Carbondale Glen Lot E-8, LLC |
| Carbondale Glen Lot GV-13, LLC |
| Carbondale Glen Lot GV-6, LLC |
| Carbondale Glen Lot IS-11, LLC |
| Carbondale Glen Lot SD-14, LLC |
| Carbondale Glen Lot SD-23, LLC |
| Carbondale Glen Mesa Lot 19, LLC |
| Carbondale Glen River Mesa, LLC |
| Carbondale Glen Sundance Ponds, LLC |
| Carbondale Glen Sweetgrass Vista, LLC |
| Carbondale Spruce 101, LLC |
| Carbondale Sundance Lot 15, LLC |
| Carbondale Sundance Lot 16, LLC |
| Casper Falls Investments, LLC |
| Castle Pines Investments, LLC |
| Centershot Investments, LLC |
| Chaplin Investments, LLC |
| Chestnut Investments, LLC |
| Chestnut Ridge Investments, LLC |
| Clementina Park Investments, LLC |
| Cliff Park Investments, LLC |
| Clover Basin Investments, LLC |
| Coffee Creek Investments, LLC |
| Conneaut Lake Investments, LLC |
| Copper Sands Investments, LLC |
| Craven Investments, LLC |
| Crestmark Investments, LLC |

| |
|---|
| Crossbeam Investments, LLC |
| Crosskeys Investments, LLC |
| Crowfield Investments, LLC |
| Crystal Valley Holdings, LLC |
| Crystal Woods Investments, LLC |
| Cuco Settlement, LLC |
| Daleville Investments, LLC |
| Derbyshire Investments, LLC |
| Diamond Cove Investments, LLC |
| Dixmont State Investments, LLC |
| Dixville Notch Investments, LLC |
| Dogwood Valley Investments, LLC |
| Dollis Brook Investments, LLC |
| Donnington Investments, LLC |
| Doubleleaf Investments, LLC |
| Drawspan Investments, LLC |
| DVDO Design, LLC |
| DVDO Holding Company, LLC |
| Eldredge Investments, LLC |
| Elm City Investments, LLC |
| Elstar Investments, LLC |
| Emerald Lake Investments, LLC |
| Evergreen Way Investments, LLC |
| Fieldpoint Investments, LLC |
| Foothill CL Nominee, LLC |
| Foxridge Investments, LLC |
| Franconia Notch Investments, LLC |
| Fulton Underwood, LLC |
| Gateshead Investments, LLC |
| Glenhaven Heights Investments, LLC |
| Glenn Rich Investments, LLC |
| Golden Gate Investments, LLC |
| Goose Rocks Investments, LLC |
| Goosebrook Investments, LLC |
| Graeme Park Investments, LLC |
| Grand Midway Investments, LLC |
| Gravenstein Investments, LLC |
| Graywater Investments, LLC |
| Great Sand Investments, LLC |
| Green Gables Investments, LLC |
| Grenadier Investments, LLC |
| Grumblethorpe Investments, LLC |
| H1 Silverbaron Holding Company, LLC |

| |
|---|
| H11 Silk City Holding Company, LLC |
| H12 White Birch Holding Company, LLC |
| H13 Bay Village Holding Company, LLC |
| H14 Dixville Notch Holding Company, LLC |
| H15 Bear Brook Holding Company, LLC |
| H16 Monadnock Holding Company, LLC |
| H17 Pemigewasset Holding Company, LLC |
| H19 Emerald Lake Holding Company, LLC |
| H2 Arlington Ridge Holding Company, LLC |
| H20 Bluff Point Holding Company, LLC |
| H21 Summerfree Holding Company, LLC |
| H22 Papirovka Holding Company, LLC |
| H23 Pinova Holding Company, LLC |
| H24 Stayman Holding Company, LLC |
| H25 Elstar Holding Company, LLC |
| H26 Gravenstein Holding Company, LLC |
| H27 Grenadier Holding Company, LLC |
| H28 Black Locust Holding Company, LLC |
| H29 Zestar Holding Company, LLC |
| H3 Evergreen Way Holding Company, LLC |
| H30 Silver Maple Holding Company, LLC |
| H31 Addison Park Holding Company, LLC |
| H32 Arborvitae Holding Company, LLC |
| H34 Pearman Holding Company, LLC |
| H35 Hornbeam Holding Company, LLC |
| H36 Sturmer Pippin Holding Company, LLC |
| H37 Idared Holding Company, LLC |
| H38 Mutsu Holding Company, LLC |
| H39 Haralson Holding Company, LLC |
| H4 Pawtuckaway Holding Company, LLC |
| H40 Bramley Holding Company, LLC |
| H41 Grumblethorpe Holding Company, LLC |
| H42 Hillview Holding Company, LLC |
| H43 Lenni Heights Holding Company, LLC |
| H44 Green Gables Holding Company, LLC |
| H45 Harmony Inn Holding Company, LLC |
| H46 Beech Creek Holding Company, LLC |
| H47 Summit Cut Holding Company, LLC |
| H48 Irondale Inn Holding Company, LLC |
| H49 Bowman Holding Company, LLC |
| H5 Chestnut Ridge Holding Company, LLC |
| H51 Old Carbon Holding Company, LLC |
| H52 Willow Grove Holding Company, LLC |

| |
|---|
| H53 Black Bass Holding Company, LLC |
| H54 Seven Stars Holding Company, LLC |
| H55 Old Maitland Holding Company, LLC |
| H56 Craven Holding Company, LLC |
| H57 Cliff Park Holding Company, LLC |
| H58 Baleroy Holding Company, LLC |
| H59 Rising Sun Holding Company, LLC |
| H6 Lilac Meadow Holding Company, LLC |
| H60 Moravian Holding Company LLC |
| H61 Grand Midway Holding Company, LLC |
| H62 Holmesburg Holding Company, LLC |
| H63 Dixmont State Holding Company, LLC |
| H64 Pennhurst Holding Company, LLC |
| H65 Thornbury Farm Holding Company, LLC |
| H66 Heilbron Manor Holding Company, LLC |
| H67 Powel House Holding Company, LLC |
| H68 Graeme Park Holding Company, LLC |
| H69 Conneaut Lake Holding Company, LLC |
| H7 Dogwood Valley Holding Company, LLC |
| H70 Bishop White Holding Company, LLC |
| H71 Calendonia Circle Holding Company, LLC |
| H72 Clementina Park Holding Company, LLC |
| H73 Glenhaven Heights Holding Company, LLC |
| H74 Imperial Aly Holding Company, LLC |
| H75 Pacific Heights Holding Company, LLC |
| H76 Diamond Cove Holding Company, LLC |
| H77 New Montgomery Holding Company, LLC |
| H78 Ingleside Path Holding Company, LLC |
| H79 Atalaya Circle Holding Company, LLC |
| H8 Melody Lane Holding Company, LLC |
| H80 Junipero Serra Holding Company, LLC |
| H81 Golden Gate Holding Company, LLC |
| H82 Van Ness Holding Company, LLC |
| H83 Seacliff Run Holding Company, LLC |
| H84 Holly Park Holding Company, LLC |
| H85 Birchwood Manor Holding Company, LLC |
| H86 Bonifacio Hill Holding Company, LLC |
| H87 Copper Sands Holding Company, LLC |
| H88 Ashburton Way Holding Company, LLC |
| H89 Vista Verde Holding Company, LLC |
| H9 Strawberry Fields Holding Company, LLC |
| H90 Harbor Point Holding Company, LLC |
| Hackmatack Investments, LLC |

| |
|---|
| Haffenburg Investments, LLC |
| Haralson Investments, LLC |
| Harbor Point Investments, LLC |
| Harringworth Investments, LLC |
| Hawthorn Investments, LLC |
| Hays Investments, LLC |
| Hazelpoint Investments, LLC |
| Heilbron Manor Investments, LLC |
| Hillview Investments, LLC |
| Holly Park Investments, LLC |
| Hollyline Holdings, LLC |
| Hollyline Owners, LLC |
| Holmesburg Investments, LLC |
| Hornbeam Investments, LLC |
| Idared Investments, LLC |
| Imperial Aly Investments, LLC |
| Ingleside Path Investments, LLC |
| Irondale Inn Investments, LLC |
| Ironsides Investments, LLC |
| Ivy Circle, LLC |
| Junipero Serra Investments, LLC |
| L1 Luxury Holdings, LLC |
| Lenni Heights Investments, LLC |
| Lilac Circle, LLC |
| Lilac Meadow Investments, LLC |
| Lincolnshire Investments, LLC |
| Lockwood Investments, LLC |
| Lonetree Investments, LLC |
| Longbourn Investments, LLC |
| M1 Archstone Holding Company, LLC |
| M10 Gateshead Holding Company, LLC |
| M11 Anchorpoint Holding Company, LLC |
| M12 Bearingside Holding Company, LLC |
| M13 Cablestay Holding Company, LLC |
| M14 Crossbeam Holding Company, LLC |
| M15 Doubleleaf Holding Company, LLC |
| M17 Lincolnshire Holding Company, LLC |
| M18 Twin Pier Holding Company, LLC |
| M19 Arrowpoint Holding Company, LLC |
| M2 Caisson Holding Company, LLC |
| M20 Bowstring Holding Company, LLC |
| M21 Crestmark Holding Company, LLC |
| M22 Drawspan Holding Company, LLC |

| |
|---|
| M23 Sightline Holding Company, LLC |
| M24 Fieldpoint Holding Company, LLC |
| M25 Centershot Holding Company, LLC |
| M26 Archivolt Holding Company, LLC |
| M27 Brise Soleil Holding Company, LLC |
| M28 Broadsands Holding Company, LLC |
| M29 Brynderwen Holding Company, LLC |
| M3 Cantilever Holding Company, LLC |
| M30 Calder Grove Holding Company, LLC |
| M31 Cannington Holding Company, LLC |
| M32 Dollis Brook Holding Company, LLC |
| M33 Harringworth Holding Company, LLC |
| M34 Quarterpost Holding Company, LLC |
| M35 Saddlemount Holding Company, LLC |
| M36 Springline Holding Company, LLC |
| M37 Topchord Holding Company, LLC |
| M38 Pemberley Holding Company, LLC |
| M39 Derbyshire Holding Company, LLC |
| M4 Sidespar Holding Company, LLC |
| M40 Longbourn Holding Company, LLC |
| M41 Silverthorne Holding Company, LLC |
| M42 Orchard Mesa Holding Company, LLC |
| M43 White Dome Holding Company, LLC |
| M44 Wildernest Holding Company, LLC |
| M45 Clover Basin Holding Company, LLC |
| M46 Owl Ridge Holding Company, LLC |
| M47 Bellmire Holding Company, LLC |
| M48 Vallecito Holding Company, LLC |
| M49 Squaretop Holding Company, LLC |
| M5 Stepstone Holding Company, LLC |
| M50 Wetterhorn Holding Company, LLC |
| M51 Coffee Creek Holding Company, LLC |
| M52 Lockwood Holding Company, LLC |
| M53 Castle Pines Holding Company, LLC |
| M54 Lonetree Holding Company, LLC |
| M55 Great Sand Holding Company, LLC |
| M56 Haffenburg Holding Company, LLC |
| M57 Ridgecrest Holding Company, LLC |
| M59 Casper Falls Holding Company, LLC |
| M6 Trestlewood Holding Company, LLC |
| M60 Thunder Basin Holding Company, LLC |
| M61 Mineola Holding Company, LLC |

| |
|---|
| M62 Sagebrook Holding Company, LLC |
| M63 Crowfield Holding Company, LLC |
| M64 Hays Holding Company, LLC |
| M65 Phillipsburg Holding Company, LLC |
| M66 Wonderview Holding Company, LLC |
| M67 Mountain Spring Holding Company, LLC |
| M68 Goosebrook Holding Company, LLC |
| M69 Foxridge Holding Company, LLC |
| M7 Breckenridge Holding Company, LLC |
| M70 Pinney Holding Company, LLC |
| M71 Eldredge Holding Company, LLC |
| M72 Daleville Holding Company, LLC |
| M73 Mason Run Holding Company, LLC |
| M74 Varga Holding Company, LLC |
| M75 Riley Creekholding Company, LLC |
| M76 Chaplin Holding Company, LLC |
| M78 Graywater Holding Company, LLC |
| M79 Chestnut Company, LLC |
| M8 Crosskeys Holding Company, LLC |
| M80 Hazelpoint Holding Company, LLC |
| M81 Boilling Spring Holding Company, LLC |
| M82 Winnisquam Holding Company, LLC |
| M83 Mt. Holly Holding Company, LLC |
| M84 Pembroke Academy Holding Company, LLC |
| M85 Glenn Rich Holding Company, LLC |
| M86 Steele Hill Holding Company, LLC |
| M87 Hackmatack Hills Holding Company, LLC |
| M88 Franconia Notch Holding Company, LLC |
| M9 Donnington Holding Company, LLC |
| M90 Merrimack Valley Holding Company, LLC |
| M91 Newville Holding Company, LLC |
| M92 Crystal Woods Holding Company, LLC |
| M93 Goose Rocks Holding Company, LLC |
| M94 Winding Road Holding Company, LLC |
| M95 Pepperwood Holding Company, LLC |
| M97 Red Woods Holding Company, LLC |
| M98 Elm City Holding Company, LLC |
| M99 Ironsides Holding Company, LLC |
| Mandevilla Circle, LLC |
| Mason Run Investments, LLC |
| Melody Lane Investments, LLC |
| Merrimack Valley Investments, LLC |
| Mineola Investments, LLC |

| |
|---|
| Monadnock Investments, LLC |
| Moravian Investments, LLC |
| Mountain Spring Investments, LLC |
| Mt. Holly Investments, LLC |
| Mutsu Investments, LLC |
| New Montgomery Investments, LLC |
| Newville Investments, LLC |
| Old Carbon Investments, LLC |
| Old Maitland Investments, LLC |
| Orchard Mesa Investments, LLC |
| Owl Ridge Investments, LLC |
| Pacific Heights Investments, LLC |
| Papirovka Investments, LLC |
| Pawtuckaway Investments, LLC |
| Pearmain Investments, LLC |
| Pemberley Investments, LLC |
| Pembroke Academy Investments, LLC |
| Pemigewasset Investments, LLC |
| Pepperwood Investments, LLC |
| Phillipsburg Investments, LLC |
| Pinney Investments, LLC |
| Pinova Investments, LLC |
| Poppy Circle, LLC |
| Powel House Investments, LLC |
| Quarterpost Investments, LLC |
| Red Woods Investments, LLC |
| RHS Capital, LLC |
| Ridgecrest Investments, LLC |
| Riley Creek Investments, LLC |
| Rising Sun Investments, LLC |
| SAC Holding Company of Aspen, LLC |
| SAC Management, LLC |
| Saddlemount Investments, LLC |
| Sagebrook Investments, LLC |
| Seacliff Run Holding Company, LLC |
| Seven Stars Investments, LLC |
| Sidespar Investments, LLC |
| Sightline Investments, LLC |
| Silk City Investments, LLC |
| Silver Maple Investments, LLC |
| Silverbaron Investments, LLC |
| Silverleaf Funding, LLC |
| Silverthorne Investments, LLC |

| |
|---|
| Springline Investments, LLC |
| Squaretop Investments, LLC |
| Stayman Investments, LLC |
| Steele Hill Investments, LLC |
| Stepstone Investments, LLC |
| Strawberry Fields Investments, LLC |
| Sturmer Pippin Investments, LLC |
| Summerfree Investments, LLC |
| Summit Cut Investments, LLC |
| Texas Co-Lenders 01, LLC |
| Thornbury Farm Investments, LLC |
| Thunder Basin Investments, LLC |
| Topchord Investments, LLC |
| Trestlewood Investments, LLC |
| Tweedia Square Funding, LLC |
| Twin Pier Investments, LLC |
| U Street Holdings, LLC |
| Vallecito Investments, LLC |
| Van Ness Investments, LLC |
| Varga Investments, LLC |
| Vista Verde Investments, LLC |
| Wetterhorn Investments, LLC |
| WFS Holding Company, LLC |
| White Birch Investments, LLC |
| White Dome Investments, LLC |
| Whiteacre Funding, LLC |
| Wildernest Investments, LLC |
| Willow Grove Investments, LLC |
| Winding Road Investments, LLC |
| Winnisquam Investments, LLC |
| WMF Management, LLC |
| Wonderview Investments, LLC |
| Woodbridge Capital Investments, LLC |
| Woodbridge Commercial Bridge Loan Fund 1, LLC |
| Woodbridge Commercial Bridge Loan Fund 2, LLC |
| Woodbridge Group of Companies, LLC |
| Woodbridge Guarantee Holding, LLC |
| Woodbridge Guarantee, LLC |
| Woodbridge Investments, LLC |
| Woodbridge Lending Fund 1, LLC |
| Woodbridge Luxury Homes, LLC |
| Woodbridge Mezzanine Fund 1, LLC |
| Woodbridge Mortgage Investment Fund 1, LLC |

| |
|---|
| Woodbridge Mortgage Investment Fund 2, LLC |
| Woodbridge Mortgage Investment Fund 3, LLC |
| Woodbridge Mortgage Investment Fund 3A, LLC |
| Woodbridge Mortgage Investment Fund 4, LLC |
| Woodbridge Structured Funding, LLC |
| Zestar Investments, LLC |

**<u>Exhibit H</u>**

**Contribution Agreement**

# MEMBERSHIP INTEREST CONTRIBUTION AGREEMENT

This MEMBERSHIP INTEREST CONTRIBUTION AGREEMENT, dated as of December 1, 2017 (this "Agreement"), is by and among RS Protection Trust, a trust organized under Nevada law (the "Trust"), Woodbridge Group of Companies, LLC, a Delaware limited liability company ("Woodbridge"), and Carbondale Doocy, LLC, a Delaware limited liability company ("Carbondale").

## RECITALS

A.      The Trust owns 100% of the membership interests (the "Membership Interests") of each of the limited liability companies listed in the column under the "Contributed Company" heading on Schedule A hereto (the "Contributed Companies").

B.      The Trust owns 100% of the membership interests in Carbondale, which in turn owns 100% of the membership interests in Woodbridge.

C.      Each of the Trust and Carbondale wish to contribute the Membership Interests of each Contributed Company as a capital contribution to Carbondale and Woodbridge, respectively, and each of Carbondale and Woodbridge wishes to accept the Membership Interests of such Contributed Company as a capital contribution from the Trust and Carbondale, respectively.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I
## CONTRIBUTION

Section 1.1     Contribution of the Membership Interests.  Upon the terms and subject to the conditions of this Agreement, the Trust (a) hereby contributes, conveys, assigns, transfers and delivers all right, title and interest in, to and under the Membership Interests of each Contributed Company, free and clear of all Encumbrances (as defined below), to Carbondale; and (b) to the extent required, consents to admission of Carbondale as a member of each Contributed Company and withdraws as a member of each Contributed Company (the "Carbondale Contribution").  Immediately following the Carbondale Contribution, Carbondale (a) hereby contributes, conveys, assigns, transfers and delivers all right, title and interest in, to and under the Membership Interests of each Contributed Company, free and clear of all Encumbrances, to Woodbridge; and (b) to the extent required, consents to admission of the Woodbridge as a member of each Contributed Company and withdraws as a member of each Contributed Company.  Woodbridge hereby accepts the Membership Interests of each Contributed Company and assumes all past, present and future obligations, duties and liabilities of the Trust under, and joins as the sole member, the operating agreement of each Contributed Company.

Section 1.2    <u>Further Assurances</u>. The Trust hereby covenants that, from time to time, the Trust will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered such further acts, conveyances, transfers, assignments, powers of attorney and assurances necessary to convey, transfer to and vest in Woodbridge, and to put the Woodbridge in possession of, all of the Membership Interests of each Contributed Company, free and clear of all Encumbrances.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE TRUST

The Trust hereby represents and warrants to Woodbridge as follows as of the date hereof:

Section 2.1    <u>Organization and Qualification</u>. To the knowledge of the Trustee, the Trust has heretofore furnished Woodbridge a complete and correct copy of the organizational documents, each as amended to date, of each Contributed Company and its subsidiaries. To the knowledge of the Trustee, such organizational documents are in full force and effect, and no Contributed Company nor any of its subsidiaries is in violation of any of the provisions of such organizational documents.

Section 2.2    <u>Authority</u>. This Agreement has been duly executed and delivered by the trustee of the Trust (the "<u>Trustee</u>") on behalf of the Trust.

Section 2.3    <u>Membership Interests</u>. The Trust is the owner of the Membership Interests of each Contributed Company, free and clear of any charge, limitation, condition, mortgage, lien, security interest, adverse claim, encumbrance or restriction of any kind (collectively, "<u>Encumbrances</u>"). The Trust has the right, authority and power to sell, convey, assign, transfer and deliver the Membership Interests of each Contributed Company to Woodbridge. As of the date hereof, Woodbridge shall acquire good, valid and marketable title to the Membership Interests of each Contributed Company, free and clear of any Encumbrance.

Section 2.4    <u>Capitalization</u>. Each Contributed Company owns 100% of the membership interests of any direct subsidiary of such Contributed Company listed on Schedule B hereto (the "<u>Subsidiary Interests</u>"). Except for such subsidiaries listed on Schedule B hereto, such Contributed Company does not own any equity, partnership, membership or similar interest in, or any interest convertible into, exercisable for the purchase of or exchangeable for any such equity, partnership, membership or similar interest in, any person. Except for the Membership Interests of each Contributed Company and such Subsidiary Interests, or as provided in the operating agreement, limited liability company agreement, or other governing agreement, as applicable, of each such Contributed Company or its subsidiaries, neither such Contributed Company nor its subsidiaries has issued or agreed to issue any (a) equity, ownership or voting interests; (b) securities or instruments convertible into or exchangeable for equity, ownership or voting interests; or (c) equity equivalents, earnings, profits or revenue-based or equity-based rights. There are no outstanding obligations of any Contributed Company or its subsidiary to issue, sell, transfer, repurchase or redeem any equity, ownership or voting interests of such Contributed Company or such subsidiary, or any securities or instruments convertible into or exchangeable for or that otherwise give rights with respect to equity, ownership or voting interests of such Contributed Company or such subsidiary, or that relate to the holding, voting or

2

disposition thereof, other than as disclosed in the documentation provided by the Trustee to Woodbridge.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF WOODBRIDGE

Woodbridge hereby represents and warrants to the Trust as follows as of the date hereof:

Section 3.1   Organization and Qualification.   Woodbridge is duly organized and validly existing under the laws of the state of Delaware.

Section 3.2   Authority.   This Agreement has been duly executed and delivered by Woodbridge.

## ARTICLE IV
## OTHER AGREEMENTS

Section 4.1   Sale Proceeds. Woodbridge hereby agrees that, unless prohibited by a court order, Woodbridge shall distribute to the Trust an amount equal to fifty percent (50%) of the net proceeds of such sale, up to a maximum amount of $500,000 of the net proceeds from each such sale, within ten (10) business days of receipt of such proceeds. The agreement in this Section is intended to be an advance on distributions to which the Trust is entitled pursuant to the organizational documents of Woodbridge, and nothing herein shall alter or affect the right of the Trust or any other person to receive distributions pursuant to the organizational documents of Woodbridge or any Contributed Company.

Section 4.2   Survival of Representations and Warranties; Indemnification.  The representations and warranties of the Trust and Woodbridge contained in this Agreement shall be continuing and survive the consummation of the transactions contemplated hereby. Each party shall save, defend, indemnify and hold harmless the other party and its successors and assigns from and against any and all losses, damages, liabilities, deficiencies, claims, diminution of value, interest, awards, judgments, penalties, costs and expenses (including attorneys' fees, costs and other out-of-pocket expenses incurred in investigating, preparing or defending the foregoing), asserted against, incurred, sustained or suffered by any of the foregoing as a result of, arising out of or relating to (a) any breach of any representation or warranty made such party contained in this Agreement or any other document delivered pursuant hereto or in connection with the transactions contemplated hereby; and (b) any breach of any covenant or agreement by such party contained in this Agreement. Payment of amounts due under this indemnity shall be made promptly upon demand by the indemnified party as and when incurred by wire transfer of immediately available funds to an account designated in writing by the indemnified party to the indemnifying party.

Section 4.3   Fees and Expenses.  All fees and expenses incurred in connection with or related to this Agreement and the transactions contemplated hereby shall be paid by the party incurring such fees or expenses.

Section 4.4   Amendment and Modification.  To the extent the terms of this Agreement are inconsistent with the terms of the operating agreements of the Contributed Companies this

Agreement shall control and the operating agreements of the Contributed Companies are hereby so amended. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party.

Section 4.5 <u>Waiver</u>. No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof. Any such waiver by a party shall be valid only if set forth in writing by such party.

Section 4.6 <u>Governing Law</u>. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflict of laws principles of the State of Delaware.

Section 4.7 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements and understandings and all prior and contemporaneous oral agreements, arrangements and understandings between the parties with respect to the subject matter of this Agreement.

Section 4.8 <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement shall confer upon any person other than the parties and their respective successors and permitted assigns any right of any nature.

Section 4.9 <u>Assignment; Successors</u>. This Agreement may not be assigned by any party without the prior written consent of the other parties hereto. Subject to the preceding sentence, this Agreement will be binding upon the parties and their respective successors and permitted assigns.

Section 4.10 <u>Severability</u>. If any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 4.11 <u>Counterparts</u>. This Agreement may be executed in counterparts (including facsimile and electronic transmission counterparts), all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**TRUST:**

**RS PROTECTION TRUST**

By: _____
     Name:  Robert Shapiro
     Title:  Trustee

**WOODBRIDGE:**

**WOODBRIDGE GROUP OF COMPANIES, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
     Name:  Lawrence Perkins
     Title:  Chief Restructuring Officer

**CARBONDALE:**

**CARBONDALE DOOCY, LLC**

By:  WGC Independent Manager LLC
Its:  Manager

By: _____
     Name:  Lawrence Perkins
     Title:  Chief Restructuring Officer

SIGNATURE PAGE TO MEMBERSHIP INTEREST CONTRIBUTION AGREEMENT

## SCHEDULE A

| Contributed Company |
| --- |
| WMF Management, LLC |
| H31 Addison Park Holding Company, LLC |
| H20 Bluff Point Holding Company, LLC |
| H47 Summit Cut Holding Company, LLC |
| H6 Lilac Meadow Holding Company, LLC |
| H76 Diamond Cove Holding Company, LLC |
| H66 Heilbron Manor Holding Company, LLC |
| H65 Thornbury Farm Holding Company, LLC |
| M62 Sagebrook Holding Company, LLC |
| H74 Imperial Aly Holding Company, LLC |
| H26 Gravenstein Holding Company, LLC |
| H30 Silver Maple Holding Company, LLC |
| M68 Goosebrook Holding Company, LLC |
| H25 Elstar Holding Company, LLC |
| H35 Hornbeam Holding Company, LLC |
| H11 Silk City Holding Company, LLC |
| Hollyline Holdings, LLC |
| M63 Crowfield Holding Company, LLC |
| M25 Centershot Holding Company, LLC |
| H68 Graeme Park Holding Company, LLC |
| M73 Mason Run Holding Company, LLC |
| M70 Pinney Holding Company, LLC |
| M22 Drawspan Holding Company, LLC |
| M15 Doubleleaf Holding Company, LLC |
| H12 White Birch Holding Company, LLC |
| M17 Lincolnshire Holding Company, LLC |
| H2 Arlington Ridge Holding Company, LLC |
| H13 Bay Village Holding Company, LLC |

## SCHEDULE B

| Contributed Company | Subsidiaries |
|---|---|
| WMF Management, LLC | Woodbridge Mortgage Investment Fund 1, LLC<br>Woodbridge Mortgage Investment Fund 2, LLC<br>Woodbridge Mortgage Investment Fund 3, LLC<br>Woodbridge Mortgage Investment Fund 3A, LLC<br>Woodbridge Mortgage Investment Fund 4, LLC<br>Woodbridge Commercial Bridge Loan Fund 1, LLC<br>Woodbridge Commercial Bridge Loan Fund 2, LLC |
| H31 Addison Park Holding Company, LLC | Addison Park Investments, LLC |
| H20 Bluff Point Holding Company, LLC | Bluff Point Investments, LLC |
| H47 Summit Cut Holding Company, LLC | Summit Cut Investments, LLC |
| H6 Lilac Meadow Holding Company, LLC | Lilac Meadow Investments, LLC |
| H76 Diamond Cove Holding Company, LLC | Diamond Cove Investments, LLC |
| H66 Heilbron Manor Holding Company, LLC | Heilbron Manor Investments, LLC |
| M65 Thornbury Farm Holding Company, LLC | Thornbury Farm Investments, LLC |
| M62 Sagebrook Holding Company, LLC | Sagebrook Investments, LLC |
| H74 Imperial Aly Holding Company, LLC | Imperial Aly Investments, LLC |
| H26 Gravenstein Holding Company, LLC | Gravenstein Investments, LLC |
| H30 Silver Maple Holding Company, LLC | Silver Maple Investments, LLC |
| M68 Goosebrook Holding Company, LLC | Goosebrook Investments, LLC |
| H25 Elstar Holding Company, LLC | Elstar Investments, LLC |
| H35 Hornbeam Holding Company, LLC | Hornbeam Investments, LLC |
| H11 Silk City Holding Company, LLC | Silk City Investments, LLC |
| Hollyline Holdings, LLC | Hollyline Owners, LLC |
| M63 Crowfield Holding Company, LLC | Crowfield Investments, LLC |
| M25 Centershot Holding Company, LLC | Centershot Investments, LLC |
| H68 Graeme Park Holding Company, LLC | Graeme Park Investments, LLC |
| M73 Mason Run Holding Company, LLC | Mason Run Investments, LLC |
| M70 Pinney Holding Company, LLC | Pinney Investments, LLC |
| M22 Drawspan Holding Company, LLC | Drawspan Investments, LLC |
| M15 Doubleleaf Holding Company, LLC | Double Leaf Investments LLC |
| H12 White Birch Holding Company, LLC | White Birch Investments, LLC |
| M17 Lincolnshire Holding Company, LLC | Lincolnshire Investments, LLC |
| H2 Arlington Ridge Holding Company, LLC | Arlington Ridge Investments, LLC |
| H13 Bay Village Holding Company, LLC | Bay Village Investments, LLC |

## EXHIBIT I

**Cash Flow Projections**

# Woodbridge Companies

**Consolidated Weekly Cash Forecast**
*($ in thousands)*

| | 1 F W.E. 12/8 | 2 F W.E. 12/15 | 3 F W.E. 12/22 | 4 F W.E. 12/29 | 5 F W.E. 1/5 | 6 F W.E. 1/12 | 7 F W.E. 1/19 | 8 F W.E. 1/26 | 9 F W.E. 2/2 | 10 F W.E. 2/9 | 11 F W.E. 2/16 | 12 F W.E. 2/23 | 13 F W.E. 3/2 | 13 Week F W.E. 2/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING CASH - Beginning Book Balance** | 12,500 | 30,717 | 28,728 | 25,512 | 25,000 | 25,000 | 73,978 | 86,259 | 79,331 | 111,497 | 108,333 | 105,939 | 100,753 | 12,500 |
| | | | | | | | | | | | | | | |
| Total Net Property Sales - Non Collateral | - | 2,351 | - | - | 8,265 | 2,272 | 15,635 | - | 41,335 | - | 933 | - | | 70,793 |
| Total Net Property Sales - Collateral | - | - | - | - | - | - | - | - | 5,985 | - | 26,790 | - | 13,300 | 46,075 |
| Total Net Fundraising | | | | | | | | | | | | | | |
| **Total Inflows** | - | 2,351 | - | - | 8,265 | 2,272 | 15,635 | - | 47,320 | - | 27,723 | - | 13,300 | 116,868 |
| **Disbursements** | | | | | | | | | | | | | | |
| Total Funds Redemptions | - | - | - | - | | | | | | | | | | - |
| Total Property Purchases | - | - | | | | | | | | | | | | - |
| Total Soft Costs - Design | 145 | 145 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 77 | 77 | 1,190 |
| Total General Contractor Costs | 2,969 | 2,969 | 2,039 | 2,039 | 2,039 | 2,039 | 2,039 | 2,039 | 2,039 | 2,039 | 2,039 | 1,934 | 1,934 | 28,154 |
| Total Plus Development Costs | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 845 |
| Total Maintenance Costs | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 299 |
| Total Marketing Costs | 25 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 230 | 230 | 2,940 |
| Total Property Management Costs | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 33 |
| Total HOA Dues | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 65 |
| Total Appraisals | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 52 |
| Total Property Taxes | 1,500 | - | - | - | - | - | - | - | - | - | - | - | | 1,500 |
| Total Property Mortgages | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| Total Funds Interest Payments | - | - | - | - | 5,926 | - | - | - | 5,926 | - | - | - | 5,926 | 17,777 |
| Total Operating Overhead | 434 | 597 | 461 | 434 | 509 | 522 | 509 | 1,766 | 429 | 354 | 517 | 381 | 429 | 7,342 |
| Contingency | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,600 |
| Total Operating Disbursements | 5,373 | 4,256 | 3,127 | 3,100 | 9,101 | 3,188 | 3,175 | 4,432 | 9,021 | 3,020 | 3,183 | 2,921 | 8,895 | 62,796 |
| **Net Cash Flow from Operations** | (5,373) | (1,905) | (3,127) | (3,100) | (836) | (916) | 12,460 | (4,432) | 38,299 | (3,020) | 24,540 | (2,921) | 4,405 | 54,072 |
| **Legal and Professional Fees** | | | | | | | | | | | | | | |
| Total Legal and Professional Fees | - | 25 | 30 | - | - | - | 25 | 2,341 | - | - | 25 | 2,171 | - | 4,617 |
| **Net Cash Flow Before Line of Credit** | (5,373) | (1,930) | (3,157) | (3,100) | (836) | (916) | 12,435 | (6,773) | 38,299 | (3,020) | 24,515 | (5,092) | 4,405 | 49,455 |
| | | | | | | | | | | | | | | |
| Payments to / (Advances from Loan) | (25,000) | - | - | (2,649) | (900) | (50,000) | - | - | 5,985 | - | 26,790 | - | 13,300 | (32,475) |
| Loan Interest and Fees | 1,410 | 59 | 59 | 61 | 64 | 106 | 154 | 154 | 149 | 143 | 119 | 93 | 81 | 2,653 |
| **Net Cash Flow from All Activities** | 18,217 | (1,989) | (3,216) | (512) | - | 48,978 | 12,281 | (6,928) | 32,166 | (3,163) | (2,394) | (5,186) | (8,976) | 79,276 |
| | | | | | | | | | | | | | | |
| **OPERATING CASH - Ending Book Balance** | 30,717 | 28,728 | 25,512 | 25,000 | 25,000 | 73,978 | 86,259 | 79,331 | 111,497 | 108,333 | 105,939 | 100,753 | 91,777 | 91,777 |
| | | | | | | | | | | | | | | |
| Ending DIP Balance | 25,000 | 25,000 | 25,000 | 27,649 | 28,550 | 78,550 | 78,550 | 78,550 | 72,565 | 72,565 | 45,775 | 45,775 | 32,475 | 32,475 |
| | | | | | | | | | | | | | | |
| Loan Calculations | | | | | | | | | | | | | | |
| Beginning Collateral Base | - | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 193,700 | 193,700 | 165,500 | 165,500 | - |
| New Contributed Properties | 200,000 | | | | | | | | | | | | | 200,000 |
| Property Sales | - | - | - | - | - | - | - | - | (6,300) | - | (28,200) | - | (14,000) | (6,300) |
| Ending Collateral Base | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 193,700 | 193,700 | 165,500 | 165,500 | 151,500 | 193,700 |
| Advance Rate (50%) | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% |
| Max Availability | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 96,850 | 96,850 | 82,750 | 82,750 | 75,750 | 96,850 |
| | | | | | | | | | | | | | | |
| Beginning Loan Balance | - | 25,000 | 25,000 | 25,000 | 27,649 | 28,550 | 78,550 | 78,550 | 72,565 | 72,565 | 45,775 | 45,775 | - | - |
| Payments to Loan from Sale of Collateral Properties | - | - | - | - | - | - | - | - | (5,985) | - | (26,790) | - | (13,300) | (5,985) |
| Advances / (Payments) from (to) Loan | 25,000 | - | - | 2,649 | 900 | 50,000 | - | - | - | - | - | - | - | 78,550 |
| Ending Loan Balance | 25,000 | 25,000 | 25,000 | 27,649 | 28,550 | 78,550 | 78,550 | 78,550 | 72,565 | 72,565 | 45,775 | 45,775 | 32,475 | 72,565 |
| | | | | | | | | | | | | | | |
| Availability | 75,000 | 75,000 | 75,000 | 72,351 | 71,450 | 21,450 | 21,450 | 21,450 | 24,285 | 24,285 | 36,975 | 36,975 | 43,275 | |